Nicole Lavallee (SBN 165755)
Daniel E. Barenbaum (SBN 209261)
Jeffrey V. Rocha (SBN 304852)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com
jrocha@bermantabacco.com

*Counsel for Lead Plaintiff Alameda County Employees' Retirement Association and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

***Caption Consistent With Order Appointing Lead Plaintiff dated April 22, 2020, ECF No. 49:***

ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION and OKLAHOMA FIREFIGHTERS RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

PORTOLA PHARMACEUTICALS, INC.; SCOTT GARLAND; MARDI C. DIER; SHELDON KOENIG; HOLLINGS C. RENTON; JEFFREY W. BIRD; LAURA BREGE; DENNIS FENTON; JOHN H. JOHNSON; DAVID C. STUMP; H. WARD WOLFF; GOLDMAN SACHS & CO. LLC; CITIGROUP GLOBAL MARKETS INC.; COWEN AND COMPANY, LLC; WILLIAM BLAIR & COMPANY, L.L.C.; and OPPENHEIMER & CO. INC.,

Defendants.

No. 3:20-cv-00367-VC

**CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS**

CLASS ACTION

JURY TRIAL DEMANDED

| | |
|---|---|
| ***Original Caption:***<br><br>PAUL HAYDEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PORTOLA PHARMACEUTICALS INC., SCOTT GARLAND, and MARDI C. DIER,<br><br>Defendants. | |
| JOHN R. MCCUTCHEON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PORTOLA PHARMACEUTICALS INC., SCOTT GARLAND, SHELDON KOENIG, and MARDI C. DIER,<br><br>Defendants. | No. 3:20-cv-00949-VC<br><br><u>CLASS ACTION</u> |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PORTOLA PHARMACEUTICALS, INC., SCOTT GARLAND, MARDI C. DIER, SHELDON KOENIG, HOLLINGS C. RENTON, JEFFREY W. BIRD, LAURA BREGE, DENNIS FENTON, JOHN H. JOHNSON, DAVID C. STUMP, and H. WARD WOLFF,<br><br>Defendants. | No. 3:20-cv-01501-VC<br><br><u>CLASS ACTION</u> |

## TABLE OF CONTENTS


I. SUMMARY OF THE ACTION ....... 2

II. JURISDICTION AND VENUE ....... 11

III. INTRADISTRICT ASSIGNMENT ....... 12

IV. THE PARTIES ....... 12

- A. Lead Plaintiff ....... 12
- B. Additional Named Plaintiff ....... 12
- C. Defendants ....... 13
  - 1. The Company ....... 13
  - 2. Officer Defendants ....... 13
  - 3. Director Defendants ....... 15
  - 4. Underwriter Defendants ....... 16

V. BACKGROUND AND SUBSTANTIVE ALLEGATIONS ....... 18

- A. Company's Background ....... 18
- B. Burn Rate from Extensive Research, Development, and Commercialization Expenses ....... 18
- C. Background of Bevyxxa ....... 21
- D. Background of Andexxa ....... 23
- E. Detailed Confidential Witness Accounts ....... 29
- F. Defendants' Representations to the Market and Market's Reaction ....... 49
  - 1. Portola Announces the Broad Commercial Launch of Andexxa ....... 49
  - 2. Fourth Quarter 2018 Financial Results ....... 51
  - 3. First Quarter 2019 Financial Results ....... 54
  - 4. Goldman Sachs Global Healthcare Conference ....... 58
  - 5. Second Quarter Financial Results ....... 58
  - 6. August 2019 Public Offering ....... 61
  - 7. Morgan Stanley Global Healthcare Conference ....... 62
  - 8. Third Quarter Financial Results ....... 63

G. The Truth is Revealed ....................67

1. Portola Reveals Andexxa Demand is Flat, Utilization is Decreasing and the Company Under-Reserved for Product Returns, and Sold Excessive Product to Its Specialty Distributors ....................67

2. Portola is Forced to Discontinue Bevyxxa Operations to Support Floundering Andexxa Commercialization ....................72

3. Portola Admits that the Marketing of Andexxa and Resistance to Utilization by Hospital Formulary Committee Was Adversely Impacted by Competition with Off-Label Use of 4F-PCCs ....................73

VI. EXCHANGE ACT VIOLATIONS ....................74

A. Defendants' Material Misrepresentations ....................74

1. Defendants Issued False and Misleading Statements Falsely Portraying the Commercial Launch of Andexxa as a Success ....................75

a. Defendants Made False and Misleading Statements Concerning Andexxa Demand ....................75

b. Defendants Made False And Misleading Statements Concerning Andexxa Utilization ....................86

c. Defendants Made False and Misleading Statements Concerning New Hospital Adds and Reorder Rate ....................98

2. Defendants Issued False and Misleading Statements Concerning Andexxa's Accounting Practices for Net Product Revenue ....................111

B. Additional Allegations of Scienter ....................114

1. The Nature and Significance of the Problems with Andexxa, Which is the Company's Core Business, Further Support Scienter ....................115

2. The Defendants Consummated the August 2019 Offering to Exploit the Artificial Inflation in the Company's Common Stock ....................116

3. The Defendants Were Motivated to Inflate Andexxa Sales to Access the $62.5 Million Second Tranche of the Secured Term Loan ....................116

C. Loss Causation ....................118

D. Presumption of Reliance ....................120

E. Exchange Act Counts ....................122

1. Count One - Violations of Section 10(b) and Rule 10b-5 ....................122

2. Count Two - Violations of Section 20(a) of the Exchange Act (Against the Officer Defendants) ....................124

VII. SECURITIES ACT VIOLATIONS ....125

A. Summary of Offering ....125

B. The Materially Untrue and Misleading Statements in the Offering Materials ....127

1. Untrue and Misleading Statements Concerning New Hospital Additions and Reorder Rates ....127

2. Untrue and Misleading Statements Concerning Andexxa Product Revenues and Reserves for Returns ....135

C. The Securities Act Counts ....139

1. Count One - Violations of Section 11 of the Securities Act (Against all Defendants, Except Koenig) ....139

2. Count Two - Violations of Section 12(a)(2) of the Securities Act (Against Portola and the Underwriter Defendants) ....141

3. Count Three - Violations of Section 15 of the Securities Act (Against the Officer and Director Defendants) ....143

VIII. CLASS ALLEGATIONS ....145

IX. NO SAFE HARBOR ....148

X. PRAYER FOR RELIEF ....148

XI. DEMAND FOR TRIAL BY JURY ....149

Court-appointed Lead Plaintiff the Alameda County Employees' Retirement Association ("Lead Plaintiff") brings claims individually and on behalf of investors who purchased or otherwise acquired common stock of Portola Pharmaceuticals, Inc. ("Portola" or the "Company"), including shares sold in the August 2019 Offering (defined below), between January 8, 2019 and February 26, 2020, inclusive (the "Class Period"), and were damaged as a result (the "Class").

Lead Plaintiff asserts claims under two federal statutes against Defendants. First, Lead Plaintiff brings claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b5"). Second, Lead Plaintiff brings claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o (the "Securities Act"). The Securities Act claims allege strict liability and/or negligence and do not sound in fraud.

Lead Plaintiff alleges the following based upon personal knowledge as to the allegations specifically pertaining to Lead Plaintiff and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon an investigation of Lead Counsel, which included a review and analysis of (a) U.S. Securities and Exchange Commission ("SEC") filings by Portola; (b) press releases and other public statements; (c) securities analyst reports and media reports about the Company; and (d) interviews with former Portola employees who were employed by Portola before and/or during the Class Period, as well as customers/potential customers of Portola. Moreover, Lead Plaintiff believes that further substantial evidentiary support exists for these allegations, which will be revealed after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. Portola is the classic case of a company misleading the investing public regarding the actual market value of its main product—it was counting money it hoped to make before it actually made it. Few would argue that Portola's Andexxa drug sounded—in a vacuum—good on paper: a drug with the potential to fill a void, save lives, and make money. Certainly, Portola screamed it from the rooftops. But context is king, and little context can be gleaned from within that vacuum. Portola went through money like it was water developing two coagulant drugs. One, Bevyxxa, failed before this story began, leaving all of Portola's eggs in its Andexxa basket. Unfortunately, Andexxa did not translate from that vacuum into a product in demand in the real world.

2. While a company is entitled to obtain financial benefit from a drug it put significant resources into developing, obtaining such benefit requires that there be commensurate demand for the product. The federal securities laws prohibit the company from lying to the investing public—the people who fund the company's efforts—regarding the value of the drug and the market's reception of it.

3. From a 30,000-foot view, Andexxa looked like a drug that had promise—one without an FDA-approved competitor to combat significant bleeds caused by either of two anti-coagulant drugs: Eliquis and Xarelto. From 30,000 feet, it looked almost like a fairytale. And, as it turns out, the story that Portola told about the marketing and sales of Andexxa was just that—a fairytale.

4. Closer to the ground and out of that vacuum, Andexxa's survival was more fraught. First, while no FDA-approved competitor existed for Eliquis- and Xarelto-related serious bleeds, at least one—Kcentra—did exist and was prescribed off-label regularly by doctors for years. Second, Kcentra cost just a fraction of what Andexxa cost. As one hospital

Confidential Witness (or "CW") (defined below) articulated, hospitals have treated life-threatening Xarelto- and Eliquis-related bleeding events without the need for Andexxa for the last six to seven years. According to a sales Confidential Witness, even a professor of pharmacology paid by Portola to speak at a conference spoke very favorably about Andexxa *from a clinical perspective*, but told the room full of hospital pharmacists that, *from his practical perspective*, he would never use Andexxa due to its cost and that he was going to use Kcentra instead.

5. Unfortunately for Portola, the disproportionately lower cost of Kcentra when compared to Andexxa was ***not attributed to how cheap*** Kcentra was, but rather ***how expensive Andexxa was***. As described by former employees of Portola as well as actual and potential customers (*i.e.*, hospital pharmacies), Andexxa's arrival in the marketplace was met with a tempered reaction. At costs between approximately $25,000 and $50,000 per dose depending on the severity of the bleed, Portola's Andexxa salesforce was met with what one former salesperson CW described as "shock." Another salesperson CW said that "[i]t was a struggle for me from day one to sell Andexxa" and "the hospital pharmacists were terrified of [Andexxa], and not from a clinical point; strictly from a cost point." Yet another salesperson CW said, "Many of us came onboard thinking that this was such an attractive product and a potential blockbuster. As soon as the customers saw the price, they said that they have lived without it for five or six years and that they could live without it longer." And a CW from a large hospital said that most of the hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments.

6. As CWs describe it, hospitals acted warily toward Andexxa and the Portola salesforce. Many refused to purchase it. Others purchased it in limited quantities—*e.g.*, one,

two, six doses—while at the same time restricting use to only the most dire life-threatening bleeds, such as cranial bleeds. No CWs described it being used on less severe bleeds, whether gastrointestinal or cosmetic-surgery related or other. A CW from a large hospital system that purchased Andexxa said that the system used it less than six (6) times in total.

7. What is remarkable about the story that the CWs weave together about hospital reaction to Andexxa is how uniformly their accounts fit the same narrative: (a) limited demand; and (2) limited utilization where purchased—either usage depth (amount) or breadth (types of bleeds).

8. Portola and its management ***cannot say*** that they did not know about this narrative—about sales demand and utilization; about cost-as barrier to sales and revenue. Salesperson CWs report that they used customer relationship management (CRM) software and Excel spreadsheets to track meetings, sales, and utilization; they recorded what sort of limitations hospitals were imposing on use of the drug and how restrictive they were. Salesperson CWs also report that management knew that cost was the primary cause of hospitals not purchasing Andexxa. The issue was often or always in some way the topic of conversation in sales meetings. There were both company-wide meetings and regional meetings. After noting that the notion of cost being a barrier to Andexxa sales was a discussion topic in some way at every sales meeting, a salesperson CW stated that with Portola being such a small company where everyone was connected, it would be impossible for the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") to assert that they were unaware that sales of Andexxa were "nonexistent because of its egregious pricing."

9. Ultimately, Portola threatened some salespeople's jobs—two CWs report that they were told that they had to sell Andexxa to a particular hospital each or they would be

terminated. One of those salespeople had been in the top quarter in terms of results the prior quarter.

10. Unfortunately, despite this clear customer reaction to the drug, Defendants provided a decidedly different narrative to investors and analysts, thereby artificially inflating the value of its stock.

a. ***They touted demand***. At the beginning of the Class Period in January 2019 and carrying through for a good part of the year, Portola and its executives were saying that demand was strong and growing and that "the current trajectory should continue at a linear rate." They repeated this mantra over and over again. And at a Morgan Stanley Health Conference in September 2019, Portola CEO Scott Garland said that it "feel[s] like there's a lot of momentum, wind in our sales for Portola…."

b. ***They touted utilization***—depth and breadth. With regard to depth, even in August 2019, Mr. Garland said that "[t]here's nothing that we're seeing today that makes us concerned about a lack of pull-through or a plateauing of our utilization." And with regard to breadth, in November 2019, one executive said on an analyst conference call that "Andexxa is being used in all ranges of bleeds."[1]

c. ***They touted Andexxa's ascension.*** Indeed, on August 7, 2019, Garland stated that based on information, "Andexxa is becoming the standard of care for patients on apixaban or rivaroxaban."

[1] All emphasis is added, unless otherwise noted.

11. To support these claims, the Company pointed to the reorder rate and hospital adds. Yet the Company never explained what made up those non-GAAP measures and opted not to generally share detailed numbers when pressed. Ultimately, in or around November 2019, Portola disclaimed using that metric going forward.

12. Defendants were motivated to mislead the investing public because of the Company's cash needs. Throughout all of this, one thing that was top of mind for Portola was cash—the Company was burning through a lot and seeking more. Portola's launch of Andexxa in Spring and Summer 2018 just like the launch of its coagulant drug in the spotlight—Bevyxxa—failed. As one salesperson CW who had worked on the sale of Bevyxxa explained, the Bevyxxa rollout was a "disaster." On August 13, 2018, after what a Credit Suisse report referred to as a "stunningly slow … launch" of Bevyxxa, *Bloomberg* reported that a Morgan Stanley analyst had stated that he was "worried about mgt.'s ability to fund the company" in light of disappointing second quarter sales. Commenting on the Company's burn rate of $326 million in the previous year, 2018, Mr. Garland stated on a January 8, 2019 call to analysts, "Cash is our fuel on this journey. We take it very seriously. It's what it's going to take to get us from this side to the other side of the river or the pond, and we're being very judicious with how we spend our money."

13. In line with that, on February 28, 2019, the Company entered into a credit agreement for a term loan of $125.0 million to be advanced in two equal tranches of $62.5 million each—the first, immediately. However, the second tranche was to be made available near year's end—on November 15, 2019—***and only if*** conditions were met (a) regarding certain regulatory approvals as well as (b) that consolidated net sales for the three fiscal quarter periods

ending September 30, 2019 were at least $50.0 million. Defendants needed that cash infusion and used clever accounting to get there.

14. Further, and riding the wave of Defendants' hype over 2019 about demand and utilization of Andexxa, in August 2019, eight months into the Class Period, Portola closed a secondary public offering (the "Offering," defined *infra*) of 8,035,715 shares of common stock at a price of $28.00 per share (with an option for additional shares granted to the underwriters), for gross proceeds of approximately $250 million for the Company.

15. As the inevitable day approached that the truth about Andexxa's troubles would be discovered, Portola moved away from talking about reorder rates and miraculous growth and demand, and into pushing out new scientific data in an attempt to demonstrate the value of the drug. As one article published by *Seeking Alpha* on January 30, 2020 claimed after Andexxa's problems came to light: "Portola has published numerous pieces of research during 2019 supporting management's claim that Andexxa is a best-in-class solution for treatment of Factor Xa related bleeds. ... As I will describe below however, ***doubts have been cast about these results that are quite troubling and could prevent Andexxa from making it onto hospital formulary lists***."[2] Both salesperson and hospital CWs relay that this later data pushed out by Portola was met with skepticism—that from their perspectives it did not change minds.

16. Defendants' public statements regarding the Company's achievements and trajectory were untrue and misleading when made. And indeed, at the end of the Class Period, Defendants' misrepresentations finally caught up with them. Much of the truth was revealed on

---

[2] Edmund Ingham, *Portola: Doubtful Trials And Falling Sales Make Andexxa An Unlikely Blockbuster*, Seeking Alpha (Jan. 30, 2020), https://seekingalpha.com/article/4320305-portola-doubtful-trials-and-falling-sales-make-andexxa-unlikely-blockbuster.

January 9, 2020, when the Company announced its fourth quarter (or "Q4") 2019 results and issued a press release stating that total net U.S. Andexxa revenues were projected to be $24 million, down from $33 million the prior quarter—a decline of 27%. Further information was provided in a follow-up analyst presentation on a January 14, 2020 put on by Portola in response to market and analyst reaction to the January 9 announcement.

17. On one or both of those two dates, the Company announced that three factors had impacted sales: (1) a "$5 million gross to net adjustment due to a return reserve for short-dated product"; (2) "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts"; and (3) "lower distributor purchases to manage inventory" in order "to keep their inventory levels at a constant level in the fourth quarter." This $5 million adjustment to reserve was significant as the gross-to-net adjustment effectively reduced $29 million in revenues to $24 million (a reduction of 17%).

18. These results, along with comments made concurrently, seemingly recognize what the CWs had known all along: that demand and utilization were weak, caused in part by decisions of hospital pharmacies to curtail purchasing and utilization and in part by the fact that distributors had retained or otherwise possessed excessive inventory.

19. The Company's failure to adequately reserve for product returns and its shipment of Andexxa inventory to Portola's distributors in excess of demand during the third quarter helped the Company exceed a $50 million milestone which was critical to accessing $62.5 million in seriously-needed capital on November 15, 2019.

20. Significantly, the Company effectively admitted that it was not properly calculating its reserves each quarter in providing its quarterly Net Revenue figures. Throughout the Class Period, it represented that its accounting policy provided that it would net out the

appropriate amount reserves to provide a Net Revenues figure. However, with this January 2020 disclosure about its Q4 2019 results, the Company admitted that it had not properly netted out reserves throughout 2019. Specifically, when asked by an analyst whether the "$5 million reserve is for product that is short-dated, but has not yet been returned," CFO Mardi Dier responded that the reserve addresses both

> what's been returned, ***it's a little bit of catch-up for the year***, and then you need to make an estimate of what you think may be returned based on what you've seen so far. That's just accounting for return reserves. So we come up with a calculation. We feel good about the $5 million, taking the $5 million now. ***And then moving forward, we'll have our classic return reserve adjustment as part of our gross-to-net calculations***.

21. On the January 9, 2020 news and conference call, the Company's share price plummeted by $9.98, or approximately 40%, to close at $14.76 per share on January 10, 2020. Analysts lowered expectations for the Company.

22. Portola used a prior-used investor-presentation template for the January 14, 2020 follow-up presentation on its Q4 2019 results. Glaringly absent from that updated deck—the slide that had been there all year claiming that "Andexxa Demand is Strong and Growing." Indeed, the following slide was presented to investors on November 5, 2019 (only two months earlier):




23. Then on February 26, 2020, after the market closed, the Company revealed that the future of Andexxa was even more dire when it announced that the Company would have to restructure its operations to focus on Andexxa by shutting down the last vestiges of Bevyxxa and taking a $27.5 million charge for Bevyxxa manufacturing and inventory that was still sitting on the books. This charge came 17 months after the Company had admitted that it was effectively discontinuing its commercialization of Bevyxxa. Portola further described a bleaker future for Andexxa, when it revealed that it expected to add 350 new hospitals in 2020 (down from 425 hospital additions in 2019).

24. As news about the true status of the Andexxa was revealed, the stock price fell, closing at $10.17 per share (a decline of $2.35 per share or 19%) on February 27, 2020. The following chart reflects the price of Portola's stock from December 3, 2018 to May 18, 2020:[3]

[3] On May 5, 2020, an announcement was made that Alexion Pharmaceuticals, Inc., a global biopharmaceutical company, would acquire Portola for $18 per share in a cash deal worth




## II. JURISDICTION AND VENUE

25. Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v. This Court has jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly since Portola's principal place of business is located in South San Francisco, California.

27. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act and Section 22 of the Securities Act because many of the false and misleading statements were made in or issued from this district. Many of Defendants' acts and practices that give rise to this complaint substantially occurred in this district.

---

approximately $1.4 billion. On that news, the stock jumped from a prior close of $7.76 to $17.85, and it has stayed consistently at or around that level.

28. In connection with the acts, conduct, and other wrongs Lead Plaintiff alleges, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and national securities markets.

## III. INTRADISTRICT ASSIGNMENT

29. Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Francisco Division of this district is proper because a substantial part of the events or omissions, which give rise to the claims asserted herein, occurred in San Mateo County, and Portola's principal place of business is located, in San Mateo County, California.

## IV. THE PARTIES

### A. Lead Plaintiff

30. On April 22, 2020, Alameda County Employees' Retirement Association ("ACERA") was appointed Lead Plaintiff. ECF No. 49. ACERA is a public pension fund that was established in 1948 and includes over 23,000 current and former public employees working in Alameda County, California who collectively invest their deferred wages to receive a secure income after retirement. As of December 31, 2018, ACERA managed approximately $7.6 billion on behalf these public servants. As set forth in its Certification attached as **Exhibit 1**, ACERA purchased Portola common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Additional Named Plaintiff

31. The Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") is a public pension system established for the benefit of firefighters in the state of Oklahoma. Created in 1980, Oklahoma Firefighters holds more than $2.8 billion in net assets for the benefit of more than 25,000 members and beneficiaries as of June 30, 2019. As set

forth in its certification attached as **Exhibit 2**, Oklahoma Firefighters purchased Portola common stock during the Class Period, including shares issued pursuant to the August 2019 Offering, and was damaged as a result. Specifically, but not exclusively, Oklahoma Firefighters purchased 7,889 shares of Portola common stock on August 14, 2019 directly in the Offering at the Offering price of $28.00 per share.

### C. Defendants

#### 1. The Company

32. Defendant Portola Pharmaceuticals, Inc. is incorporated under the laws of Delaware with its principal executive offices located in South San Francisco, California. The Company is the issuer of the common stock sold in the Offering. Portola's common stock trades on the NASDAQ exchange under the symbol "PTLA." As of February 20, 2020, the number of shares outstanding of Portola's common stock was 78,080,365.

#### 2. Officer Defendants

33. Defendant Scott Garland ("Garland") is, and at all relevant times was, the CEO and President of the Company, as well as a Director of Portola. Throughout the Class Period, he issued false and misleading statements for which he is liable under the Exchange Act. In addition, Garland signed and certified the Company's Annual Report on Form 10-K ("Form 10-K") for the year ended December 31, 2018, filed with the SEC on March 1, 2019 (the "FY 2018 Form 10-K"), Quarterly Report on Form 10-Q ("Form 10-Q") for the period ended March 31, 2019, filed with the SEC on May 8, 2019 (the "Q1 2019 Form 10-Q"), Form 10-Q for the period ended June 30, 2019, filed with the SEC on August 7, 2019 (the "Q2 2019 Form 10-Q"), and Form 10-Q for the period ended September 30, 2019, filed with the SEC on November 5, 2019 (the "Q3 2019 Form 10-Q"). Garland signed the Registration Statement (as

defined *infra*, ¶194) and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials (as defined *infra*, ¶194).

34. Defendant Mardi C. Dier ("Dier") is, and at all relevant times was, an Executive Vice President and the CFO of the Company. Throughout the Class Period, she issued false and misleading statements for which she is liable under the Exchange Act. In addition, Dier signed and certified the FY 2018 Form 10-K, Q1 2019 Form 10-Q, Q2 2019 Form 10-Q, and Q3 2019 Form 10-Q. Dier also signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

35. Defendant Sheldon Koenig ("Koenig") is, and at all relevant times was, an Executive Vice President and the Chief Commercial Officer of the Company. Throughout the Class Period, he issued false and misleading statements for which he is liable under the Exchange Act.

36. Defendants Garland, Dier, and Koenig (collectively, the "Officer Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

37. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations

which were being made were thereby materially false and/or misleading. The Officer Defendants are liable for the false and/or misleading statements pleaded herein.

### 3. Director Defendants

38. Defendant Hollings C. Renton ("Renton") has served as Chairman of Portola's Board of Directors since March 2010. Renton signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

39. Defendant Jeffrey W. Bird ("Bird") has served as a Director of Portola since November 2003. Bird signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

40. Defendant Laura Brege ("Brege") has served as a Director of Portola since January 2015. Defendant Brege signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

41. Defendant Dennis Fenton ("Fenton") has served as a Director of Portola since February 2015. Fenton signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

42. Defendant John H. Johnson ("Johnson") has served as a Director of Portola since March 2014. Johnson signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

43. Defendant David C. Stump ("Stump") has served as a Director of Portola since September 2015. Stump signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

44. Defendant H. Ward Wolff ("Wolff") has served as a Director of Portola since November 2007. Wolff signed the Registration Statement and is therefore liable under the Securities Act for the materially untrue and misleading statements and omissions in the Offering Materials.

45. Defendants Garland, Renton, Bird, Brege, Fenton, Johnson, Stump, and Wolff are collectively referred to hereinafter as the "Director Defendants." Each of the Director Defendants signed the Registration Statement. In addition, as Directors and/or executive officers of the Company, the Director Defendants participated in the solicitation and sale of Portola shares to investors in the Offering for their own benefit and the benefit of Portola. The Director Defendants, because of their positions within Portola, possessed the power and authority to control the contents of the Offering Materials.

**4. Underwriter Defendants**

46. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an Underwriter in the Offering. Goldman Sachs is a New York limited liability company with its headquarters at 200 West Street, New York, NY 10282.

47. Defendant Citigroup Global Markets Inc. ("Citigroup") served as an Underwriter in the Offering. Citigroup is a New York corporation with its headquarters at 388 Greenwich Street, New York, NY 10013.

48. Defendant Cowen and Company, LLC ("Cowen") served as an Underwriter in the Offering. Cowen is a Delaware limited liability company with its headquarters at 599 Lexington Avenue, 20th Floor, New York, NY 10022.

49. Defendant William Blair & Company, L.L.C. ("William Blair") served as an Underwriter in the Offering. William Blair is a Delaware limited liability company with its headquarters at 222 West Adams Street, Chicago, IL 60606.

50. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an Underwriter in the Offering. Oppenheimer is a New York corporation with its headquarters at 85 Broad Street, New York, NY 10004.

51. Defendants Goldman Sachs, Citigroup, Cowen, William Blair, and Oppenheimer are collectively referred to as the "Underwriter Defendants."

52. The Underwriter Defendants acted as the underwriters of the Offering by offering, selling, and distributing the Portola common stock offered to the investing public and purchased by Lead Plaintiff, Oklahoma Firefighters, and members of the Class.

53. The chart below sets forth the number of shares purchased by each Underwriter Defendant in the Offering:

| **Name** | **Number of shares** |
|---|---|
| Goldman Sachs & Co. LLC | 2,973,215 |
| Citigroup Global Markets Inc. | 2,330,358 |
| Cowen and Company, LLC | 1,767,857 |
| William Blair & Company, L.L.C. | 803,571 |
| Oppenheimer & Co. Inc. | 160,714 |
| Total: | 8,035,715 |

54. As the underwriters of the Offering, the Underwriter Defendants earned lucrative fees for their participation in the Offering.

55. Each of the Underwriter Defendants was obligated under the federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the statements contained in or incorporated by reference into the Offering Materials. The Underwriter Defendants purported to conduct an adequate and reasonable investigation into the operations of the Company, an undertaking known as a "due diligence" investigation. During their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, assets, and growth prospects. A reasonable investigation into the truthfulness and accuracy of the Offering Materials, including the statements incorporated by reference, would have revealed that the Offering Materials contained materially untrue and misleading statements and omissions, as alleged below. As alleged, none of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Materials.

## V. BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A. Company's Background

56. For most of its existence, Portola has been focused on the research and development of drugs in the areas of thrombosis (clotting of the blood), other hematologic (blood) disorders, and inflammation. At the time of the Company's May 2013 initial public offering ("IPO"), the Company had two lead therapeutics that it was focused on researching and developing with a goal of commercialization. These two potential blockbusters drugs were Bevyxxa and Andexxa.

### B. Burn Rate from Extensive Research, Development, and Commercialization Expenses

57. Portola generated significant operating losses researching and developing Bevyxxa and Andexxa. The Company financed its costly research and development operations

primarily through sales of equity securities; collaborations (including loans from collaboration partners); and a royalty-based financing arrangement and sales of commercial and development rights to some of its "product candidates."[4]

58. After Bevyxxa was approved by the Food and Drug Administration ("FDA") in June 2017 and Andexxa was approved by the FDA (at a 100 mg dose)[5] in May 2018, Portola's capital needs significantly increased because the Company had to establish and scale-up manufacturing capabilities and a sales, marketing, and distribution infrastructure to commercialize Bevyxxa and Andexxa in the U.S. and abroad, and to complete additional clinical studies. In 2017, Portola burned through $225 million for its operating activities.[6] The Company's burn rate increased in 2018 when cash required for operating activities increased to $326 million.[7] As of December 31, 2018, the Company had $317 million in cash, cash equivalents, and investments, and an accumulated deficit of $1.5 billion.[8]

59. Because of the burn rate, Garland commented on a conference call on January 8, 2019 ("Jan. 8, 2019 Conference Call") that: "Cash is our fuel on this journey. We take it very seriously. It's what it's going to take to get us from this side to the other side of the river or the pond, and we're being very judicious with how we spend our money." At that time, Garland said that Portola had "been able to push [its] cash runway into the second quarter of 2020 and

---

[4] FY 2018 Form 10-K.

[5] FDA Accelerated Approval Letter dated May 3, 2018, at 3, https://www.fda.gov/media/113285/download.

[6] Portola's Form 10-K for the year ended December 31, 2017, filed with the SEC on March 1, 2018 (the "FY 2017 Form 10-K"), at 64.

[7] FY 2018 Form 10-K, at 57.

[8] *Id.* at 17, 56.

… lowered our OpEx guidance for 2018. So it is now $355 million to $365 million, that was a $35 million to $65 million reduction in our OpEx."

60. On February 28, 2019, the Company entered into a credit agreement that provided for a term loan in an aggregate principal amount of up to $125.0 million to be advanced in two tranches subject to certain performance-based milestones related to Andexxa (the "Secured Term Loan").[9] The first tranche, in the amount of $62.5 million, was drawn down immediately. The second tranche of $62.5 million was to be available as of November 15, 2019 only if (i) the Company had received all regulatory approval from the European Medicines Agency ("EMA") for Ondexxya,[10] and (ii) Andexxa's consolidated net sales for the three fiscal-quarter periods ending September 30, 2019 were at least $50.0 million. If the Company did not achieve both these milestones, it would not receive the remaining $62.5 million. On April 26, 2019, Ondexxya received its approval satisfying the first condition.[11] Then, on November 21, 2019, the Company announced that it had met the necessary $50 million in sales requirement (having hit $80.4 million Andexxa net product revenues in the

[9] FY 2018 Form 10-K, Ex. 10.46.

[10] Ondexxya is the brand name of Andexxa marketed in Europe.

[11] Current Report on Form 8-K ("Form 8-K"), filed with the SEC on May 8, 2019, Ex. 99.1; FY 2018 Form 10-K, at 4.

nine months ended September 30, 2019)[12] and had drawn down the entire $62.5 million available from the second tranche.[13]

## C. Background of Bevyxxa

### 1. Bevyxxa's FDA Approval in June 2017

61. A little over four years after its IPO, on June 23, 2017, Portola announced that Bevyxxa was approved by the FDA as the "the first and only anticoagulant" for hospital and extended duration prophylaxis of venous thromboembolism ("VTE"), a condition in which dangerous blood clots form in the leg, groin, or arm in adult patients hospitalized for an acute medical illness who are at risk for thromboembolic complications due to moderate or severe restricted mobility and other risk factors for VTE.[14] The Company stated that it expected to launch Bevyxxa between August and November 2017. *Id.* On this news, shares of Portola increased 48.7% to close at $56.91 per share by June 26, 2017, on heavy volume.

62. In a June 26, 2017 report, an analyst from William Blair noted that that the "approval of Bevyxxa by the FDA significantly transforms Portola as it becomes one of the few biotechnology companies with a wholly owned, approved drug targeting a multibillion-dollar market opportunity." The analyst commented that Bevyxxa and Andexxa both had "blockbuster potential" and could "reach over $1 billion in annual sales, providing the opportunity for significant share appreciation given the company's current market cap of just over $3 billion." To support the costly commercial launch of Bevyxxa, the Company

---

[12] Q3 2019 Form 10-Q, at F-9.

[13] Form 8-K, filed with the SEC on Nov. 21, 2019.

[14] Press Release, Portola, *U.S. FDA Approves Bevyxxa® (betrixaban) First and Only Anticoagulant for Hospital and Extended Duration Prevention of Venous Thromboembolism (VTE) in Acutely Ill Medical Patients* (June 23, 2017).

conducted a public offering of common stock in September 2017, raising approximately $380 million.[15]

**2. January 2018 Commercial Launch of Bevyxxa is a Failure**

63. The commercial launch of Bevyxxa was a monumental failure. From the outset, the commercial launch was delayed until the first quarter of 2018 due to manufacturing issues. By March 1, 2018, shares of Portola had fallen back to $31.56 per share. Bevyxxa's sales of $606,000 for the first quarter of 2018 were well-below expectations. Second quarter sales were even worse at a mere $33,000.

64. On July 27, 2018, Bevyxxa was denied approval by the EMA. In response, Portola's share price fell 7.51% to close at $38.31, on heavy volume.

65. During an August 9, 2018 earnings call discussing second quarter Bevyxxa sales ("Aug. 9, 2018 Conference Call"), Portola admitted that its Bevyxxa commercialization efforts were not being well received by hospitals stating, "[w]e are experiencing a bottleneck in getting Bevyxxa on to the hospital protocols and electronic order systems." Also, in an August 9, 2018 report, an analyst from William Blair noted that the second quarter sales were "well below our estimate of $1.3 million."[16] And in an August 10, 2018 report, an analyst from Credit Suisse downgraded the Company due to Bevyxxa's "stunningly slow … launch."

---

[15] FY 2018 Form 10-K, at 58.

[16] Bevyxxa generated a mere $639,000 in revenues ***over the first half*** of 2018. *See* Portola's Form 10-Q for the period ended June 30, 2018, filed with the SEC on August 9, 2018 (the "Q2 2018 Form 10-Q"), at 33. In the third quarter of 2018, Bevyxxa new product revenue was ***negative***, losing $552,000 during that quarter. *See* Portola's Form 10-Q for the period ended September 30, 2018, filed with the SEC on November 7, 2018 (the "Q3 2018 Form 10-Q"), at 4. The Company attributed the loss to "an adjustment to Bevyxxa product revenue as we adjusted our gross to net revenue estimates during the quarter, particularly in response to anticipated ***returns due to product expiry***." *Id.*

Further, on August 13, 2018, *Bloomberg* reported that a Morgan Stanley analyst had stated that he was "worried about mgt.'s ability to fund the company" in light of disappointing second quarter sales.

66. By September 2018, a little more than a year after its FDA approval, Portola's first "blockbuster" drug was dead in the water. During a September 12, 2018 Morgan Stanley Health Conference, the Company announced a new strategy significantly curtailing its efforts to commercialize Bevyxxa. Dier stated Portola would "narrow[] [its] effort on Bevyxxa" by "drilling down on 10 of the hospitals that are on formulary," referred to as "Centers of Excellence." An analyst from William Blair in a September 20, 2018 report stated that "investor expectations for Bevyxxa ha[d] been essentially removed" from Portola's valuation. The Company then decided to place the Bevyxxa commercialization on the back-burner to focus on Andexxa.[17]

67. Fifteen months later, on February 26, 2020, Portola announced that it would incur a $27.5 million charge to wind-down Bevyxxa operations.[18]

## D. Background of Andexxa

### 1. May 2018 FDA Approval of Andexxa (via the FDA Accelerated Approval Pathway)

68. On May 3, 2018, after the market closed, Portola revealed that its second lead drug, Andexxa, had received accelerated approval by the FDA as the "first and only antidote" "indicated for patients treated with rivaroxaban [(also known as Xarelto)] and apixaban [(also

---

[17] In the first two quarters of 2019, Bevyxxa sales were $77,000 and $74,000. *See* Q1 2019 Form 10-Q, at 4, Q2 2019 Form 10-Q, at 4. By the third quarter, Bevyxxa sales were a mere $17,000. *See* Q3 2019 Form 10-Q, at 4.

[18] Portola's Form 10-K for the year ended December 31, 2019, filed with the SEC on February 28, 2020 (the "FY 2019 Form 10-K"), at 48.

known as Eliquis)], when reversal of anticoagulation is needed due to life-threatening or uncontrolled bleeding." In response to this news, shares of Portola traded up to close at $42.44 per share on May 4, 2018 (up $8.66 or 25.64%), on heavy volume.

69. In a May 4, 2018 report, a William Blair analyst commented that we "believe Andexxa has blockbuster potential given the millions of patients treated with Factor Xa inhibitors globally and the lack of an approved agent to reverse the anticoagulant when these patients experience life-threatening bleeding events." In a follow up report issued on May 7, 2018, the William Blair analyst stated "Andexxa has blockbuster potential and [we] are raising our peak sales estimate to $1.6 billion from $1.2 billion."

70. Andexxa was approved under the FDA's Accelerated Approval pathway. The Accelerated Approval regulations allow drugs that are being developed to treat an unmet medical need to be approved substantially based on evidence of an effect on a biomarker endpoint that is considered reasonably likely to predict clinical benefit rather than a clinical endpoint. Andexxa's FDA approval was based on the change from baseline in anti-Factor Xa activity in healthy volunteers rather than a randomized controlled trial which compares Andexxa to other types of care the enrolling institution would provide in the absence of Andexxa. The FDA conditioned Andexxa's approval upon conducting a post-marketing randomized controlled trial of Andexxa. This clinical trial was initiated in early 2019 and was expected to run for four years.

71. While Andexxa is the only FDA-approved drug of its kind, older and cheaper alternative treatments existed to treat severe bleeds in patients taking anti-coagulants. These include the off-label use of treatments designed to enhance coagulation including Fresh Frozen Plasma ("FFP"), 4-factor Prothrombin Complex Concentrates ("4F-PCCs"), recombinant

activated Factor VII ("rFVIIa"), Vitamin K, protamine, or whole blood.[19] Moreover, other blood thinners besides apixaban and rivaroxaban are in use, the effects of which Andexxa does not reverse.

72. Prior to the availability of Andexxa, Kcentra (the brand name of 4F-PCCs)[20] and other coagulant factors were widely used for the same indications that Andexxa was approved for, *i.e.*, reversing the anticoagulant activity of rivaroxaban and apixaban.[21] Although Andexxa received FDA-approval in May 2018, as of 2020, Kcentra and other anticoagulants continue to be "widely used."[22] The approximate cost of Kcentra is $5,000 compared to $25,000 for a low dose of Andexxa and $49,500 for a high dose of Andexxa.[23]

**2. Andexxa's Early Supply Program**

73. Upon receiving FDA approval, in May 2018, the Company began a limited commercial launch, referred to as the Early Supply Program ("ESP"), in the United States using limited quantities of the drug manufactured under the clinical-scale process, referred to as Generation 1 (or "Gen 1") supply. The Gen 1 supply shipped as a powder in 100 mg, single use vials. Before use, the powder would be reconstituted with sterile water. A low dose was 400 mg while a high dose was 800 mg.

---

[19] FY 2018 Form 10-K, at 7.

[20] Press Release, *Portola Pharmaceuticals Presents New In Vitro Data Demonstrating that Four-Factor Prothrombin Complex Concentrates (4F-PCCs) Had No Direct Effect on Inhibition of Thrombin Generation by Factor Xa Inhibitors* (July 8, 2019) ("4F-PCC (using commercially available Kcentra®/Beriplex®)") (the "July 8, 2019 Press Release").

[21] FY 2019 Form 10-K, at 19.

[22] *Id.*

[23] Marina Haque, Michael Gratson, Jodi Woerle, Fitz Tavernier Jr., *Beginning to Understand the Cost-effectiveness of Andexxa*, Georgetown Medical Review (May 9, 2019), https://gmr.scholasticahq.com/article/7777-beginning-to-understand-the-cost-effectiveness-of-andexxa.

74. The ESP was intended to focus on approximately 30 to 40 hospitals that were predominantly clinical-trial sites for Andexxa and a limited number of Level I trauma centers and comprehensive stroke centers. The hospitals in the ESP received Gen 1 Andexxa product directly from the Company. Andexxa's wholesale price ranged from $25,000 to $49,500 depending on dosage level. In a May 7, 2018 report, a William Blair analyst commented that the price was "noticeably above our expected range of $15,000 to $20,000 per patient."

75. During an earnings call with investors on November 7, 2018 ("Nov. 7, 2018 Conference Call"), Garland commented on the significant strategic changes that had been made at Portola, shifting corporate resources from Bevyxxa to Andexxa. Garland stated that the "***top priority of Portola is Andexxa*** ensuring the approval of the Gen-2 supply and a successful launch."

### 3. Approval of Generation 2 Andexxa And Full Commercial Launch

76. On December 31, 2018, Portola announced in a press release that the FDA approved Portola's Generation 2 ("Gen 2") manufacturing process which provided commercial scale volume to support a global launch that could meet worldwide commercial demand over the next several years. In response to this news, shares of Portola were up $2.43 per share (an increase of 14.22%) to close at $19.52 on December 31, 2018, on heavy volume.

77. Gen 2 Andexxa shipped in 200 mg/vial compared to 100 mg/vial for Gen 1 Andexxa sold during the ESP period. According to Garland in a May 8, 2019 conference call ("May 8, 2019 Conference Call"), Portola received "a lot of positive feedback on the 200 milligram/vial in terms of improving the constitution time…. And actually one of the reasons why we're seeing some of the Gen 1 hospitals transition over to Gen 2, because it's an easier reconstitution time it speeds up the door to needle time."

78. The full commercial launch of Andexxa was announced at the January 8, 2019 Conference Call with investors led by Garland who was purportedly brought on to Portola as CEO in September 2018 because of his prior experience with "multiple billion dollar product launches."[24] During the conference call discussing the commercial launch of Andexxa, Garland stated, "[t]his is, by far, the most important destination for Portola and that is Andexxa. I tell folks internally all the time that ***our first, second, third priority, fourth priority, fifth priority*** are demonstrating that Andexxa can achieve the potential that we believe that it can achieve."

### 4. Change in Andexxa Distribution Model for Gen 2 Commercial Launch

79. The commercial launch of Gen 2 also resulted in a change in the Company's distribution model by selling to specialty distributors who would then fill Andexxa orders from hospitals. During the January 8, 2019 Conference Call, Dier announced:

> We're moving from what we call a drop shipping method, which we would deliver the product directly to the hospital and now it will be through our distributors, through orders through distributors, and now we'll be going through our distributors so there will be some stocking going into first quarter. We're not going to say how much or what our estimate is, but maybe we'll give more of a sense of that on our Q4 call, or maybe down into our Q1 call, but it is important to know that, that is a change in how we'll recognize revenue. ***Everything will be recognized when we sell into the distributors.***

80. In its FY 2018 Form 10-K, the Company stated that it sells Andexxa to "specialty distributors and wholesalers in the United States ('Customers')." These Customers subsequently resell products to hospitals, pharmacies, and long-term care centers. The Company stated that it would "recognize revenue on product sales when the Customer obtains control of our product, which occurs at a point in time (upon delivery)." The Company did not

[24] Press Release, *Portola, Portola Pharmaceuticals Names Scott Garland President and Chief Executive Officer* (Sept. 20, 2018).

report gross revenues, only revenues net of applicable reserves for variable consideration, including discounts and allowances.

### 5. Addition of Consignment Sales to Business Model

81. Garland announced during the January 8, 2019 Conference Call that as part of the Gen 2 commercial launch, the Company started offering "consignment" sales. This was where Portola's Customers (their specialty distributors) offered hospitals the opportunity to stock Andexxa on their shelves without having to pay for it. The hospitals would pay a small percentage to keep the inventory on their shelves, so it gave that hospital the opportunity to have access to Andexxa without paying up front. The hospitals would pay when they used the product. Garland noted that consignment "is all handled by the wholesalers and it's something they offer to customers." According to Garland, "when [the Company] talk[ed] to pharmacists, they say that this is one of the most important offerings for them to be able to help the access and reimbursement environment."

82. During the May 8, 2019 Conference Call, John Curnutte, Executive Vice President and Head of Research & Development commented that "if you look at how many institutions are using consignment again it's, at this point it's represents really a small portion of our overall sales." During the August 7, 2019 conference call ("Aug. 7, 2019 Conference Call"), Koenig noted that "as we started the consignment earlier this year, and again this is something that allows hospitals and patients to have greater access just another way of having access to Andexxa. This is something that is really operationalized through our specialty distributors, it still represents a small portion of our business." During a February 26, 2020 conference call ("Feb. 26, 2020 Conference Call"), Koenig stated that "[c]onsignment is something that I would say that everybody is aware of."

### E. Detailed Confidential Witness Accounts

83. Accounts of ten (10) confidential witnesses ("CW") contribute to the allegations of this complaint—six (6) from former Portola salespeople and four (4) from customer and potential-customer hospital representatives. They vary geographically, from regions around the United States.

84. Remarkably, the stories from both customers' and sellers' perspectives each individually show that what they know about the key issues complained about herein are at odds with what Portola was communicating publicly—that Portola claimed strong, rising demand and an incredible reorder rate; and that Portola reported utilization that was both broad (types of bleeds) and deep (how often used). But what is more remarkable is how consistent each of their accounts are with the others how uniform they are in telling a story that of what was actually happening, and how different a story that was from the one that Defendants were telling publicly. Their accounts help demonstrate that Portola's representations and omissions were materially false and misleading.

85. Together, they paint a picture that suggests the following:

a) Portola's pricing of Andexxa—magnitudes higher than its quasi-competitor, Kcentra (which is viewed by most hospitals as a form of alternative)—is the primary impediment to selling the product. In a vacuum, some see Andexxa as being useful. But at the price offered, as compared to other available treatments, it is mainly rejected for purchase and addition to hospital formularies, or it is added gingerly (for example just two or three doses purchased that are then heavily restricted to only life-threatening traumatic bleeds that meet a series of criteria and, in at least one instance, require the additional sign-off of two designated chief medical professionals).

b) No one—whether salespeople or hospital clients or potential clients—spoke to the concept of broad utilization of Andexxa beyond life-threatening traumatic cranial hemorrhaging. No formulary known to or described by these witnesses used Andexxa for any broader applications, such as serious gastrointestinal (or "GI") bleeds, not to mention bleeds during elective surgeries or those less severe. To the extent hospitals purchased Andexxa at all, they did so for the most dire situations. One hospital CW said that the drug has been used across his/her large hospital system less than half a dozen times since his/her system started using it. Two hospital CWs said that severe restrictions to just those types of catastrophic bleeds that are life threatening are what they understand has been put in place in hospitals that have decided to use Andexxa.

c) But more often, CWs suggest that hospitals are not purchasing the drug. That is certainly the message from salespeople CWs—that they regularly get significant push-back on pricing. Salespeople report hearing from hospitals that the price of Andexxa was shocking. Most hospitals would not purchase the drug. For some, despite trying to sell Andexxa day-in and day-out, they sold it to just one, two, or a handful of hospitals. As one seasoned CW salesperson put it, Andexxa was an "extremely tough sell." And a hospital CW from a very large hospital that <u>did not</u> purchase Andexxa, said that most of the hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments.

d) The CWs knew that hospitals generally were either not buying Andexxa or purchasing very limited amounts—one or a few doses—and restricting the drug's usage to just the most life-threatening bleeds (such as intercranial bleeds). The salespeople CWs knew this from their own experiences trying to (and almost always failing) to sell the drug, but also from

Portola sales meetings (including Company-wide or regional meetings where these issues were discussed) and general meetings. The hospital CWs knew this from their own experiences at the hospital or system pharmacies that were the decision-makers about whether to buy the drug and add it to their formularies and how to restrict its usage, but also from keeping abreast about what other hospitals and systems in their industry were doing.

e) At least two hospital CWs mentioned data supporting Andexxa's launch and sales process, and they question both its strength and limited nature (with one of them describing it as "flimsy"). One also questioned the results of a study that Portola conducted on Andexxa that were presented in December 2019, claiming that they were weak and did nothing to convince his/her hospital system to lift the stringent restrictions on Andexxa that were in place. (A salesperson CW also said that, from his/her perspective, the study did nothing to change opinions on Andexxa.) CWs also frame the decision-making issue as being between, for example, buying three doses of the drug on the one hand versus hiring someone to work a hospital on the other. That seems particularly true for rural hospitals, where resources and budgets are scarcer.

f) CWs—both salespeople and hospital representatives—note the challenge of selling the drug when there is another remedy—Kcentra—at a significantly cheaper price. The general sense is that, while in a vacuum they may not be equal, (a) Kcentra has been used for years off-label to treat bleeds caused by the anticoagulants Xarelto and Eliquis, (b) the cost of Andexxa did not justify requiring use of Andexxa (and to the extent a hospital felt it did, then only for the most severe bleeds), and (c) the data supporting Andexxa was not that strong.

g) The picture painted by the CWs, in general terms, is that Portola was aware that cost was the primary deterrent to selling the drug. Salespeople used customer

management software and/or tracking spreadsheets to report not just purchases and reorders, but also whether the drug was broadly utilized or heavily restricted by hospitals to only severe life-threatening bleeds. Salespeople describe the cost-as-barrier issue being discussed at Portola meetings regularly. Some report having raised it with their managers as well. Moreover, there were quarterly meetings that are reported to have included senior management, if not the CEO and CFO directly. As one witness described, it was inconceivable that the most senior executives were not aware of this.

h) Some salespeople CWs describe discussing the cost-as-barrier issue with their managers. One manager responded that the price could not come down because it would affect the stock price and "venture capital." Another responded by saying that the price will not change. A third said that Portola did not change its marketing strategy after hearing repeatedly about the issue. In fact, at least two witnesses explained that they were "threatened" with being fired in Spring or Summer 2019 if they did not sell either a certain amount or ensure that a certain hospital was using the drug in the coming months. One of those CWs had just previously been ranked in the top quarter of the salespeople. That CW was ultimately fired when s/he could not deliver a particular hospital, and the other resigned upon being told that his/her job was in jeopardy. The corporate environment was described as "toxic" and "stressful."

86. Together, none of these witnesses support the picture of ongoing or rising demand painted by Defendants during the Class Period. None suggest that there was broad or deep utilization of the drug, but rather that, to the extent a hospital purchased one or a few doses, it was used just for the most severe life-threatening bleeds. None suggest scenarios where the reorder rate was increasing, or even high. To the contrary, the CWs paint a picture where it was

hard to fathom that these issues with demand and reserves were not visible and present quarter upon quarter.

**Confidential Witness No. 1**

87. CW1 was a Thrombosis Area Manager for Portola focusing on a major metropolitan area in New England from September 2018 through November 2019.

88. CW1 recounted that, from his/her perspective, hospitals had difficulty justifying the cost ($25,000 for a low dosage and $50,000 for a high one), that they believed that they had been getting along without a drug like Andexxa for many years and could still do so without spending so much. CW1 said that the data on the effectiveness of Andexxa was not supportive enough to justify the cost versus the potential benefit. CW1 said s/he believes that some hospitals carry Andexxa to have it on hand as a "CYA," but do not intend to use it.

89. CW1 explained that because Andexxa is so expensive, one hospital that s/he covered had in place very restrictive use protocols for the drug. According to CW1, that hospital would only allow Andexxa to be used for life-threating intracranial bleeding. Andexxa was not on the hospital formulary for any other indication. As recounted by CW1, there were several layers of approval to get through before Andexxa could be administered. First, the hospital's prescribing software required that the pharmacist scroll through a series of indications to ensure that they are met prior to authorizing use of Andexxa. Second, the hospital required the approval of both the attending neurosurgeon and the trauma specialist before Andexxa was authorized for use. CW1 reported that if both did not sign off, Andexxa would not be administered.

90. CW1 said that Portola management "100%" knew that high cost versus benefit is why hospitals don't use Andexxa and that the few hospitals that carry Andexxa place restrictions on its use. According to CW1, Portola's internal sales reporting program tracks this information.

CW1 explained that sales reps are required to enter certain information into the system such as the name of the hospital, when the hospital was contacted, whether and when the Pharmacy and Therapeutic ("P&T") Committee is meeting about Andexxa, and, if Andexxa was purchased, what restrictions the hospital placed on prescribing Andexxa. CW1 said that Portola management knew that Andexxa is not widely used even by hospitals that carry it.

91. CW1 reported that, nonetheless, there was a lot of pressure to make sales of Andexxa. CW1 described the work environment to be "stressful" and "toxic." CW1 reports that although s/he had been in the top quarter of performers earlier in 2019, CW1 was told in an April 2019 meeting with CW1's regional manager that if a particular one of her/his hospitals did not use Andexxa at least twice by November 2019, s/he would be let go. According to CW1, that hospital did not use any Andexxa during that period and in November s/he was terminated.

92. CW1 said that Portola attempted to address the cost versus benefit problem by conducting a new study and presenting additional data on Andexxa's effectiveness on other bleeding conditions. CW1 said that s/he did not believe that data changed anyone's opinion of the drug. Further, CW1 reported that, given all the restrictions on usage of Andexxa imposed by hospitals that purchased it, s/he would not say that the drug was broadly utilized. Rather, those hospitals that carry Andexxa restrict its use and others simply refuse to carry it because it is too costly.

93. CW1 said that even though s/he left in November 2019, s/he knew that sales of Andexxa had stalled. CW1 noted that, while sales did grow during the year s/he was with Portola, s/he believes that the restrictions on Andexxa's usage by hospitals hinders reorders.

94. CW1 explains that while s/he is not familiar with the specifics of Andexxa's return policy, CW1 understands that it is very generous. According to CW1, Andexxa could be

returned and exchanged for new vials 6 months before the expiration date. CW1 further reported that the policy allowed for the return of Andexxa even if it was opened and mixed and prepared for use but not ultimately used. In that situation, CW1 thought that the hospital might get something like a 90% credit towards a new package.

95. CW1 also noted that the way that Andexxa was packaged led to some "waste"—that a package contained 4 vials, but at times dosing could require the use of 4½ or 5 vials. (CW1 did say that if the unused vials were not opened, they could still be used.)

**Confidential Witness No. 2**

96. CW2 was employed as a Regional Sales Manager for Portola focusing on an area in the Far West region of the United States from June 2017 through August 2018. CW2 said that s/he left Portola approximately 2 to 3 weeks before the launch of Andexxa, but did participate in the Company's training program to market the drug.

97. CW2 reported that there was tremendous pressure on the salesforce to sell Andexxa and that they were all instructed to use every contact they had and to advocate to get hospitals to stock Andexxa.

98. Like CW1, CW2 reported that sales representatives were threatened with losing their jobs if they did not get hospitals to stock the drug.

**Confidential Witness No. 3**

99. CW3 was an Area Thrombosis Manager at Portola focusing on an area in the Southwest region of the United States between 2018 and February 2019. CW3 said s/he was responsible for marketing and sales of Andexxa for a Southwestern state.

100. Despite believing Andexxa to be an effective drug, CW3 identified Andexxa's price as being problematic. CW3 noted, "It was a struggle for me from day one to sell

Andexxa." CW3 reported that Portola had two pricing levels for Andexxa: $25,000 and $50,000 per dose.

101. During his/her tenure at Portola, CW3 was able to sell and get Andexxa stocked at just six hospitals. When asked, CW3 indicated that s/he had push-back from the hospitals from day one due to the high price of Andexxa. S/he later noted that "the hospital pharmacists were terrified of [Andexxa], and not from a clinical point; strictly from a cost point."

102. CW3 maintained that because Portola priced the drug very aggressively, it made it difficult for some hospitals to purchase. CW3 indicated that many of the hospitals that s/he called on were small rural hospitals. CW3 and the hospitals that s/he called on believed that Andexxa was "way too aggressively" priced. According to CW3, many could not afford Andexxa. CW3 said that because of the high cost, a hospital with 100 beds or less would have to make a choice between purchasing Andexxa and hiring a staff member. CW3 said, at another point, that the cost of using Andexxa just three times was the equivalent of hiring a new hospital staff member for these hospitals.

103. CW3 stated that the only hospitals that reordered Andexxa were huge hospitals. CW3 sold Andexxa to the largest health system in his/her region and they told him/her that they were going to restrict the use of Andexxa to their two flagship hospitals. Smaller hospitals in CW3's state were not buying Andexxa and patients in those hospitals that would appear to benefit specifically from Andexxa were "life-flighted" to the appropriate facility that had Andexxa on stock.

104. CW3 said that the drug Kcentra was another anti-coagulant reversal drug and is priced between $7,000 and $8,000 per dose. CW3 said that this is a cheaper alternative than Andexxa for many hospitals.

105. In fact, CW3 hosted a speaker event in June 2018 for the Hospital Pharmacy Society. The event was attended by 55 hospital pharmacists. Portola paid an honorarium to a noted professor of pharmacology and clinical specialist to speak about the benefits of Andexxa. During this speaking event, the speaker spoke very favorably about Andexxa from a clinical perspective. At the end of his presentation, however, he told the room full of hospital pharmacists that he would never use Andexxa because it cost too much and that "I am going to use Kcentra."

106. CW3 said that during a "one on one" meeting with his/her boss, an Area Business Director, they discussed the high cost of Andexxa and that the price of the drug was prohibitive. CW3 said s/he suggested that the Company should consider lowering the price. According to CW3, the Area Business Director's response was that the Company could not lower the price because it would cause the stock price to go down and drive away venture capital.

**Confidential Witness No. 4**

107. CW4 was a Thrombosis Area Manager at Portola focusing on an area in Great Lakes region of the United States from February 2019 through the end of the Class Period. CW4 said that s/he joined Portola after the FDA approved production of the 200 mg dosage of Andexxa (Gen 2).

108. CW4 said s/he was only able to sell Andexxa to one hospital while with Portola. CW4 explained that the price of Andexxa was a shock to people. CW4 said that the drug was anticipated for a few years and was believed to effective. But when Andexxa was compared to the price of Kcentra, pharmacists were shocked at the price difference.

109. CW4 reported that sometime in 2019, an article was written by three pharmacists that provided hospital pharmacy directors with information to push back on ordering Andexxa.[25] Prior to this, CW4 believed hospitals were worried about being sued if a patient died following a severe bleed and it did not carry Andexxa. According to CW4, this article provided information many used to question carrying Andexxa at such a high cost. CW4 further stated that following the publication of this article, hospitals began to conduct their own Drug Usage Evaluation and many determined Andexxa was too expensive to carry when a cheaper alternative such as Kcentra was available.

110. CW4 states that s/he believed that Portola's management was aware of how the article was being used against Andexxa, but they did not change Portola's marketing strategy or consider lowering the price. CW4 said that the Company's sales force always pushed to lower the price but was told the price is the price. CW4 did discuss the price issue with his/her supervisor.

111. CW4 said that the high cost of Andexxa put a strain on pharmacy budgets. CW4 explained that Andexxa—classified by the FDA as an "orphan" drug—was an inpatient drug that was paid for by the hospital. By contrast, orphan drugs generally are administered as outpatient drugs, the cost of which are often absorbed in part by third parties.

112. According to CW4, Andexxa was utilized for severe bleeds resulting from Xarelto or Eliquis and had to be administered within 18 hours of the event. CW4 explained that even though many patients receive Xarelto and Eliquis, Andexxa was an orphan drug because of the

---

[25] CW4 appears to be referencing Harry Peled, Nhu Quyen Dau & Helen Lau, *Key Points to Consider When Evaluating Andexxa for Formulary Addition*, Neurocritical Care (Oct. 22, 2019), https://link.springer.com/article/10.1007/s12028-019-00866-6.

limitations on its use and the minimal off-label indications. CW4 said hospitals could not use Andexxa for common nose bleeds. CW4 said that it was this limited the number of possible patients, which allowed Andexxa to be classified as an orphan drug.

113. CW4 reports that s/he was not familiar with Portola's return policy, but that s/he believed that the policy allowed for return of partially used doses if the patient had died before it was used.

**Confidential Witness No.5**

114. CW5 was employed as a Thrombosis Area Manager for Portola focusing on an area in the Great Lakes region of the United States from February 2019 through March 2020. CW5 said that s/he was responsible for sales of Andexxa for a particular state and reported to the Regional Business Director.

115. According to CW5, Andexxa was a "niche" drug. CW5 said the indications for Andexxa are limited only to life-threating bleeds for patients being treated with Eliquis or Xarelto; although many patients are treated with these drugs, few have life-threating bleeds.

116. CW5 said Andexxa was very expensive. CW5 said that, from his/her perspective, the Portola sales force frequently advised management that the cost of the drug was hindering sales. According to CW5, the response from management was that the price was not going to be reduced.

117. In line with statements by CW3 and CW4, CW5 said that the biggest issues Portola had concerning Andexxa usage was the cost of the drug combined with the off-label use of Kcentra.

118. Implying that pharmacies were making the purchasing decisions, similar to statements made by or implications raised by CW3 and CW4, CW5 said that doctors liked

Andexxa but were often told by pharmacy directors that it was not available or that its use was restricted and that Kcentra was the only available treatment on the formulary. CW5 said that pharmacy directors at many hospitals have the power to override a doctor's order.

119. CW5 said that hospitals did not order Andexxa based on the number of patients treated with Eliquis or Xarelto, but on an estimate of usage. CW5 believes that hospitals made a cost versus utilization analysis and determined that it was too costly to stock more than 3 to 5 boxes of Andexxa or to reorder additional boxes given that the indications were so limited.

120. CW5 said that insurance coverage does not affect a hospital pharmacy department's decision about whether to purchase Andexxa. CW5 explained that the expense for carrying Andexxa comes out of the pharmacy budget, but the reimbursement from Centers for Medicare and Medicaid Services ("CMS") or another third party tends to go back to the general hospital accounts (*i.e.*, that the reimbursement may not get returned to the pharmacy's budget). (CW5 reported that s/he believes that the CMS had authorized between 50% and 65% cost reimbursement for Andexxa.)

121. CW5 stated that Portola has a very liberal return policy. CW5 explained that facilities could exchange Andexxa under three conditions. First, a hospital could return the dosage if it had expired. Second, a hospital could return the dosage if the patient for whom it was intended had passed away. And third, a hospital could return Andexxa if they had originally purchased the low-dose form of Andexxa (100 mg) (originally approved by the FDA) and wanted the higher dose (200 mg) after the FDA approved the manufacturing of it. According to CW5, many hospitals that originally ordered the 100 mg dosage returned them to Portola for the larger dosage.

**Confidential Witness No. 6**

122. CW6 was a Thrombosis Area Manager at Portola focusing on an area in the Rocky Mountain region of the United States from July 2017 until January 2019. His/her territory consisted of a state in that region. S/he was initially responsible for selling Portola's Bevyxxa and then Andexxa.

123. CW6 stated that s/he was working at Portola when Andexxa was originally launched. Prior to the launch of Andexxa, the Company was very quiet about how they intended to price the drug. When s/he asked about the expected pricing of Andexxa during his/her interview, CW6 was told that the Company was not allowed to share pricing with him/her. S/he noted that s/he took the job "blind," adding, "Many of us came onboard thinking that this was such an attractive product and a potential blockbuster. As soon as the customers saw the price, they said that they have lived without it for five or six years and that they could live without it longer."

124. When the pricing was finally announced, CW6 reports that s/he and the other reps were "shocked" at how expensively the drug was priced. CW6 says that when Portola announced that they were going to sell Andexxa for between $25,000 to $50,000, there was shock and disbelief—at first from the sales reps, and then from the hospitals that they called on.

125. CW6 says that s/he sold the drug to two Level I trauma centers with large bed capacity in his/her district. Yet, CW6 says, these trauma centers pushed back on the pricing of Andexxa and restricted the drug's use.

126. CW6 noted that having two large accounts purchasing Andexxa was more than what the other sales reps were able to achieve. Many other hospitals refused to add Andexxa to their formularies because of its high price. These hospitals told CW6 that they have learned to

manage bleeding with these patients, and they have strategies that have been working—that if Andexxa was priced differently, they would it add to their formularies. S/he added that Andexxa was an "extremely tough sell."

127. CW6 stated that management knew about the difficulty the price was causing salespeople. CW6 indicated that the high price of Andexxa was "absolutely" discussed at sales meetings. S/he commented, "There wasn't one single meeting where this was not discussed." CW6 stated that Portola was such a small company and that everyone was connected, so it would be impossible for the CEO and CFO to assert that they were unaware that sales of Andexxa were "nonexistent because of its egregious pricing."

128. CW6 stated that s/he attended four sales meetings a year, some district meetings and some national meetings. These meetings were generally held in a hotel in San Francisco near Portola's headquarters. The executives at these meetings always asked, "Where is our take? What are the customers saying? What are the issues?" S/he indicated that everyone knew what the feedback was from the customers.

129. CW6 recalls reporting to management at the end of 2018 that hospitals balked at the high price of Andexxa. S/he had started selling Andexxa in May 2018 and had been part of a separate sales group and visited clients between May and June 2018. The feedback that his/her group had received from the hospitals was that Andexxa was too expensive. S/he then attended two meetings at the end of 2018 where the Company wanted the feedback from these hospitals and reasons for why Andexxa was not on their formulary. It was at that point that CW6 responded as reported.

130. CW6 stated that Portola was "absolutely" struggling to sell Andexxa in the period leading up to its August 2019 Offering. S/he noted that s/he started speaking to customers about Andexxa in May 2018.

131. CW6 reports that Andexxa clients were told that if their order was fulfilled, they may receive some short-dated product. S/he did not believe that Portola discounted the short-dated product. CW6 stated that Portola offered to replenish any short-dated product that was not used within the specified shelf life.

132. Prior to selling Andexxa, CW6 was first tasked with selling Portola's predecessor drug Bevyxxa, an oral anticoagulant. S/he stated that Bevyxxa was approved by the FDA for venous thrombosis prevention. However, according to CW6, the rollout of Bevyxxa was a "disaster." CW6 indicated that Portola should never have launched Bevyxxa based on the data that they had at the time. S/he noted that it was a great molecule that had very little data to support it. S/he explained that Bevyxxa had just one study which did not meet its primary endpoint, yet the product was still FDA approved. The data was good enough that the FDA thought that there was an "unmet clinical need." CW6 reported that even sites (presumably ones that s/he was working with) that had done the trials and had put the product in formulary never ordered it. S/he added, "It was a disaster and a terrible launch. It was a storm right before the Andexxa launch."

**Confidential Witness No. 7**

133. CW7 is the Clinical Specialist Formulary Management and Drug Information Coordinator at a healthcare system in the Southeast region of the United States. CW7 has been in this position since October 2018.

134. CW7 said that s/he was the individual that brought Andexxa to the system. CW7 said that in October 2018, s/he presented Andexxa to the P&T Committee and it was added to the hospital system formulary. CW7 noted that while the data presented in the clinical trial was "flimsy," it was felt that it was irresponsible to not carry the drug while prescribing Xarelto or Eliquis.

135. CW7 said that the system has restricted the use of Andexxa to only life-threatening intercranial bleeding for patients being treated with Xarelto or Eliquis. According to CW7, this decision was based on the clinical study data published in the New England Journal of Medicine, and it is CW7's understanding that this is consistent with how hospitals throughout the country are utilizing Andexxa.

136. CW7 said that the system only stocks one high dose and one low dose of Andexxa because the usage is so limited. CW7 said that the hospital system only authorizes Andexxa's use for intercranial bleeding, which is normally accompanied by a stroke. These events have high mortality rates even if the bleeding is stopped. According to CW7, doctors might not use Andexxa in every situation where it is indicated. CW7 said that if treatment with Andexxa would not ultimately save the patient's life, it would probably not be used. CW7 also said that a doctor is more likely to use Andexxa on an otherwise young and healthy patient where the outcome is more certain.

137. In line with comments by CW3, CW4, and CW5 about hospitals using the less costly Kcentra in place of Andexxa, CW7 noted that the data on the use of Kcentra indicated it was as effective in many of the same situations as Andexxa.

138. CW7 said that although the cost of Andexxa was high, it was not the reason for the restrictions. The restrictions were based on the data concerning Andexxa's effectiveness.

CW7 said that while Andexxa is an effective treatment, it is not a cure for the causes of the bleeding event. CW7 reports that Andexxa has a short half-life of 1 hour (the time a drug's presence in the body to be reduced by 50%) and is only effective for 3 hours—that Andexxa provided a "drug holiday" for Xarelto and Eliquis by pausing their effects. However:

a. CW7 reports that after the dosage of Andexxa leaves the patient's system 3 hours later, the anti-coagulation re-starts.

b. CW7 also said that this time period should be enough for clotting to take place.

c. CW7 further noted that if clotting had not occurred, it is not known if "redosing" with Andexxa is indicated. There is no data on that.

139. CW7 said that s/he believes Portola is aware of how hospitals are using Andexxa. According to CW7, s/he has told the Portola sales reps covering the system what restrictions the hospital system put in place on Andexxa. CW7 said Portola salespeople would try to advocate for getting the restrictions expanded to include other indications, such gastrointestinal bleeding.

140. CW7 attributed the early rise of Andexxa sales to hospitals "stocking up" on the drug. CW7 suggested that the drop in sales occurred because hospitals strictly limit the use of Andexxa and do not reorder.

**<u>Confidential Witness No. 8</u>**

141. CW8 is the Team Leader, Ambulatory Care, Emergency Department, and a member of the cardiology team for a large regional healthcare system in the Southeast region of the United States. CW8, with a PharmD degree, specializes in anticoagulation and investigational drug studies.

142. CW8 said that for at least the last 6 to 7 years since the anticoagulants Xarelto and Eliquis have been available, hospitals have treated life-threatening bleeding events without the need for Andexxa. CW8 said that his/her hospital system has Andexxa on its formulary but restricts its usage to only life-threatening events involving intercranial bleeding. CW8 said that throughout the entire hospital system, Andexxa had been used less than half a dozen times.

143. CW8 said that Andexxa does not stop the cause of the bleeding, but only binds or pauses the anti-coagulant. The underlying cause of the bleeding is not affected, and when the binding wears off, the bleeding can restart.

144. CW8 said that the decision to restrict Andexxa's use is based on the cost versus benefit and the data presented in Portola's clinical trials. According to CW8, the data supporting use of Andexxa for gastrointestinal bleeding was not enough to support its use for this indication.

145. CW8 said Portola was aware that hospitals were restricting the use of Andexxa. According to CW8, Portola conducted an additional study of Andexxa. CW8 said that the results of the study were presented at the American Society of Hospital Pharmacists convention in December 2019 in Las Vegas, Nevada. CW8 said that, in his/her opinion, the study was weak and still not convincing enough to change the Andexxa restrictions.

146. CW8 said that in March 2020, during the virtual conference of the American College of Cardiology, s/he told the Portola representatives that the hospital system would continue to restrict Andexxa use and would not authorize it use for other types of indications such as gastrointestinal bleeding.

147. Discussing the use of other treatments in place of Andexxa, CW8 said that the cost of Andexxa—$20,000 to $50,000, depending on the dosage—is a factor when evaluating

cost versus benefit. CW8 explained that treatments such as Kcentra and Feiba[26] have been used in the past and have been shown to be effective for less cost. CW8 said that the cost of Andexxa was not the only factor, however, and that the past treatment and clinical data supported using the other treatments. CW8 explained the cost would prohibit using Andexxa for a routine application such as during elective surgery or to stop a nosebleed. CW8 noted that, in light of some of those factors (and having previously noted that the data did not support use for gastrointestinal bleeds), s/he would not say that Andexxa was not broadly utilized. CW8 stated that s/he believes that most hospitals have similar restrictions on Andexxa.

148. CW8 said that while s/he does not have much information on Portola's return policy for Andexxa, s/he believes that it is generous and that returns may be allowed 30 days prior the expiration date.

**Confidential Witness No. 9**

149. CW9 is currently the Director of Pharmacy (and was previously the Assistant Director of Pharmacy) at a large hospital in the Great Lakes region of the United States since April 2013.

150. CW9 said that his/her team determined that the cost of Andexxa was too high when the benefits are compared with other medications. CW9 said that other PCC treatments such as Kcentra and Feiba are effective for significantly less cost. CW9 said that the cost versus benefit analysis was the only reason Andexxa is not on his/her hospital's formulary. CW9 said

---

[26] Feiba is an activated prothrombin complex concentrate ("aPCC") which has been used for the same indications as Andexxa. It costs around $5,000. *See* Marina Haque, Michael Gratson, Jodi Woerle, Fitz Tavernier Jr., *Beginning to Understand the Cost-effectiveness of Andexxa*, Georgetown Medical Review (May 9, 2019), https://gmr.scholasticahq.com/article/7777-beginning-to-understand-the-cost-effectiveness-of-andexxa.

that there are no issues with the effectiveness of Andexxa; rather, it was determined to be too costly to carry when compared with other treatments.

151. CW9 said that s/he knows that his/her team communicated the cost issue directly to officials at Portola. CW9 said that it was his/her opinion that Portola knows that the issue with Andexxa is cost, and not efficacy.

152. CW9 explained that most hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments. Although s/he does not work in a small rural hospital or area, CW9 stated that s/he believes that Andexxa is carried by smaller and rural hospitals.

153. CW9 noted that it is possible that, by carrying Andexxa, a hospital pharmacy may be unable to hire a technician or otherwise fill a vacant position.

154. CW9 explained that Andexxa is a drug that would come out of the hospital pharmacy's budget, and that third-party reimbursements do not affect the cost to the pharmacy department. CW9 explained that this is because Andexxa is an inpatient diagnostic-related group, or "DRG," medication. CW9 said that s/he thought, but was not sure, that the CMS had approved a New Technology Add-On Payment ("NTAP") for Andexxa, but s/he did know how much it was. CW9 said that the NTAP would not have changed the cost versus benefit determination for his/her hospital.

**Confidential Witness No. 10**

155. CW10 has been the Director of Pharmacy Services at a regional hospital in the Southeast region of the United States since January 2019.

156. CW10 reports that the hospital's Chief Clinical Officer ("CCO") was tasked with approving the inclusion of any drug over a certain cost on his/her hospital's formulary.

157. CW10 stated that s/he was familiar with Andexxa and explained that it was indicated for the reversal of anticoagulation and was generally used in rare circumstances due to life-threatening or uncontrolled bleeding. A proposal was made to add it his/her hospital's formulary, but it was denied by the hospital's CCO.

158. CW10 reported that the emergency room ("ER") physician group reviewed the formulary in January 2019 and asked for 5 drugs to be added to it, including Andexxa. The group's proposal was to have at least a couple of doses of Andexxa on hand in the ER.

159. CW10 stated that all the drugs on the ER physician group's list were approved except for Andexxa. CW10 said that the CCO told the group that the cost of Andexxa was too prohibitive to carry. S/he added that the CCO had said that there was no justification for Andexxa's pricing when they could try other things.

160. CW10 reported that the CCO told the ER physician group that if they had a patient that was critical and needed Andexxa, then the patient should be immediately transferred by ambulance to a larger hospital within the area that carried Andexxa. CW10 said that the CCO further said that other drugs that were cheaper than Andexxa could be used, such as Kcentra.

## F. Defendants' Representations to the Market and Market's Reaction

### 1. Portola Announces the Broad Commercial Launch of Andexxa

161. The Class Period begins on January 8, 2019, when Portola gave an investor presentation (the Jan. 8, 2019 Conference Call) announcing the broad commercial launch of Andexxa. The Company reported that following the FDA approval of the second-generation manufacturing process on December 31, 2018, the Company had officially begun shipping Andexxa to specialty distributors, which would supply hospitals in the expanded commercial launch in the United States. Garland told investors about the positive outlook of the broad

commercial launch of Andexxa. Garland reported that since Andexxa first began shipping to select hospitals at the end of May 2018 through the ESP, Portola had stocked 200 hospitals, doubling the number of sites that it had begun stocking in the previous quarter. Critically, Garland also told investors that Portola had seen its reorder rate improve such that the percentage of accounts that had reordered was at 50% as of December 31, 2018. "What I can say today and what we said on our Q3 call is that we're very encouraged with the reorder rate that we're seeing, and we believe it's truly reflective of pull-through demand. Not just stocking, but real pull-through demand."

162. In addition, Portola's Vice President of Business Development Jeet Mahal stated on the Jan. 8, 2019 Conference Call, "[I]n terms of the performance of the [ESP], . . . what we have seen and I think we're encouraged by, is what we expect, which is a time frame for these hospitals who want their stock to get activated, and that can range 3 or 4, 5, 6 months, really depends on the institution. Many of the earliest institutions were the largest academic centers, so they have a lot of processes and protocols. But once they get going, they get going on a regular basis, and that's what we're really encouraged by."

163. In the presentation materials (the "Jan. 8, 2019 Presentation"), which the Company also filed with the SEC on Form 8-K that day, Portola stated, "Andexxa Demand is Strong and Growing":




### 2. Fourth Quarter 2018 Financial Results

164. On March 1, 2019, the Company issued a press release announcing fourth quarter Andexxa revenues of $14.0 million, "followed by three consecutive quarters of strong revenues and the approval of our Generation 2 manufacturing process." Garland stated, "With the full commercial launch of Andexxa now underway in the United States, the pending approval from the European Commission anticipated in early May, and the further extension of our cash runway, we look forward to continuing our positive momentum through 2019."

165. During a conference call on that same day ("Mar. 1, 2019 Conference Call"), Garland touted, "This is our third consecutive quarter of strong revenues for Andexxa and reflects solid demand. As mentioned during our presentation in January, approximately 200

hospitals were stocking Andexxa by the end of the fourth quarter, with a reorder rate of approximately 50%. That's double the roughly 100 hospitals that were stocking Andexxa at the end of the third quarter, with a reorder rate of approximately 40%."

166. During the conference call, Garland stated when asked a direct question regarding the use of competing treatments:

> [**Analyst**]: [W]here Andexxa is available, is it your understanding that that is clearly the first line therapy for the Xa bleeds or might there be some hospitals that while they have Andexxa available, are still using some of the older methods like fresh frozen plasma or four-factor PCCs even though that Andexxa is available?
>
> [**Garland**]: Certainly, we know hospitals are using PCCs and we expect they probably will continue to use PCCs although we believe that's inappropriate given the fact that we're the only approved agent. But in many ways you call it, it really does vary by hospital. ***It's kind of hard to speak about it generally because each hospital is somewhat unique*.**"

167. Also, that same day, an analyst from Cowen noted in a report that Portola's $14 million Andexxa sales beat his estimate of $10.1 million and the consensus of $9.4 million.

168. On March 1, 2019, the Company filed its FY 2018 Form 10-K reporting its detailed its distribution practices for the Andexxa broad commercial launch and its method for recognizing revenue:

> We sell Andexxa and Bevyxxa to a limited number of specialty distributors and wholesalers in the United States ("Customers"). These Customers subsequently resell our products to hospitals, pharmacies and long-term care centers. In addition to distribution agreements with Customers, we enter into arrangements with group purchasing organizations, indirect customers and payors that provide for privately negotiated rebates, chargebacks, distribution costs and discounts with respect to the purchase of our products. We recognize revenue on product sales when the Customer obtains control of our product, which occurs at a point in time (upon delivery). Product revenues are recorded net of applicable reserves for variable consideration, including discounts and allowances.

169. In describing how Portola determines net product revenue, the FY 2018 Form 10-K stated:

> Our product revenue consists of the U.S. sales of Andexxa, which we began shipping to customers in May 2018, and the U.S. sales of Bevyxxa, which we began shipping to customers in January 2018 … In addition to distribution agreements with Customers, we enter into arrangements with group purchasing organizations, indirect customers and payors that provide for privately negotiated rebates, chargebacks, distribution costs and discounts with respect to the purchase of our products.
>
> We recognize revenue on product sales when the Customer obtains control of our product, which occurs at a point in time (upon delivery). Product revenues are recorded net of applicable reserves for variable consideration, including discounts and allowances.

170. In the FY 2018 Form 10-K, Portola described its process for establishing "Reserves for Variable Consideration," which included "discounts, returns, chargebacks, rebates, copay assistance and other allowances" that are factored into the Company's reported revenues. Specifically, the FY 2018 Form 10-K stated:

> Revenues from product sales are recorded at the net sales price (transaction price), which includes estimates of variable consideration for which reserves are established and which result from discounts, returns, chargebacks, rebates, copay assistance and other allowances … Where appropriate, these estimates take into consideration a range of possible outcomes that are probability-weighted in accordance with the expected value method under ASC 606 for relevant factors. These factors include current contractual and statutory requirements, specific known market events and trends, industry data, and/or forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the respective underlying contracts.
>
> The amount of variable consideration that is included in the transaction price may be constrained, and is included in the net sales price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. Actual amounts of consideration ultimately received may differ from our estimates. If actual results in the future vary from our estimates, we will adjust these estimates, which would affect net product revenue and earnings in the period such variances become known.

171. The FY 2018 Form 10-K described the variable considerations that were purportedly factored into the Company's revenues, stating:

> *Product Returns:* We generally offer Customers a right of return based on the product's expiration date or other market-based factors for product that has been

> purchased from us. We estimate the amount of our product sales that may be returned by our Customers and record this estimate as a reduction of revenue in the period the related product revenue is recognized. We currently estimate product return liabilities using available industry data, our own sales information and our visibility into the inventory remaining in the distribution channel.

172. The FY 2018 Form 10-K, which characterized as merely "[r]isks related to commercial and marketing operations" that Portola's "[f]ailure to attain market acceptance among the medical community and third-party payors ***may*** have an adverse impact on our operations and profitability," and "***[i]f*** we are not successful in commercializing Andexxa, our future product revenue will suffer, we ***may*** incur significant additional losses and our business will be materially harmed."

173. The FY 2018 Form 10-K furthers stated that "Andexxa ***may compete*** with the off-label use of other treatments designed to enhance coagulation, such as FFP, PCCs, rFVIIa or whole blood. Although there is no approved indication for these products in patients taking Factor Xa inhibitors, physicians may choose to use them because of familiarity, cost or other reasons."

174. The FY 2018 Form 10-K was signed by Garland and Dier and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Garland and Dier.

### 3. First Quarter 2019 Financial Results

175. On May 8, 2019, the Company issued a press release announcing its financial results for the first quarter (or "Q1") ended March 31, 2019 ("May 8, 2019 Press Release"). The Company reported total revenues of $22.2 million for the first quarter of 2019, compared to $6.6 million for the first quarter of 2018. Total first quarter revenues included $20.3 million in net product revenues from Andexxa sales, or 45% more than the previous quarter. In the

Company's earnings release, Garland represented that "our first quarter results continue to reflect strong demand for Andexxa, as well as focused execution on our commercial launch."

176. Later that day, the Company conducted an earnings call, the May 8, 2019 Conference Call, where Koenig represented that the "daily demand [for Andexxa] continue[s] to grow" as "hospitals will continue to come online at a rate that is approximately consistent with what we have seen in the last few quarters." Garland added that the Company was "very happy with what we've been seeing so far with the reorder rate" from hospitals, as those "reorder rates are really reflecting … pull through and underlying demand." Furthermore, Garland represented that there was "enthusiasm and the desire from what we might call a nontarget hospital to stock this drug," which therefore "speaks both to the significant value of the drug as well as the desire to use the product as quickly as possible." Accordingly, Garland underscored that he was "actually very, very pleased with the uptake of Andexxa so far" and "expected that the current trajectory should continue at a linear rate" with respect to revenues, as the "utilization on a per hospital level [] deepen[s] both as physicians get used to the product and as hospitals continue to go through their protocol development[.]"

177. Koenig also stated on the May 8, 2019 Conference Call that "the amount of inventory with our distributors remain relatively constant throughout the quarter and is in line with industry norms." Koenig also noted that the Company is "seeing that the utilization of Andexxa is both in ICH bleeds and also in other bleeds outside of ICH. So we're seeing a mix of all types of bleeds that are currently being treated." Similarly, Garland represented that he was "pleasantly surprised by the fact that [the] drug is being used broadly."

178. Koenig further represented that the majority of the Company's 300 hospital customers had made their P&T determinations—a shorthand reference to hospitals' policies

regarding the utilization of drugs, therapies, and drug-related products and identifying those that are most cost-effective and medically appropriate for the hospital's patient population (also known as a "formulary system"). Specifically, Koenig told investors that "[t]he majority of hospitals have made P&T decisions. So the majority of them have the product on the protocol and are using the product. As we mentioned earlier, happy with the rate of reorder rates that we are currently seeing."

179. In the presentation materials used on the May 8, 2019 Conference Call (the "May 8, 2019 Presentation"), Portola stated, "Andexxa Demand in the U.S. is Strong and Growing":




180. On that same day, an analyst from Cowen noted that Andexxa's $20.3 million of sales were in-line with his estimates and consensus estimates of $20 million. The Cowen analyst noted, "Management declined to quantify the revenue contribution from hospital stocking versus end-user demand, but indicated that in January specialty distributors purchased ~$2MM in initial inventory and that inventory remained relatively constant throughout the

quarter, in-line with industry norms." The Cowen analyst also recounted that "Portola has been adding ~100 hospitals per quarter and suggested on the call this morning that the pace of hospital addition is expected to continue at a linear rate. Andexxa continues to undergo P&T reviews at institutions, a process which Portola estimates typically takes 6-9 months."

181. On May 8, 2019, the Company filed a quarterly report on Form 10-Q, its Q1 2019 Form 10-Q, affirming the previously reported financial results. The Q1 2019 Form 10-Q was signed by Garland and Dier and contained signed SOX certifications by Garland and Dier.

182. In the Q1 2019 Form 10-Q, the Company represented that Portola's operations "may be affected by a variety of factors, including: the level of demand and market acceptance," and that the Company's success depended on the "degree of market acceptance," "the willingness of physicians and healthcare organizations to change their current treatment practices," and "the willingness of hospitals and hospital systems to include our products as treatment options."

183. On July 8, 2019, Portola issued the July 8, 2019 Press Release announcing new in vitro data establishing the relationship between concentrations of the direct oral anticoagulants apixaban and rivaroxaban and the ability of 4F-PCC to correct inhibition of thrombin generation, compared with warfarin anticoagulation reversal by 4F-PCCs, such as Kcentra.[27] This was the first press release issued by Portola attacking 4F-PCCs during Andexxa's commercial launch.

---

[27] Press Release, Portola, *Portola Pharmaceuticals Presents New In Vitro Data Demonstrating that Four-Factor Prothrombin Complex Concentrates (4F-PCCs) Had No Direct Effect on Inhibition of Thrombin Generation by Factor Xa Inhibitors* (July 8, 2019).

### 4. Goldman Sachs Global Healthcare Conference

184. On June 11, 2019, Garland participated in the Goldman Sachs Global Healthcare Conference ("June 11, 2019 Goldman Sacks Global Healthcare Conference"). Garland represented that the Company "track[s] the number of accounts that have ordered at least once," stressed that on a quarter-on-quarter basis, Portola had "about 100 new hospitals ordering each quarter," and touted that there was "enough data to feel very confident in both the short- and the long-term trajectory of Andexxa."

### 5. Second Quarter Financial Results

185. On August 7, 2019, Portola issued a press release announcing its financial results for the second quarter (or "Q2") ended June 30, 2019 ("Aug. 7, 2019 Press Release"). The Company reported that Andexxa net product revenues grew to $27.1 million of the Company's total revenue in the quarter of $28.4 million, compared to only $4 million during the same period for the prior year. In the Company's earnings release, Garland touted "this is our fifth consecutive quarter of strong revenue growth reflecting our exceptional launch execution and continued demand for Andexxa." On this news, shares of Portola traded up $3.22 or 11.9% to closed at $30.36 per share on August 8, 2019, on heavy volume.

186. During the earnings call later in the day, the Aug. 7, 2019 Conference Call, Koenig represented that to continue to optimize its targeting efforts, the Company was "deepening utilization within existing accounts" and that it was "seeing encouraging trends." Koenig further represented that there was "continued strength and demand for Andexxa" as "74% of our sales in the quarter came from reorders, reflecting real pull-through and increasing use in patients."

187. Also, on the earnings call, Garland represented that Andexxa was "one of the top five hospital drug launches over the last 30 years." Garland said that Portola tracked the type of usage of Andexxa by hospitals as a metric of deepening utilization, saying, "We do track that. We do track it with a chart [or poll]. What we have said in the past and what's very encouraging is that we are definitely seeing usage in patients outside of the intracranial hemorrhage space." Garland also reaffirmed, "There's deepening of usage in existing accounts."

188. Later, on the Aug. 7, 2019 Conference Call, Garland responded to a question by an analyst concerning utilization as follows:

> [**Analyst**]: Does it concern among investors that over time as you get later doctors to stock a drug, their utilization is going to be less than the people who have stocked already. So the revenue curve is going to—going to begin to plateau or decelerate. What are your—what are your thoughts on that concern that's in the market.
>
> [**Garland**]: … What we are seeing, as we've looked at a cohort of our institutions, large important institutions that came on earlier at [ESP] ***and actually what we're seeing is increased usage over time or deepening usage over time. There's nothing that we're seeing today*** that makes us concerned about a lack of pull-through or a plateauing of our utilization."

189. Garland also proclaimed, "Also last week, the Joint Commission known as JCAHO, the oldest and largest accrediting body for hospitals and med care [ph] issued a new report on DOACs. The report directs accredited hospitals and critical care centers to stock anecdotes appropriate for the use with each type of anticoagulant. ***Reports like these are making it clear that Andexxa is becoming the standard of care for patients on apixaban or rivaroxaban***."[28]

---

[28] A review of The Joint Commission *Sentinel Event Alert* on July 30, 2019, reveals that Andexxa was not specifically mentioned in this article. *See*

190. In the presentation materials used on the Aug. 7, 2019 Conference Call ("Aug. 7, 2019 Presentation"), Portola stated, "Andexxa Demand in the U.S. is Strong and Growing":




191. In a report issued that same day, an analyst at Cowen noted that Andexxa sales of $27.1 million were above the consensus of $24.0 million and his estimate of $25 million. Similarly, a Credit Suisse analyst commented, "While reorder rates have remained stable at 55%, the above-expectations hospital adds and a concentration towards the end of the quarter impacted the metric and the company indicated that earlier adopting hospitals have a higher reorder rate and deepening usage. Management highlighted that 74% of revenues this quarter were from reorders, potentially reflecting real underlying demand and hospital utilization of Andexxa."

---

https://www.jointcommission.org/resources/patient-safety-topics/sentinel-event/sentinel-event-alert-newsletters/sentinel-event-alert-61-managing-the-risks-of-direct-oral-anticoagulants/.

192. Also, on August 7, 2019, the Company filed a quarterly report on Form 10-Q, its Q2 2019 Form 10-Q, affirming the previously reported financial results. The Q2 2019 Form 10-Q was signed by Garland and Dier and contained signed SOX certifications by Garland and Dier.

193. The Q2 2019 Form 10-Q represented that Portola's operations "may be affected by a variety of factors, including: the level of demand and market acceptance," and that the Company's success depended on the "degree of market acceptance" and "the willingness of physicians and healthcare organizations to change their current treatment practices" and "the willingness of hospitals and hospital systems to include our products as treatment options."

**6. August 2019 Public Offering**

194. On August 7, 2019, the Company filed a Registration Statement on Form S-3 which included a base prospectus ("Registration Statement" or "August 7, 2019 Base Prospectus") with the SEC. The Registration Statement became effective on August 7, 2019. On August 12, 2019, Portola filed a Preliminary Prospectus Supplement on Form 424(b)(5) with the SEC ("August 12, 2019 Preliminary Prospectus"), which preliminarily announced a public offering. On August 14, 2019, the Company filed a Prospectus Supplement on Form 424(b)(5) with the SEC (collectively with the August 7, 2019 Base Prospectus, August 12, 2019 Preliminary Prospectus Supplement, the "Prospectus"). In the Registration Statement and Prospectus, Portola incorporated by reference the following Company documents: (a) the FY 2018 Form 10-K; (b) Q1 2019 Form 10-Q; and (c) Q2 2019 Form 10-Q. These materials, along with the Registration Statement and Prospectus, are collectively referred to herein as the "Offering Materials." As the Offering Materials stated, the "information incorporated by reference is considered to be part of" the Registration Statement and Prospectus.

195. Portola sold 9,241,072 shares of common stock in the Offering, which included 1,205,357 shares of common stock issued pursuant to the over-allotment option granted to the underwriters, at a public offering price of $28 per share. The total proceeds from the Offering and over-allotment, net of underwriting discounts and commissions of approximately $14.2 million, were approximately $244.5 million.[29]

196. In the Offering Materials the Company specifically touted the success of the Andexxa commercial launch along other metrics such as "reorder rate": "Andexxa is tracking with the most successful among 45 other acute care hospital drugs launched in the past 30 years based on average quarterly sales for the first four full quarters of launch. In addition, in the second quarter of 2019, Andexxa had a reorder rate of 54% with 74% of Andexxa revenues from reorders for the quarter. In the same period we added 125 additional hospitals for a total of over 400 hospitals that have ordered Andexxa since launch."

**7. Morgan Stanley Global Healthcare Conference**

197. On September 10, 2019, during the Morgan Stanley Global Healthcare Conference Call ("Sept. 10, 2019 Morgan Stanley Health Conference Call"), Garland assured investors of Andexxa's "broad utilization" and emphasized that Portola was hearing "from our physicians … a lot of enthusiasm for the drug, high unmet medical need, very limited treatment options and a very large and growing problem that is urgent and life-threatening." To bolster his assertion of Andexxa's "broad utilization," Garland cited internal metrics on the increasing number of hospitals making their first, second, and third purchases of Andexxa; a "regular chart audit" of hospital records for patients who have been given Andexxa; and an internal

---

[29] FY 2019 Form 10-K, at F-9.

benchmark analysis purportedly ranking Andexxa "in the top 5" of 45 comparable drug launches in the past 30 years. Garland further assured investors that his focus was "first and foremost" on Andexxa, which was Portola's "first, second, third priority." Garland said that all of this "gives a really positive picture about the future projections of this drug, both in short and long term." Garland specifically stated:

> The reorder rate, we've talked about before, it was 55%, which was stable quarter-on-quarter, is heavily influenced by when a hospital comes online. And remember, we added 125 hospitals in the second quarter. Many of those were later in the quarter. And as a result, they are in the denominator, but they haven't been around long enough to contribute to the numerator. ***So that had an impact on the reorder rate, which is why we gave it a new metric, which was that roughly 3/4 of our business, or 74% of our business, came from reorders.*** So what we're seeing consistently is that the drug is getting utilized.

**8. Third Quarter Financial Results**

198. On November 5, 2019, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2019 where it reported total global revenues of $36.8 million, compared to $14.2 million for the third quarter of 2018 ("Nov 5, 2019 Press Release"). Total global revenues included $35.7 million in net product revenues from sales of Andexxa/Ondexxya. In the release, Garland represented that the Company had "delivered another quarter of strong Andexxa revenue in the U.S." and "will continue to focus on exceptional launch execution, leveraging external support from health authorities and favorable society guidelines, and building the clinical evidence and awareness of Andexxa" as the "use of Factor Xa inhibitors in both markets continues to grow, driving the underlying market opportunity for Andexxa/Ondexxya and long-term value of Portola."

199. Later that day, the Company conducted an earnings call ("Nov. 5, 2019 Conference Call"). In the presentation materials used during the call ("Nov. 5, 2019 Presentation"), Portola stated, "Andexxa Demand is Strong and Growing":




200. Garland represented during the Nov. 5, 2019 Conference Call that Portola "remain[s] confident in our ability to build long-term growth and value" and that "the demand for Andexxa was strong" because of continued execution on Andexxa's launch, the rapid growth of the Factor Xa inhibitor market, and Portola's success in establishing Andexxa as "the standard of care." Garland further represented, "Our revenue is being driven by new customer additions and positive utilization trends."

201. Koenig represented at the Nov. 5, 2019 Conference Call that, "Existing accounts continued to show strong pull-through, with 76% of sales in the quarter coming from utilization or reorders compared to 74% in the previous quarter." He further stated, "Inventory in the channel remained steady at approximately two weeks of demand" and described the U.S. market as "very data-rich" for use in tracking orders. Further when asked by an analyst whether Portola was "still conducting [a] quarterly chart review and if [the Company] could comment on what sort of bleeds you're seeing Andexxa is used for in the U.S. and how that may be evolving over time," Koenig responded, "So we do still continue our chart review on a quarterly basis. And

similar to what we've reported in our previous quarters, Andexxa is being used in all ranges of bleeds."

202. During the Nov. 5, 2019 Conference Call, Garland responded to specific analyst concerns regarding utilization during the year as follows:

> [**Analyst**]: And then now with a year of experience on the U.S. market, I'm just wondering if you could start to give us some kind of comparison or, if it's high level, even about the current utilization at some of those hospitals that have been online for at least a year, maybe even over a year, versus maybe some that have come online in the past six months….
>
> [**Garland**]: [N]ow that we've got a couple of years under—or a year under our belt how does the utilization look[?] We aren't giving any detailed information around utilization per hospital per month. ***What we have seen is that, that utilization per hospital per month stays—has been staying consistent in 2019***."
>
> ***
>
> **[Analyst]**: [O]n the 76% of sales, revenue driven by reorders, can you just comment on where you see that number trending? And it seems like it's leveling off a bit. Is that how – what you expect at this point in the launch?
>
> **[Garland]**: [W]e haven't and won't be providing any sort of forward-looking guidance on the reorder rate. It obviously went up quarter-over-quarter. I do expect, though, that, that number is not going to be 100%.

203. An analyst report issued by Cowen that same day stated that "Andexxa/Ondexxya sales of $35.7MM (+32% Q/Q), above consensus of $33.6MME and our $32.0MME… 76% of Q3 U.S. sales were from re-orders reflecting genuine pull-through of the product. On the call tonight, Portola indicated that the proportion of hospitals reordering per quarter (56% by the end of Q3:19) is subject to variability due to the timing, mix, and order of hospital additions during the quarter, and this figure will no longer be provided in the future."

204. Also, on November 5, 2019, the Company filed a quarterly report on Form 10-Q, its Q3 2019 Form 10-Q, affirming the previously reported financial results including

$32.95 million for Andexxa net product revenues for the third quarter. The Q3 2019 Form 10-Q reported that for the nine-months ending September 30, 2019, Andexxa had $80.4 million in net product revenues. The Q3 2019 Form 10-Q was signed by Garland and Dier and contained signed SOX certifications by Garland and Dier.

205. In the Q3 2019 Form 10-Q, the Company represented that Portola's operations "may be affected by a variety of factors, including: the level of demand and market acceptance," and that the Company's success depended on the "degree of market acceptance" and "the willingness of physicians and healthcare organizations to change their current treatment practices" and "the willingness of hospitals and hospital systems to include our products as treatment options."

206. On November 6, 2019, Oppenheimer issued a research report stating "Andexxa 3Q revenues of ~$36M exceeded our estimate and consensus estimate, both at ~$33M, by adding 125 new US hospitals for a total of 550 now stocking Andexxa." Further, "[m]anagement indicates US inventory levels were essentially constant during the quarter with no incremental stocking…." The report also noted that "[t]he 56% reorder rate in 3Q increased slightly from 2Q and is potentially misleading based on a large number of hospitals added toward the end of 3Q." However, "[m]anagement describes reorders as a % of total revenues as a more meaningful metric compared to the reorder rate. In 3Q, 76% of revenues were from reorders, up slightly from the 74% in 2Q."

207. On November 15, 2019, Portola issued a press release announcing that the Annals of Emergency Medicine, the journal of the American College of Emergency Physicians ("ACEP"), published a multidisciplinary anticoagulant reversal and replacement guidance statement. In the guidance statement, ACEP highlighted Andexxa as a first-in-line, FDA-

approved reversal agent for patients treated with apixaban or rivaroxaban, "as compared to 4F-PCC [*e.g.*, Kcentra], which are highlighted as a second-in-line option for Factor Xa reversal and recommended for use only if Andexxa is not available."[30]

### G. The Truth is Revealed

#### 1. Portola Reveals Andexxa Demand is Flat, Utilization is Decreasing and the Company Under-reserved for Product Returns. and Sold Excessive Product to Its Specialty Distributors

208. On January 9, 2020, Portola announced in a press release that Andexxa demand was collapsing ("Jan. 9, 2020 Press Release"). In the press release the Company stated that total net U.S. Andexxa revenues were projected to be $24 million, down from $33 million the prior quarter, a decline of 27%. The press release stated that fourth quarter Andexxa net sales in the U.S. were impacted primarily by two factors: (i) a "$5 million gross to net adjustment due to a return reserve for short-dated product"; and (ii) "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts." Portola further stated that it "believes that in certain of these accounts, hospital pharmacies curtailed use of Andexxa following drug utilization reviews in an effort to manage pharmacy budgets." The Company, however, stated that it had a "strong cash position."

209. During a conference call on January 9, 2020 ("Jan. 9, 2020 Conference Call"), Dier stated, "the $5 million does represent short-dated product return reserve adjustment for this quarter. So obviously, that had an impact on the gross to net, but that represents a little bit of a catch-up and a little bit about what we project going forward for the short-dated product….

---

[30] Press Release, Portola, *Andexxa Highlighted as a First-Line Factor Xa Reversal Option by the American College of Emergency Physicians* (Nov. 15, 2019).

***[T]he accounts that did return for a short-dated product have reordered***, which is great, and we've also already started shipping our longer-dated 36-month product starting in November."

210. When asked by analyst in the same conference call whether the "$5 million reserve is for product that is short-dated, but has not yet been returned," Dier responded that the reserve addresses both "what's been returned, ***it's a little bit of catch-up for the year***, and then you need to make an estimate of what you think may be returned based on what you've seen so far. ***That's just accounting for return reserves***…. So we come up with a calculation. We feel good about the $5 million, taking the $5 million now. ***And then moving forward, we'll have our classic return reserve adjustment as part of our gross-to-net calculations***." On this issue, Koenig further noted, "[o]n the short-dated product, it was … was ***between 6 and 12 months***. And the reason why the decision was made to go out with that dating was to get the medicine to patients as quickly as possible." Garland added, "I should emphasize that the dating of 6 to 12 months is when it got to the distributor."

211. On this news, the Company's share price plummeted by $9.98, or approximately 40%, to close at $14.76 per share on January 10, 2020.

212. A January 9, 2020 analyst report by Cowen noted, "Q4 sales were hurt by lower utilization at early-adopting Tier 1 hospitals. Management notes many held drug utilization reviews and these resulted in the requirement for a physician or pharmacy consult prior to use of Andexxa. Though management does not think the reviews produced specific restrictions on which patients can get Andexxa***, the revenue numbers clearly suggest that the consults are resulting in fewer patients getting the antidote***…. We are concerned by this decrease in utilization. Though management outlined a number of measures it will take to deepen utilization during 2020, we suspect that these will take time to have an impact. Moreover, as

the reviews were undertaken by early-adopters, other hospitals could be expected to perform them over time. This implies Andexxa will ramp more slowly than we had projected. We are cutting our estimates for 2020-22."

213. On January 10, 2020, a Credit Suisse analyst issued a report lowering its target price from $35 per share to $18 per share, also raising concerns of a "high burn rate (2020 consensus OpEx of ~$340m vs $464m cash balance)." Credit Suisse note, "Portola reported Q4'19 revenue of ~$28m, which came in substantially below FactSet consensus of ~$41m, and was 22% lower than Q3 2019 revenue of ~$36m." Credit Suisse also stated, "PTLA sees the health economic data as a key component to support/incentivize use of Andexxa, since no such data is available currently." Further, Oppenheimer issued a report on Portola that stated it was, "[m]oving to the [s]idelines on Andexxa [h]eadwinds" because the utilization reviews "signal hospital interest in Andexxa likely crossed a critical threshold." In another report, William Blair stated, "The decreased utilization at tier-1 accounts is the most worrisome update, which management believes is due to hospital pharmacies curtailing the use of Andexxa following drug utilization reviews and determining the impact on pharmacy budgets. Management continues to highlight that physician demand remains strong; however, the decline in utilization raises serious concerns regarding the growth trajectory of Andexxa, particularly in the near term."

214. On January 14, 2020, Garland participated in an industry conference where he revealed that, in addition to the two factors disclosed in the Company's fourth quarter 2019 earnings release, Andexxa's net revenues were also impacted by "lower distributor purchases to manage inventory" in order "to keep their inventory levels at a constant level in the fourth quarter." In doing so, Portola essentially admitted that its distributors were so overstocked

with Andexxa product that they had stopped ordering new inventory or reduced their orders. Garland also explained that a typical utilization review occurs "every 6 to 12 months."

215. On January 14, 2020, Portola had a second investor call, where Portola further disclosed that Andexxa's net revenues were also impacted by "***lower distributor purchases to manage inventory***" in order "to keep their inventory levels at a constant level in the fourth quarter." During this call, Portola used a prior investor presentation, but removed the slide from the Company's three prior earnings presentations that "Andexxa Demand is Strong and Growing."

216. In the presentation materials used on the call, Portola detailed three factors that had primarily impacted fourth quarter sales:

## Andexxa Q4 Results and Business Trends in 2019

| | 4Q19 | FY 2019 |
|---|---|---|
| **Andexxa Revenue (M)** | **$28** | **$111** |
| U.S. | $24 | $104 |
| Europe | $4 | $7 |
| **New Hospitals Adds** | **90** | **425** |

**80% of revenue from reorders in Q4**, up from 78% in the third quarter

**Fourth quarter sales were impacted primarily by:**

- $5 million gross to net adjustment due to return reserve for short-dated product
- Flat Q/Q demand due to a decrease in utilization, primarily in Tier 1 accounts
- Lower distributor purchases to manage inventory

**Cash balance at Dec. 31, 2019 ~ $464 million**

217. On January 30, 2020, a *Seeking Alpha* article titled "Portola: Doubtful Trials and Falling Sales Make Andexxa and Unlikely Blockbuster" was published in response to the Company's "underwhelming" fourth quarter Andexxa sales.[31] The commentator noted that he

[31] Ingham, *supra* note 2.

had recommended Portola back in October 2019 believing Andexxa was a "blockbuster" drug. The commentator noted recently that there were "serious concerns raised around Andexxa's [pre-FDA approval] ANNEXA-4 trial results, and ***questions are being asked as to how a drug with a list price of $27,500 can replace an existing treatment costing $5,000 if it has not yet been proven to be more effective***." The commentator further stated, "Portola has published numerous pieces of research during 2019 supporting management's claim that Andexxa is a best-in-class solution for treatment of Factor Xa related bleeds. Andexxa has been shown to reduce inpatient mortalities, whilst rival 4FPCC treatments have been shown to be less effective when treating Factor Xa related bleeds. As I will describe below however, ***doubts have been cast about these results that are quite troubling and could prevent Andexxa from making it onto hospital formulary lists***."

218. The *Seeking Alpha* article noted that although Andexxa is the only FDA drug approved treatment for Eliquis and Xarelto, the "Neurocritical note suggests within the day-to-day hospital setting ***this distinction carries little merit***" because "neither the FDA nor the American Heart Association ('AMA') insist on the use of officially approved drugs. That decision is made exclusively and independently by a physician who is free to use either an approved drug, or an off-label drug as they see fit" and because neither "the American Society for Hematology, nor the American College of Cardiology have expressed any preference for Andexxa over PCC [*e.g.*, Kcentra]. Although the American College of Chest Physicians expresses a preference for Andexxa, if available, this is clarified in the note as a consensus statement rather than a guideline recommendation." Further, the cost comparison with Kcentra was heavily in Kcentra's favor: "the price of Andexxa at $3,300 per 100mg vial. Dosage is either 900mg or 1,800mg depending on severity (or in case a second dose is required if patient

relapses)—that's either $26,400, or $59,400 per dose." In current practice, the author continues, "Kcentra at recommended dosage for anti-Xa treatment is 50 units per kg, meaning, at a price ~$1.41 per unit, it will cost only $7,050 for a 50kg patient."

### 2. Portola is Forced to Discontinue Bevyxxa Operations to Support Floundering Andexxa Commercialization

219. After the close of market on February 26, 2020, Portola announced its financial results for the fourth quarter and full year 2019 in a press release ("Feb, 26, 2020 Press Release") and held a conference call, the Feb. 26, 2020 Conference Call, that revealed in more detail the serious problems with customers' adoption of the Andexxa drug and confirmed investors' concerns after the Company's pre-announcement of financial results last month. Specifically, Portola reported in the Feb. 26, 2020 Press Release that it had sustained a fourth-quarter loss of $96.7 million, or a loss of $1.24 per share.[32] Portola disclosed that its outsized loss for the quarter encompassed a $27.5 million charge, which it attributed to its decision to discontinue operations related to the Bevyxxa.[33] *Id.* During the conference call, Garland stated that the Company was forced to cease Bevyxxa commercialization efforts and undertake an internal restructuring so it could focus its efforts on Andexxa.

220. Also, during the Feb. 26, 2020 Conference Call, Koenig stated:

> In 2019, we added 425 new hospital customers for a total of 640 accounts that have ordered Andexxa…. As we progress in 2020, we expect to add approximately 350 new hospital accounts throughout the year. We expect that our new customer mix in 2020 will include hospitals in all tiers, as well as non-target hospitals that are proactively interested in adopting Andexxa, oftentimes through an affiliation with the larger hospital that is already using Andexxa.

---

[32] In a February 26, 2020 article, *Bloomberg* noted that loss was "wider than the average analyst estimate" of $0.88 per share.

[33] *Id.*

221. An analyst from Credit Suisse in a February 26, 2020 report commented, "[i]n 2020, PTLA expects to add approximately 350 new hospital accounts, with a mix that will include hospitals in all tiers and non-target hospitals; while ***this could drive the average revenue per account*** down slightly depending on reordering rates for existing accounts." Likewise, Cowen issued a report on February 26, 2020 stating, "[o]n tonight's call, Portola indicated that it expects to add approximately 350 … new hospital accounts during 2020, implying a ***deceleration*** from the 425 hospitals added in 2019."

222. On this news, the Company's share price fell $2.35 per share to close at $10.17 per share on February 27, 2020, an approximately 19% decline.

#### 3. Portola Admits that the Marketing of Andexxa and Resistance to Utilization by Hospital Formulary Committee Was Adversely Impacted by Competition with Off-Label Use of 4F-PCCs

223. On February 28, 2020, after the market closed, Portola filed its FY 2019 Form 10-K. The Company admitted that Andexxa had been encountering material difficulties in selling Andexxa in 2019 due to competition from "widely used" 4F-PCCs, a common standard of care preceding Andexxa:

> For example, we do not have comparator arm data, including clinical head to head data against the treatment options which were used by hospitals prior to the availability of Andexxa, which we believe continue to be widely used, including off-label use of 4F-PCCs and other coagulation factors. In addition, the efficacy statements in our product label are limited as the result of our single-arm, open-label study. These limitations have a significant impact on our ability to market Andexxa and establish it as the standard of care, as pharmaceutical companies are generally prohibited from making product claims not set forth in their product labels. These limitations can also increase resistance to utilization by hospital formulary committees and may also negatively impact government pricing discussions in the EU and abroad.

224. Further, in the FY 2019 Form 10-K, Ernst & Young LLP (the Company's auditor since 2004) communicated a "Critical Audit Matter" to the Board of Directors concerning Portola's accounting for reserves on product revenue:

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments….

***Reserves for returns on product revenue***

*Description of the Matter*

As described in Note 3 to the consolidated financial statements, the Company had product revenue of $111.6 million for the year ended December 31, 2019, which was net of $20.6 million recorded as a reduction in revenue, which includes estimates of variable consideration for which reserves are established, including reserves for product returns.

***Auditing the Company's measurement of reserves for product returns under its contracts with customers was especially challenging*** because (1) the calculation involves subjective management assumptions about inventory remaining in the distribution channel as of the balance sheet date (i.e., units held by hospitals) that could be subject to return in future periods under the Company's returns policy, and (2) the Company has limited commercial sales history on which to base its assumptions.

## VI. EXCHANGE ACT VIOLATIONS

### A. Defendants' Material Misrepresentations

225. Throughout the Class Period, Defendants repeatedly issued false and misleading statements that there was strong demand for Andexxa and that Andexxa was being broadly utilized by hospitals. To further this deceit, the Company employed bogus metrics such as "new hospital additions" and "reorder rate," which the Company claimed showed that there was strong demand for Andexxa when in fact they did not have strong demand. The Company further omitted substantial negative information concerning Andexxa, which it was under a duty to disclose when it made these false and misleading statements.

226. Throughout the Class Period, the Company also issued financial results which were false and misleading. In particular, the Company inflated Andexxa net product revenues

by under-reserving for product returns, which the Company knew or should have known would be forthcoming (a) because of approaching expiration dates and (b) by selling excess Andexxa inventories to its specialty distributors in the third quarter of 2019 when the Company knew or should have known that there was little demand for that inventory by hospitals.

### 1. Defendants Issued False and Misleading Statements Falsely Portraying the Commercial Launch of Andexxa as a Success

#### a. Defendants Made False and Misleading Statements Concerning Andexxa Demand

227. Throughout the Class Period, Defendants repeatedly reassured investors that Andexxa demand was "strong and growing" and that the growth was on a "linear" trajectory. As a result, Company had "strong execution" on the Andexxa commercial launch.

228. The following are a series of false and misleading statements that Andexxa demand was strong and growing and that growth was on a linear trajectory:[34]

- "***Andexxa Demand is Strong and Growing***." (Jan. 8, 2019 Presentation.)
- Garland stated that the Company "expected that the ***current trajectory should continue at a linear rate***" with respect to revenues. (Garland, May 8, 2019 Conference Call.)
- That "enthusiasm and the desire from what we might call a nontarget hospital to stock this drug," which therefore "speaks both to the ***significant value of the drug as well as the desire to use the product as quickly as possible***." (Garland, May 8, 2019 Conference Call.)
- That "our first quarter results continue to ***reflect strong demand*** for Andexxa, as well as focused execution on our commercial launch." (May 8, 2019 Press Release.)
- "This is our third consecutive quarter of strong revenues for Andexxa and ***reflects solid demand***." (Garland, Mar. 1, 2019 Conference Call.)

---

[34] **Bolded** and ***italicized*** quoted statements are alleged to be false and misleading, while other statements are provided for context.

- "Andexxa ***Demand in the U.S. is Strong and Growing***." (May 8, 2019 Presentation.)
- "I think we've mentioned that we think ***it's a linear rate***, which obviously [is] going to be some variability over time." (Garland, May 8, 2019 Conference Call.)
- That "***daily demand continue[s] to grow.***" (Koenig, May 8, 2019 Conference Call.)
- "And you go I know we get questions about sort of rate of hospital uptake and one of the things we've said all along is that ***we expect that rate to continue at a pretty linear rates*** to exactly what we're saying and totally in line with our expectations." (Koenig, May 8, 2019 Conference Call.)
- "This is our fifth consecutive quarter of strong revenue growth reflecting our exceptional launch execution and ***continued demand for Andexxa.***" (Aug. 7, 2019 Press Release.)
- "***Andexxa Demand in the U.S. is Strong and Growing***." (Aug. 7, 2019 Presentation.)
- "***There is continued strength and demand for Andexxa***…." (Garland, Aug. 7, 2019 Conference Call.)
- "Our second quarter results reflect the fifth consecutive quarter of strong launch, execution and ***growing demand for Andexxa***." (Dier, Aug. 7, 2019 Conference Call.)
- That it "***feel[s] like there's a lot of momentum, wind in our sales*** for Portola. We announced on our quarterly call $27.1 million in net revenues for Andexxa. That was our fifth consecutive quarter of strong revenue growth and also expectation-beating revenues. So very solid there." (Garland, Sept. 10, 2019 Morgan Stanley Health Conference Call.)
- "In Q3, we delivered ***strong Andexxa revenue growth*** in the United States … our team's ***strong execution on the launch*** of Andexxa in the United States." (Garland, Nov. 5, 2019 Conference Call.)
- "Our performance in the third quarter is a testament to the strong growth since launch and ***long-term potential of our business***." (Koenig, Nov. 5, 2019 Conference Call.)
- "Our financial results reflect ***strong growth of Andexxa in the U.S. and an initial demand*** in Europe." (Dier, Nov. 5, 2019 Conference Call.)
- "***Andexxa Demand is Strong and Growing***." (Nov. 5, 2019 Presentation.)

229. The bolded and italicized statements in ¶228, that the Company was experiencing strong demand and linear growth were affirmative statements of present fact that were materially false and misleading when made because the Company was in fact facing substantial obstacles and significant negative feedback from hospitals in marketing Andexxa during the Class Period, suggesting neither strong ongoing demand nor linear growth.

230. The truth that demand was not strong and growing is evidenced by the following consistent statements by former employees of Portola:

a. statements by CW1 that (i) hospitals had difficulty justifying the high cost of Andexxa and that they could rely on other treatments that they had been using for years without spending as much; (ii) the data concerning the effectiveness of Andexxa did not justify the cost versus the benefit; (iii) some hospitals were carrying Andexxa as a "CYA" and did not intend to use it; and (iv) because of price, a hospital covered by CW1 had very restrictive use protocols in place limiting Andexxa's use to life-threatening intracranial bleeds (¶¶88-89);

b. statements by CW3 that (i) Andexxa's price was problematic, "[i]t was a struggle for [him/her] from day one to sell Andexxa," and "the hospital pharmacists were terrified of [Andexxa] and not from a clinical point[, but] strictly from a cost point"; (ii) small, rural hospitals that CW3 called on believed that Andexxa was priced "way too aggressively" and many could not afford it; (iii) a hospital with 100 beds or less would have to make a choice between purchasing Andexxa and hiring a staff member because of the high cost; (iv) Kcentra, another anti-coagulant reversal drug, was a cheaper

alternative to Andexxa for many hospitals; and (v) a professor of pharmacology and clinical specialist paid to speak on the benefits of Andexxa by Portola at a June 2018 Hospital Pharmacy Society conference that was attended by 55 hospital pharmacists stated that he would nonetheless use Kcentra over Andexxa because of its cost (¶¶100-102, 104-105);

c. statements by CW4 that (i) hospital pharmacists were shocked at the price difference between Kcentra and Andexxa; (ii) s/he believed that hospitals were initially worried about being sued if a patient died following a severe bleed and the particular hospital did not carry Andexxa, but an article written by three pharmacists in 2019 provided hospital pharmacy directors with information to push back on ordering Andexxa; (iii) many hospitals used the publication of the article to further bolster their position that Andexxa was too expensive to carry when a cheaper alternative such as Kcentra was available; and (iv) the high cost of Andexxa put a strain on pharmacy budgets (¶¶108-109, 111);

d. statements by CW5 that (i) from his/her perspective, the biggest issues Portola had concerning Andexxa usage was the cost of the drug combined with the off-label use of Kcentra; (ii) pharmacies made the purchasing decisions, and they told doctors who wanted Andexxa that the drug was not available or that its use was restricted and that Kcentra was the only available treatment on the formulary; (iii) he/she believes that hospitals made a cost versus utilization analysis and determined that it was too costly to stock more than 3 to 5 boxes of Andexxa or to reorder additional boxes given that the indications were so

limited; and (iv) insurance coverage does not affect a hospital pharmacy department's decision about whether to purchase Andexxa because third-party reimbursement tends to go back to the general hospital accounts and generally does not get refunded to the pharmacy department's budget (¶¶117-120); and

e. statements by CW6 that (i) many hospitals refused to add Andexxa to their formularies because of its high price, telling him/her that they have learned to manage bleeding with these patients and that they have strategies that have been working so they wouldn't purchase at the current price; (ii) "[a]s soon as the customers saw the price, they said that they have lived without it for five or six years and that they could live without it longer"; (iii) two Level I large bed trauma center hospitals in his/her district pushed back on the pricing of Andexxa and placed restrictions on who could use the drug; and (iv) Portola was "absolutely" struggling to sell Andexxa in the period leading up the to its August 2019 Offering (¶¶123, 125-126, 130).

231. The truth that demand was not strong and growing is further evidenced by the following statements by customers or potential customers who were marketed Andexxa by Portola:

a. statements by CW7 that (i) s/he presented Andexxa to the P&T Committee, and it was felt that the data presented in the clinical trial was "flimsy;" (ii) nonetheless, the hospital felt that it was irresponsible to not carry the drug while prescribing Xarelto or Eliquis; it restricted use to only life-threatening intercranial bleeding for patients being treated with Xarelto or Eliquis, which s/he understands is consistent with how hospitals throughout the country are

utilizing Andexxa; (iii) the hospital system only stocks one high dose and one low dose of Andexxa because the usage is so limited, where the system only authorizes Andexxa's use for intercranial bleeding, which is normally accompanied by a stroke; (iv) in his/her hospital system, restrictions were based on effectiveness and not price; (v) the system only stocked one high and one low dose because the usage was so limited; and (vi) the data on the use of Kcentra was as effective in many of the same situations as Andexxa (¶¶134, 135, 136, 137, 138);

b. statements by CW8 that (i) his/her hospital system has Andexxa on its formulary but restricts its usage to only life-threatening events involving intercranial bleeding; (ii) the decision to restrict Andexxa's use is based on the cost versus benefit and the data presented in Portola's clinical trials; (iii) treatments such as Kcentra and Feiba have been used in the past and have been shown to be effective for less cost; (iv) throughout the entire hospital system, Andexxa has been used less than half a dozen times; (v) the data supporting use of Andexxa for gastrointestinal bleeding was not enough to support its use for that type of bleed; (vi) Portola conducted an additional study of Andexxa, the results of which were presented at the American Society of Hospital Pharmacists convention in December 2019 in Las Vegas, Nevada and, in his/her opinion, the study was weak and still not convincing enough to change the Andexxa restrictions; and (vii) s/he believes that most hospitals have similar restrictions on Andexxa (¶¶142, 144, 145, 147);

c. statements by CW9 that (i) his/her team determined that the cost of Andexxa was too high when the benefits are compared with other medications, including PCC treatments such as Kcentra and Feiba, which were effective for significantly less cost; (ii) most hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments; (iii) it is possible that, by carrying Andexxa, a hospital pharmacy may be unable to hire a technician or otherwise fill a vacant position; and (iv) Andexxa is a drug that would come out of the hospital pharmacy's budget (and third-party reimbursements do not affect the cost to the pharmacy department) (¶¶150, 152-154); and

d. statements by CW10 that (i) his/her hospital determined that the cost of Andexxa was too prohibitive to carry and that there was no justification for Andexxa's pricing when they could try other things; (ii) if they had a patient that was critical and needed Andexxa, then the patient should be immediately transferred by ambulance to a larger hospital within the area that carried Andexxa; and (iii) the hospital's CCO said that other drugs that were cheaper than Andexxa, such as Kcentra, could be used (¶¶159, 160).

232. The truth that demand was not strong and growing is further evidenced by the evasive responses by senior management to analyst questions during quarterly conference calls. For example, Garland downplayed whether 4F-PCCs and other pre-Andexxa treatments were being chosen over Andexxa on the March 1, 2019 Conference Call, Garland said that the Company was seeing no issues concerning utilization on the August 7, 2019 Conference Call (right before the August 2019 Offering), and Garland side-stepped a question regarding historical

utilization at hospitals that had been stocking Andexxa for over the past year during the November 5, 2019 Conference Call:

a. "[**Analyst**]: … where Andexxa is available, is it your understanding that that is clearly the first line therapy for the Xa bleeds or might there be some hospitals that while they have Andexxa available, are still using some of the older methods like fresh frozen plasma or four-factor PCCs even though that Andexxa is available?

   [**Garland**]: Certainly, we know hospitals are using PCCs and we expect they probably will continue to use PCCs although we believe that's inappropriate given the fact that we're the only approved agent. But in many ways you call it, it really does vary by hospital. ***It's kind of hard to speak about it generally because each hospital is somewhat unique***." (¶166);

b. "[**Analyst**]: Does it concern among investors that over time as you get later doctors to stock a drug, their utilization is going to be less than the people who have stocked already. So the revenue curve is going to—going to begin to plateau or decelerate. What are your—what are your thoughts on that concern that's in the market.

   [**Garland**]: What we are seeing is we've looked at a cohort of our institutions, large important institutions that came on earlier at E[S]P and actually what we're seeing is increased usage over time or deepening usage over time. ***There's nothing that we're seeing today that makes us concerned about a lack of pull through or plateauing of our utilization***." (¶188); and

c. "[**Analyst**]: I'm just wondering if you could start to give … some kind of on a comparison or, if it's high level even about the current utilization at some of those hospitals that have been online for at least a year maybe even over a year versus maybe some that have come online in the past six month….

   [**Garland**]: [N]ow that we've got a couple of years under—or a year under our belt how does the utilization look[?] We aren't giving any detailed information around utilization per hospital per month. ***What we have seen is that, that utilization per hospital per month stays—has been staying consistent in 2019***." (¶202).

233. The truth that demand was not strong and growing is further evidenced by the actions of senior management during the Class Period to promote additional data to support the use of Andexxa over 4F-PCCs. Before and during the Class Period, CWs repeatedly communicated to senior management that Andexxa was having difficulty competing with

4F-PCCs because of cost and concerns regarding the efficacy of Andexxa (¶¶90, 127-129). The content of the following releases touting Andexxa over 4F-PCCs coupled with the timing of these releases shows that Defendants knew that 4F-PCCs were a significant threat to Andexxa's launch but concealed such information from investors:

a. On July 8, 2019, Portola announced new *in vitro* data establishing the relationship between concentrations of the direct oral anticoagulants apixaban and rivaroxaban and the ability of 4F-PCC to correct inhibition of thrombin generation, compared with warfarin anticoagulation reversal by 4F-PCC. (¶183); and

b. On November 15, 2019, Portola issued a press release announcing that Annals of Emergency Medicine, the journal of ACEP, published a multidisciplinary anticoagulant reversal and replacement guidance statement. In the guidance statement, ACEP highlighted Andexxa as a first-in-line, FDA approved reversal agent for patients treated with apixaban or rivaroxaban, "as compared to 4F-PCC, which are highlighted as a second-in-line option for Factor Xa reversal and recommended for use only if Andexxa is not available." (¶207).

234. The previously-referenced actions by senior management during the Class Period of promoting additional data to support the use of Andexxa over 4F-PCCs demonstrates that demand is not strong and growing when viewed in light of (i) the timing of the studies, (ii) comments by a CW, and (iii) an article published in *Seeking Alpha* on January 30, 2020 calling this additional Portola data into doubt:

a. This data was pushed out only after Portola stopped relying on "reorder rate" (¶197) and refused to answer specific questions about historical trends

regarding demand and utilization during the November 5, 2019 analyst call (¶202), and as the Company neared the end of the Class Period and the point when the truth about demand and revenue was going to emerge;

b. CW8 stated that Portola conducted an additional study of Andexxa which was presented at the American Society of Hospital Pharmacist convention in December 2019 in Las Vegas, Nevada which, in his opinion, was weak and still not convincing enough to change the Andexxa restrictions (¶145); and

c. On January 30, 2020, *Seeking Alpha* published a report authored by Edmund Ingham entitled "Portola: Doubtful Trials And Falling Sales Make Andexxa An Unlikely Blockbuster." Ingham discussed data Portola had published in 2019 claiming to support Andexxa as "best-in-class." "Finally, Portola has published numerous pieces of research during 2019 supporting management's claim that Andexxa is a best-in-class solution for treatment of Factor Xa related bleeds. … As I will describe below however, ***doubts have been cast about these results that are quite troubling and could prevent Andexxa from making it onto hospital formulary lists"*** (¶217).

235. The truth that demand was not strong and growing is further evidenced by the following:

a. the Company's ultimate admissions on January 9, 2020 that the Portola encountered "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts" and that in certain of these accounts, hospital pharmacies curtailed use of Andexxa following drug utilization reviews in an effort to manage pharmacy budgets" (¶208);

b. the Company's admissions on January 14, 2020 that Andexxa sales had fallen because of "lower distributor purchases to manage inventory" in order "to keep their inventory levels at a constant level in the fourth quarter" (¶¶215-216);

c. the Company's acknowledgement on February 26, 2020 that the Company had to internally restructure its operations, including the discontinuation of all Bevyxxa operations to focus on Andexxa (¶219); and

d. the Company's admission in its FY 2019 Form 10-K filed on February 28, 2020 that the Company was having significant difficulties competing with the off-label use of 4F-PCCs and other coagulation factors and that hospital formulary committees were resistant to utilizing Andexxa because the Company lacked a clinical trial data comparing it to treatments used before Andexxa's FDA approval (¶223).

236. These misstatements were material because a reasonable investor would consider the fact that demand for Andexxa, Portola's lead drug, was weaker than portrayed by the Company meant that Andexxa's commercial launch was failing. In fact, analysts noted in reports throughout the Class Period that demand and utilization of Andexxa were factors driving the commercial success of the Company:

a. "[W]e continue to see notable upside in Portola shares as the commercial expansion of Andexxa into additional hospitals drives revenue growth and label expansions into emergency surgery and enoxaparin reversal increase the total market opportunity." (William Blair, Apr. 4, 2019.)

b. "The next few quarters will be critical to see how the initial demand translates into orders and sales and the likelihood of the product being able to achieve the $1.34Bn in peak global sales that we currently forecast." (Credit Suisse, May 8, 2019.)

c. "[M]anagement remains very encouraged by the launch and believes it is progressing better than expected based on analogues of other hospital launches from the past 30 years. The message remains that the relatively slow uptake should not be unexpected at the outset of a hospital launch, the US demand for Andexxa is strong and growing." (Credit Suisse, June 27, 2019.)

d. "We are encouraged by the continued growth of Andexxa, particularly with 74% of sales in the quarter coming from hospitals reordering Andexxa. In addition, management commentary continues to be positive, highlighting the increased utilization trends with current accounts, recent increase in CMS NTAP reimbursement level (to 65% from 50%), access to the Veterans Administration health system, and first sales in Europe. We believe there is continued longterm momentum for Andexxa beyond the addition of new accounts over the next several quarters, including strong growth of the factor Xa class, label expansion to include urgent surgery and enoxaparin, and continued guidance recommendations including the recent Joint Commission updates." (William Blair, Aug. 8, 2019.)

e. "Andexxa is now available in roughly 550 hospitals in the United States, including another 125 new hospitals added in the quarter, and 76% of sales were from reorders as opposed to initial stocking (compared to 74% in the second quarter). We believe the continued uptake of Andexxa has been encouraging in both the United States and Europe, and continue to see a long-term opportunity for Andexxa through increasing penetration into a rapidly growing market." (William Blair, Nov. 6, 2019.)

f. The significant stock drops on January 10, 2020, and February 27, 2020, which revealed the weak demand and utilization of Andexxa further demonstrate the materiality of these false and misleading statements.

**b. Defendants Made False And Misleading Statements Concerning Andexxa Utilization**

237. Throughout the Class Period, Defendants repeatedly touted that Andexxa was being "broadly" and "deeply" utilized by hospitals. As a result, Andexxa was portrayed as becoming the standard of care as the treatment of life-threatening or uncontrolled bleeding in patients treated with rivaroxaban or apixaban. This portrayal further fed into the false theme that the Andexxa commercial launch was being strongly executed.

238. The following are a series of false and misleading statements that Andexxa was being "deeply" utilized by hospitals:

- "[***U]tilization on a per hospital level [] deepen[s]*** both as physicians get used to the product and as hospitals continue to go through their protocol development." (Garland, May 8, 2019 Conference Call.)

- "I do know that when we spoke to customers about ***Q4 utilization, the #1 reason was actually supply. That was probably the main reason why accounts did not order***." (Garland, Jan. 8, 2019 Conference Call.)

- "The majority of hospitals have made P&T decisions. So the majority of them have the product on the protocol and ***are using the product***." (Koenig, May 8, 2019 Conference Call.)

- "So everything that we're seeing so far in terms of the launch kinetics points to a ***deepening and a pull-through of utilization***." (Garland, June 11, 2019 Goldman Sacks Global Healthcare Conference.)

- "Also last week, the Joint Commission known as JCAHO, the oldest and largest accrediting body for hospitals and med care [ph] issued a new report on DOACs. The report directs accredited hospitals and critical care centers to stock anecdotes appropriate for the use with each type of anticoagulant. ***Reports like these are making it clear that Andexxa is becoming the standard of care for patients on apixaban or rivaroxaban***." (Garland, Aug. 7, 2019 Conference Call.)

- "[W]hat we're seeing is increased usage over time or deepening usage over time. ***There's nothing that we're seeing today that makes us concerned about a lack of pull-through or a plateauing of our utilization***." (Garland, Aug. 7, 2019 Conference Call.)

- "Adding new accounts is just one part of ensuring continued growth. The second component is ***deepening utilization within existing accounts and we are seeing encouraging trends***." (Koenig, Aug. 7, 2019 Conference Call.)

- "I will tell you we're really happy with what we're seeing both in terms of new account adds as well as ***deepening [ph] of the utilization*** and we'll certainly give you updates as we move forward." (Garland, Aug. 7, 2019 Conference Call.)

- "[W]hat we're seeing is increased usage over time or ***deepening usage over time***." (Garland, Aug. 7, 2019 Conference Call.)

- "[W]hat we're seeing is real ***pull-through at hospitals***." (Garland, Sept. 10, 2019 Morgan Stanley Health Conference Call.)

- "What we have seen is that, ***that utilization per hospital per month stays—has been staying consistent in 2019***. That is with—in the context of us broadening the hospital-base to include more Tier 2 and Tier 3 accounts." (Garland, Nov. 5, 2019 Conference Call.)

239. The following are a series of false and misleading statements that Andexxa was being "broadly" utilized by hospitals:

- Koenig also noted that the Company is "***seeing that the utilization of Andexxa is both ICH bleeds and also in other bleeds outside of ICH. So we're seeing a mix of all types of bleeds that are currently being treated***." (Koenig, May 8, 2019 Conference Call.)

- Garland noted the Company is "pleasantly surprised by the fact that the ***drug is being used broadly*** to the label obviously, but it's definitely not being missed again a specific type bleed type like intracranial hemorrhage." (Garland, May 8, 2019 Conference Call.)

- "[W]e're actually seeing ***broad usage across all bleed types*** not necessarily focused on intracranial hemorrhage." (Garland, May 8, 2019 Conference Call.)

- "Also last week, the Joint Commission known as JCAHO, the oldest and largest accrediting body for hospitals and med care [ph] issued a new report on DOACs. The report directs accredited hospitals and critical care centers to stock anecdotes appropriate for the use with each type of anticoagulant. ***Reports like these are making it clear that Andexxa is becoming the standard of care for patients on apixaban or rivaroxaban.***" (Garland, Aug. 7, 2019 Conference Call.)

- "[W]e are definitely ***seeing usage in patients outside of the intracranial hemorrhage space***." (Garland, Aug. 7, 2019 Conference Call.)

- "[W]e're seeing actually is ***broad utilization***. We're not seeing it niched to just intracranial hemorrhage…. But like I said, ***what we are seeing is usage broadly***." (Garland, Sept. 10, 2019 Morgan Stanley Health Conference Call.)

- "***Andexxa is being used in all ranges of bleeds***. So not only intracranial hemorrhage, but also GI bleeds, trauma related compartmental bleeds. So we're seeing it being used across all bleed types." (Koenig, Nov. 5, 2019 Conference Call.)

240. The bolded and italicized statements in ¶239, that Andexxa was experiencing "broad" and "deepening" utilization and usage were affirmative statements of present fact that were materially false and misleading when made because contrary to the Company's statements Andexxa was encountering significant resistance from hospitals and their drug utilization review

committees which placed severe restrictions on Andexxa usage when stocked because of the high cost coupled with limited clinical data and an available more cost-effective alternative.

241. The truth that Andexxa was not "broadly" and "deeply" being utilized is evidenced by the following statements by former employees of Portola:

a. statements by CW1 that (i) hospitals had difficulty justifying the high cost of Andexxa and that they could rely on other treatments that they had been using for years without spending as much; (ii) the data concerning the effectiveness of Andexxa did not justify the cost versus the benefit; (iii) some hospitals were carrying Andexxa as a "CYA" and did not intend to use it; and (iv) because of price, a hospital covered by CW1 had very restrictive use protocols in place limiting Andexxa's use to life-threatening intracranial bleeds (¶¶88-89);

b. statements by CW3 that (i) Andexxa's price was problematic, "[i]t was a struggle for [him/her] from day one to sell Andexxa," and "the hospital pharmacists were terrified of [Andexxa] and not from a clinical point[, but] strictly from a cost point"; (ii) small, rural hospitals that CW3 called on believed that Andexxa was priced "way too aggressively" and many could not afford it; (iii) a hospital with 100 beds or less would have to make a choice between purchasing Andexxa and hiring a staff member because of the high cost; (iv) Kcentra, another anti-coagulant reversal drug, was a cheaper alternative to Andexxa for many hospitals; and (v) a professor of pharmacology and clinical specialist paid to speak on the benefits of Andexxa by Portola at a June 2018 Hospital Pharmacy Society conference that was

attended by 55 hospital pharmacists stated that he would nonetheless use Kcentra over Andexxa because of its cost (¶¶100-102, 104-105);

c. statements by CW4 that (i) hospital pharmacists were shocked at the price difference between Kcentra and Andexxa; (ii) s/he believed that hospitals were initially worried about being sued if a patient died following a severe bleed and the particular hospital did not carry Andexxa, but an article written by three pharmacists in 2019 provided hospital pharmacy directors with information to push back on ordering Andexxa; (iii) many hospitals used the publication of the article to further bolster their position that Andexxa was too expensive to carry when a cheaper alternative such as Kcentra was available; and (iv) the high cost of Andexxa put a strain on pharmacy budgets (¶¶108-109, 111);

d. statements by CW5 that (i) from his/her perspective, the biggest issues Portola had concerning Andexxa usage was the cost of the drug combined with the off-label use of Kcentra; (ii) pharmacies made the purchasing decisions, and they told doctors who wanted Andexxa that the drug was not available or that its use was restricted and that Kcentra was the only available treatment on the formulary; (iii) he/she believes that hospitals made a cost versus utilization analysis and determined that it was too costly to stock more than 3 to 5 boxes of Andexxa or to reorder additional boxes given that the indications were so limited; and (iv) insurance coverage does not affect a hospital pharmacy department's decision about whether to purchase Andexxa because third-party

reimbursement tends to go back to the general hospital accounts and generally does not get refunded to the pharmacy department's budget (¶¶117-120); and

e. statements by CW6 that (i) many hospitals refused to add Andexxa to their formularies because of its high price, telling him/her that they have learned to manage bleeding with these patients and that they have strategies that have been working so they wouldn't purchase at the current price; (ii) "[a]s soon as the customers saw the price, they said that they have lived without it for five or six years and that they could live without it longer"; (iii) two Level I large bed trauma center hospitals in his/her district pushed back on the pricing of Andexxa and placed restrictions on who could use the drug; and (iv) Portola was "absolutely" struggling to sell Andexxa in the period leading up the to its August 2019 Offering (¶¶123, 125-126, 130).

242. The truth that Andexxa was not "broadly" and "deeply" being utilized is further evidenced by the following statements by customers or potential customers who were marketed Andexxa by Portola:

a. statements by CW7 that (i) s/he presented Andexxa to the P&T Committee, and it was felt that the data presented in the clinical trial was "flimsy;" (ii) nonetheless, the hospital felt that it was irresponsible to not carry the drug while prescribing Xarelto or Eliquis; it restricted use to only life-threatening intercranial bleeding for patients being treated with Xarelto or Eliquis, which s/he understands is consistent with how hospitals throughout the country are utilizing Andexxa; (iii) the hospital system only stocks one high dose and one low dose of Andexxa because the usage is so limited, where the system only

authorizes Andexxa's use for intercranial bleeding, which is normally accompanied by a stroke; (iv) in his/her hospital system, restrictions were based on effectiveness and not price; (v) the system only stocked one high and one low dose because the usage was so limited; and (vi) the data on the use of Kcentra was as effective in many of the same situations as Andexxa (¶¶134, 135, 136, 137, 138);

b. statements by CW8 that (i) his/her hospital system has Andexxa on its formulary but restricts its usage to only life-threatening events involving intercranial bleeding; (ii) the decision to restrict Andexxa's use is based on the cost versus benefit and the data presented in Portola's clinical trials; (iii) treatments such as Kcentra and Feiba have been used in the past and have been shown to be effective for less cost; (iv) throughout the entire hospital system, Andexxa has been used less than half a dozen times; (v) the data supporting use of Andexxa for gastrointestinal bleeding was not enough to support its use for that type of bleed; (vi) Portola conducted an additional study of Andexxa, the results of which were presented at the American Society of Hospital Pharmacists convention in December 2019 in Las Vegas, Nevada and, in his/her opinion, the study was weak and still not convincing enough to change the Andexxa restrictions; and (vii) s/he believes that most hospitals have similar restrictions on Andexxa (¶¶142, 144, 145, 147);

c. statements by CW9 that (i) his/her team determined that the cost of Andexxa was too high when the benefits are compared with other medications, including PCC treatments such as Kcentra and Feiba, which were effective for

significantly less cost; (ii) most hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments; (iii) it is possible that, by carrying Andexxa, a hospital pharmacy may be unable to hire a technician or otherwise fill a vacant position; and (iv) Andexxa is a drug that would come out of the hospital pharmacy's budget (and third-party reimbursements do not affect the cost to the pharmacy department) (¶¶150, 152-154); and

d. statements by CW10 that (i) his/her hospital determined that the cost of Andexxa was too prohibitive to carry and that there was no justification for Andexxa's pricing when they could try other things; (ii) if they had a patient that was critical and needed Andexxa, then the patient should be immediately transferred by ambulance to a larger hospital within the area that carried Andexxa; and (iii) the hospital's CCO said that other drugs that were cheaper than Andexxa, such as Kcentra, could be used (¶¶159, 160).

243. The truth that Andexxa was not "broadly" and "deeply" being utilized is further evidenced by Garland's statement attributing lack of utilization solely to available supply. During the January 8, 2019 Conference Call, Garland commented that "I do know that when we spoke to customers about Q4 utilization, the #1 reason was actually ***supply***. That was probably the main reason why accounts did not order."

244. The truth that Andexxa was not "broadly" and "deeply" being utilized is further evidenced by the evasive responses by senior management to analyst questions during conference calls. For example, Garland downplayed whether 4F-PCCs and other pre-Andexxa treatments were being chosen over Andexxa on the March 1, 2019 Conference Call, Garland said

that the Company was seeing no issues concerning utilization on the August 7, 2019 Conference Call (right before the August 2019 Offering), and Garland side-stepped a question regarding historical utilization at hospitals that had been stocking Andexxa for over the past year during the November 5, 2019 Conference Call:

a. "[Analyst]: … where Andexxa is available, is it your understanding that that is clearly the first line therapy for the Xa bleeds or might there be some hospitals that while they have Andexxa available, are still using some of the older methods like fresh frozen plasma or four-factor PCCs even though that Andexxa is available?

[Garland]: Certainly, we know hospitals are using PCCs and we expect they probably will continue to use PCCs although we believe that's inappropriate given the fact that we're the only approved agent. But in many ways you call it, it really does vary by hospital. ***It's kind of hard to speak about it generally because each hospital is somewhat unique***." (¶¶166).

b. "[Analyst]: Does it concern among investors that over time as you get later doctors to stock a drug, their utilization is going to be less than the people who have stocked already. So the revenue curve is going to—going to begin to plateau or decelerate. What are your—what are your thoughts on that concern that's in the market.

[Garland]: What we are seeing is we've looked at a cohort of our institutions, large important institutions that came on earlier at E[S]P and actually what we're seeing is increased usage over time or deepening usage over time. ***There's nothing that we're seeing today that makes us concerned about a lack of pull through or plateauing of our utilization***." (¶¶188).

c. "[Analyst]: I'm just wondering if you could start to give … some kind of on a comparison or, if it's high level even about the current utilization at some of those hospitals that have been online for at least a year maybe even over a year versus maybe some that have come online in the past six month….

[Garland]: [N]ow that we've got a couple of years under—or a year under our belt how does the utilization look. We aren't giving any detailed information around utilization per hospital per month. ***What we have seen is that, that utilization per hospital per month stays—has been staying consistent in 2019***." (¶¶202).

245. The truth that demand was not strong and growing is further evidenced by the actions of senior management during the Class Period to promote additional data to support the

use of Andexxa over 4F-PCCs. Before and during the Class Period, CWs repeatedly communicated to senior management that Andexxa was having difficulty competing with 4F-PCCs because of cost and concerns regarding the efficacy of Andexxa (¶¶90, 127-129). The content of the following releases touting Andexxa over 4F-PCCs coupled with the timing of these releases shows that Defendants knew that 4F-PCCs were a significant threat to Andexxa's launch but concealed such information from investors:

a. On July 8, 2019, Portola announced new *in vitro* data establishing the relationship between concentrations of the direct oral anticoagulants apixaban and rivaroxaban and the ability of 4F-PCC to correct inhibition of thrombin generation, compared with warfarin anticoagulation reversal by 4F-PCC. (¶183); and

b. On November 15, 2019, Portola issued a press release announcing that Annals of Emergency Medicine, the journal of ACEP, published a multidisciplinary anticoagulant reversal and replacement guidance statement. In the guidance statement, ACEP highlighted Andexxa as a first-in-line, FDA approved reversal agent for patients treated with apixaban or rivaroxaban, "as compared to 4F-PCC, which are highlighted as a second-in-line option for Factor Xa reversal and recommended for use only if Andexxa is not available." (¶207).

246. The previously-referenced actions by senior management during the Class Period of promoting additional data to support the use of Andexxa over 4F-PCCs demonstrates that Andexxa was not "broadly" and "deeply" being utilized in light of (i) the timing of the studies, (ii) comments by a CWs, and (iii) an article published in *Seeking Alpha* on January 30, 2020 calling this additional Portola data into doubt:

a. This data was pushed out only after Portola stopped relying on "reorder rate" (¶197) and refused to answer specific questions about historical trends regarding demand and utilization during the November 5, 2019 analyst call (¶202), and as the Company neared the end of the Class Period and the point when the truth about demand and revenue was going to emerge;

b. CW8 stated that Portola conducted an additional study of Andexxa which was presented at the American Society of Hospital Pharmacist convention in December 2019 in Las Vegas, Nevada which, in his opinion, was weak and still not convincing enough to change the Andexxa restrictions (¶145); and

c. On January 30, 2020, *Seeking Alpha* published a report authored by Edmund Ingham entitled "Portola: Doubtful Trials And Falling Sales Make Andexxa An Unlikely Blockbuster." Ingham discussed data Portola had published in 2019 claiming to support Andexxa as "best-in-class." "Finally, Portola has published numerous pieces of research during 2019 supporting management's claim that Andexxa is a best-in-class solution for treatment of Factor Xa related bleeds. … As I will describe below however, ***doubts have been cast about these results that are quite troubling and could prevent Andexxa from making it onto hospital formulary lists"*** (¶217).

247. The truth that Andexxa was not "broadly" and "deeply" being utilized is further evidenced by the following:

a. the Company's ultimate admissions on January 9, 2020 that the Portola encountered "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts" and that in certain of these accounts,

hospital pharmacies curtailed use of Andexxa following drug utilization reviews in an effort to manage pharmacy budgets" (¶208);

b. the Company's admissions on January 14, 2020 that Andexxa sales had fallen because of "lower distributor purchases to manage inventory" in order "to keep their inventory levels at a constant level in the fourth quarter" (¶¶215-216);

c. the Company's acknowledgement on February 26, 2020 that the Company had to internally restructure its operations, including the discontinuation of all Bevyxxa operations to focus on Andexxa (¶219); and

d. the Company's admission in its FY 2019 Form 10-K filed on February 28, 2020 that the Company was having significant difficulties competing with the off-label use of 4F-PCCs and other coagulation factors and that hospital formulary committees were resistant to utilizing Andexxa because the Company lacked a clinical trial data comparing it to treatments used before Andexxa's FDA approval (¶223).

248. These misstatements were material because a reasonable investor would consider the fact that utilization for Andexxa was weaker than portrayed by the Company meant that Andexxa was not becoming the standard of care and that the Company's commercial launch was failing. Further, analysts noted in reports throughout the Class Period that demand utilization of Andexxa were factors driving the commercial success of the Company:

a. "[W]e continue to see notable upside in Portola shares as the commercial expansion of Andexxa into additional hospitals drives revenue growth and label expansions into emergency surgery and enoxaparin reversal increase the total market opportunity." (William Blair, Apr. 4, 2019.)

b. "The next few quarters will be critical to see how the initial demand translates into orders and sales and the likelihood of the product being able to achieve

the $1.34Bn in peak global sales that we currently forecast." (Credit Suisse, May 8, 2019.)

c. "[M]anagement remains very encouraged by the launch and believes it is progressing better than expected based on analogues of other hospital launches from the past 30 years. The message remains that the relatively slow uptake should not be unexpected at the outset of a hospital launch, the US demand for Andexxa is strong and growing." (Credit Suisse, June 27, 2019.)

d. "We are encouraged by the continued growth of Andexxa, particularly with 74% of sales in the quarter coming from hospitals reordering Andexxa. In addition, management commentary continues to be positive, highlighting the increased utilization trends with current accounts, recent increase in CMS NTAP reimbursement level (to 65% from 50%), access to the Veterans Administration health system, and first sales in Europe. We believe there is continued longterm momentum for Andexxa beyond the addition of new accounts over the next several quarters, including strong growth of the factor Xa class, label expansion to include urgent surgery and enoxaparin, and continued guidance recommendations including the recent Joint Commission updates." (William Blair, Aug. 8, 2019.)

e. "Andexxa is now available in roughly 550 hospitals in the United States, including another 125 new hospitals added in the quarter, and 76% of sales were from reorders as opposed to initial stocking (compared to 74% in the second quarter). We believe the continued uptake of Andexxa has been encouraging in both the United States and Europe, and continue to see a long-term opportunity for Andexxa through increasing penetration into a rapidly growing market." (William Blair, Nov. 6, 2019.)

f. The significant stock drops on January 10, 2020, and February 27, 2020, which revealed the weak demand and utilization of Andexxa further demonstrate the materiality of these false and misleading statements.

**c. Defendants Made False and Misleading Statements Concerning New Hospital Adds and Reorder Rate**

249. Throughout the Class Period, Defendants repeatedly touted two non-GAAP metrics: hospital adds and reorder rate. The Company portrayed these metrics as strong indicators that Andexxa was being well-received by hospitals, that Andexxa was receiving strong demand, and that the full commercial launch was a success.

250. The following are a series of false and misleading statements concerning new hospital additions:

- "So you may remember on our Q3 call, we had mentioned that we'd stocked 100 hospitals. We now have stocked 200 hospitals. So ***we've doubled the number of sites that we've begun stocking in the last quarter***." (Garland, Jan. 8, 2019 Conference Call.)

- That "approximately 200 hospitals were stocking Andexxa by the end of the fourth quarter, with a reorder rate of approximately 50%. ***That's double the roughly 100 hospitals that were stocking Andexxa*** at the end of the third quarter, with a reorder rate of approximately 40%. (Garland, Mar. 1, 2019 Conference Call.)

- "At the end of the first quarter we estimate that ***approximately 300 hospitals were stocking Andexxa***." (Koenig, May 8, 2019 Conference Call.)

- "Obviously the ***125 [hospital] adds*** that we have this quarter was ahead of expectations. I've been saying all along we expect a ***linear uptake in hospital adds***, pretty much 100 a quarter." (Garland, Aug. 7, 2019 Conference Call.)

- "In the [second quarter], ***we added 125 additional hospitals*** for a total of over 400 hospitals that have ordered Andexxa since launch." (Prospectus.)

- "At the end of the third quarter ***approximately 550 hospitals*** in the U.S. had ordered Andexxa. This was our second consecutive quarter of incremental hospital adds that exceeded our initial expectations." (Koenig, Nov. 5, 2019 Conference Call.)

251. The following are a series of false and misleading statements concerning "reorder rates":

- "We've also seen ***our reorder rate improve***. So the ***percentage of accounts that have reordered was at 40% on our Q3 call, it's now at 50% as of December 31***…. [W]e believe it's truly ***reflective of pull-through demand. Not just stocking, but real pull-through demand***." (Garland, Jan. 8, 2019 Conference Call.)

- Koenig noted that the Company was "very happy with ***what we've been seeing so far with the reorder rate***," as those "reorder rates are really reflecting true ***pull through and underlying demand***, we've seen this increase of 50% to 55%." (Koenig, May 8, 2019 Conference Call.)

- "We also are beginning to see a consistent pattern ***in the*** order and ***reorder rate***. At the end of the first quarter we estimate that approximately ***300 hospitals were stocking Andexxa with our reorder rate of about 55%***. This increase is in line with our ***overall trajectory thus far and we are seeing daily demand continue to grow***." (Koenig, May 8, 2019 Conference Call.)

- Garland said that "as we've said before, ***the that reorder is obviously influenced by the denominator***. If ***you look back at hospitals that came on earlier in the launch of Andexxa that reorder rate is significantly higher than the percentage for all hospitals so far***. So as Sheldon mentioned, we're very happy with where the reorder rate and is—and as hospitals maturities to that ***reorder rate continue to increase***." (Garland, May 8, 2019 Conference Call.)

- "We track the number of accounts that have ordered at least once. You might call that sort of new store growth. So what we've seen quarter-on-quarter is about 100 new hospitals ordering each quarter. So as of the end of the first quarter, we have 300 accounts that had ordered at least once. That was up from 200 the prior quarter, so Q4 of the prior year. ***In addition, we look at pull-through, right***? So there is both the ***new store growth but also the same-store growth, so accounts that continue to reorder.*** And ***so the metric we track there is reorders***. The ***reorder rate for the first quarter of 2019 was at 55%. That was up from 50% the prior quarter***." (Garland, June 11, 2019 Goldman Sacks Global Healthcare Conference.)

- That "***74% of our sales in the quarter came from reorders***, ***reflecting real pull through and increasing use in patients***. In addition, ***our reorder rate remained steady at 55% for the quarter***, in tandem with an incremental number of hospital adds that was beyond our expectations, and a significant percent of new hospitals coming on late in the quarter." (Garland, Aug. 7, 2019 Conference Call.)

- "As Scott mentioned, ***our reorder rate in the second quarter was approximately 55%***. More importantly, ***reorders in the second quarter grew to 74% of our total Andexxa revenues reflecting real pull through and increasing use in patients.***" (Koenig, Aug. 7, 2019 Conference Call.)

- That "in the second quarter of 2019, ***Andexxa had a reorder rate of 54% with 74% of Andexxa revenues from reorders for the quarter.*** (Prospectus.)

- That "existing accounts continued to show ***strong pull-through***, with ***76% of sales in the quarter coming from utilization or reorders compared to 74% in the previous quarter***. ***This is an important metric because it reflects demand and significant pull-through in hospitals*** where Andexxa is being used to treat patients. Also inventory in the channel remained steady at approximately two weeks of demand." (Koenig, Nov. 5, 2019 Conference Call.)

- "We think ***the number [% of sales driven by reorders]*** is great***. It's a real sign of great pull-through with the product***." (Garland, Nov. 5, 2019 Conference Call.)

- "The ***reorder rate also remained steady at 56%*** for the quarter. While this is encouraging, we believe this metric is impacted by the variability in the

timing, mix and number of our new hospital additions each quarter." (Koenig, Nov. 5, 2019 Conference Call.)

252. The bolded and italicized statements in ¶251, that the new hospitals additions and reorder rates showed growth and demand for Andexxa were affirmative statements of present fact that were materially false and misleading when made because (i) the new hospital additions included hospitals that did not intend to use Andexxa, but stock it only for liability purposes only, or so heavily restricted Andexxa use that it was unlikely that the Andexxa stock would ever be used, and (ii) the "reorder rate" was not a valid indicator of demand and pull-through in hospitals particularly because it concealed the magnitude of reorders and included all hospitals in its calculation whether they had been stocking Andexxa for several quarters or were added just recently. It is further materially false and misleading because what contributes to "reorder rates" is neither defined nor known. For example, does "reorder rate" include exchanges of returned expired or short-shelf-life doses for longer-life doses? Does it include the return of original 100 mg FDA-approved Andexxa for newly-FDA-approved 200 mg Andexxa? These inputs, if included, would be extraordinarily misleading.

253. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is evidenced by the following statements by former employees of Portola:

a. statements by CW1 that (i) hospitals had difficulty justifying the high cost of Andexxa and that they could rely on other treatments that they had been using for years without spending as much; (ii) the data concerning the effectiveness of Andexxa did not justify the cost versus the benefit; (iii) some hospitals were carrying Andexxa as a "CYA" and did not intend to use it; and (iv) because of price, a hospital covered by CW1 had very restrictive use

protocols in place limiting Andexxa's use to life-threatening intracranial bleeds (¶¶88-89);

b. statements by CW3 that (i) Andexxa's price was problematic, "[i]t was a struggle for [him/her] from day one to sell Andexxa," and "the hospital pharmacists were terrified of [Andexxa] and not from a clinical point[, but] strictly from a cost point"; (ii) small, rural hospitals that CW3 called on believed that Andexxa was priced "way too aggressively" and many could not afford it; (iii) a hospital with 100 beds or less would have to make a choice between purchasing Andexxa and hiring a staff member because of the high cost; (iv) Kcentra, another anti-coagulant reversal drug, was a cheaper alternative to Andexxa for many hospitals; and (v) a professor of pharmacology and clinical specialist paid to speak on the benefits of Andexxa by Portola at a June 2018 Hospital Pharmacy Society conference that was attended by 55 hospital pharmacists stated that he would nonetheless use Kcentra over Andexxa because of its cost (¶¶100-102, 104-105);

c. statements by CW4 that (i) hospital pharmacists were shocked at the price difference between Kcentra and Andexxa; (ii) s/he believed that hospitals were initially worried about being sued if a patient died following a severe bleed and the particular hospital did not carry Andexxa, but an article written by three pharmacists in 2019 provided hospital pharmacy directors with information to push back on ordering Andexxa; (iii) many hospitals used the publication of the article to further bolster their position that Andexxa was too expensive to carry when a cheaper alternative such as Kcentra was available;

and (iv) the high cost of Andexxa put a strain on pharmacy budgets (¶¶108-109, 111);

d. statements by CW5 that (i) from his/her perspective, the biggest issues Portola had concerning Andexxa usage was the cost of the drug combined with the off-label use of Kcentra; (ii) pharmacies made the purchasing decisions, and they told doctors who wanted Andexxa that the drug was not available or that its use was restricted and that Kcentra was the only available treatment on the formulary; (iii) he/she believes that hospitals made a cost versus utilization analysis and determined that it was too costly to stock more than 3 to 5 boxes of Andexxa or to reorder additional boxes given that the indications were so limited; and (iv) insurance coverage does not affect a hospital pharmacy department's decision about whether to purchase Andexxa because third-party reimbursement tends to go back to the general hospital accounts and generally does not get refunded to the pharmacy department's budget (¶¶117-120); and

e. statements by CW6 that (i) many hospitals refused to add Andexxa to their formularies because of its high price, telling him/her that they have learned to manage bleeding with these patients and that they have strategies that have been working so they wouldn't purchase at the current price; (ii) "[a]s soon as the customers saw the price, they said that they have lived without it for five or six years and that they could live without it longer"; (iii) two Level I large bed trauma center hospitals in his/her district pushed back on the pricing of Andexxa and placed restrictions on who could use the drug; and (iv) Portola

was "absolutely" struggling to sell Andexxa in the period leading up the to its August 2019 Offering (¶¶123, 125-126, 130).

254. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is further evidenced by the following statements by customers or potential customers who were marketed Andexxa by Portola:

a. statements by CW7 that (i) s/he presented Andexxa to the P&T Committee, and it was felt that the data presented in the clinical trial was "flimsy;" (ii) nonetheless, the hospital felt that it was irresponsible to not carry the drug while prescribing Xarelto or Eliquis; it restricted use to only life-threatening intercranial bleeding for patients being treated with Xarelto or Eliquis, which s/he understands is consistent with how hospitals throughout the country are utilizing Andexxa; (iii) the hospital system only stocks one high dose and one low dose of Andexxa because the usage is so limited, where the system only authorizes Andexxa's use for intercranial bleeding, which is normally accompanied by a stroke; (iv) in his/her hospital system, restrictions were based on effectiveness and not price; (v) the system only stocked one high and one low dose because the usage was so limited; and (vi) the data on the use of Kcentra was as effective in many of the same situations as Andexxa (¶¶134, 135, 136, 137, 138);

b. statements by CW8 that (i) his/her hospital system has Andexxa on its formulary but restricts its usage to only life-threatening events involving intercranial bleeding; (ii) the decision to restrict Andexxa's use is based on the cost versus benefit and the data presented in Portola's clinical trials;

(iii) treatments such as Kcentra and Feiba have been used in the past and have been shown to be effective for less cost; (iv) throughout the entire hospital system, Andexxa has been used less than half a dozen times; (v) the data supporting use of Andexxa for gastrointestinal bleeding was not enough to support its use for that type of bleed; (vi) Portola conducted an additional study of Andexxa, the results of which were presented at the American Society of Hospital Pharmacists convention in December 2019 in Las Vegas, Nevada and, in his/her opinion, the study was weak and still not convincing enough to change the Andexxa restrictions; and (vii) s/he believes that most hospitals have similar restrictions on Andexxa (¶¶142, 144, 145, 147);

c. statements by CW9 that (i) his/her team determined that the cost of Andexxa was too high when the benefits are compared with other medications, including PCC treatments such as Kcentra and Feiba, which were effective for significantly less cost; (ii) most hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments; (iii) it is possible that, by carrying Andexxa, a hospital pharmacy may be unable to hire a technician or otherwise fill a vacant position; and (iv) Andexxa is a drug that would come out of the hospital pharmacy's budget (and third-party reimbursements do not affect the cost to the pharmacy department) (¶¶150, 152-154); and

d. statements by CW10 that (i) his/her hospital determined that the cost of Andexxa was too prohibitive to carry and that there was no justification for Andexxa's pricing when they could try other things; (ii) if they had a patient

that was critical and needed Andexxa, then the patient should be immediately transferred by ambulance to a larger hospital within the area that carried Andexxa; and (iii) the hospital's CCO said that other drugs that were cheaper than Andexxa, such as Kcentra, could be used (¶¶159, 160).

255. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is further evidenced by an admission made by Garland during the September 10, 2019 Morgan Stanley Health Conference Call when he stated that the Company could not rely on it and shifted to a new metric percentage of revenue from reorders, and by a response that Garland gave to a question during the November 5, 2019 Q3 2019 analyst call when he was asked where he had seen the reorder rate trending and what the Company expected for the rate going forward and he avoided substantively answering the past trend question and declined to provide "***any sort of*** forward-looking guidance:"

a. "[Garland:] The reorder rate, we've talked about before, it was 55%, which was stable quarter-on-quarter, is heavily influenced by when a hospital comes online. And remember, we added 125 hospitals in the second quarter. Many of those were later in the quarter. And as a result, they are in the denominator, but they haven't been around long enough to contribute to the numerator. ***So that had an impact on the reorder rate, which is why we gave it a new metric, which was that roughly 3/4 of our business, or 74% of our business, came from reorders***. So what we're seeing consistently is that the drug is getting utilized." (¶197).

b. **[Analyst]**: [O]n the 76% of sales, ***revenue driven by reorders, can you just comment on where you see that number trending? And it seems like it's leveling off a bit***. Is that how – what you expect at this point in the launch?

**[Garland]**: ***[W]e haven't and won't be providing any sort of forward-looking guidance on the reorder rate***. It obviously went up quarter-over-quarter. I do expect, though, that, that number is not going to be 100%. (¶202).

256. The truth that these metrics did not fairly evidence demand is shown by the actions of senior management during the Class Period of promoting additional data to support the use of Andexxa over 4F-PCCs. Before and during the Class Period, CWs repeatedly communicated to senior management that Andexxa was having difficulty competing with 4F-PCCs because of cost and concerns regarding the efficacy of Andexxa (¶¶90, 127-129). The content of the following releases touting Andexxa over 4F-PCCs coupled with the timing of these releases shows that Defendants knew that 4F-PCCs were a significant threat to Andexxa's launch but concealed such information from investors:

a. On July 8, 2019, Portola announced new *in vitro* data establishing the relationship between concentrations of the direct oral anticoagulants apixaban and rivaroxaban and the ability of 4F-PCC to correct inhibition of thrombin generation, compared with warfarin anticoagulation reversal by 4F-PCC. (¶183); and

b. On November 15, 2019, Portola issued a press release announcing that Annals of Emergency Medicine, the journal of ACEP, published a multidisciplinary anticoagulant reversal and replacement guidance statement. In the guidance statement, ACEP highlighted Andexxa as a first-in-line, FDA approved reversal agent for patients treated with apixaban or rivaroxaban, "as compared to 4F-PCC, which are highlighted as a second-in-line option for Factor Xa reversal and recommended for use only if Andexxa is not available." (¶207).

257. The previously-referenced actions by senior management during the Class Period of promoting additional data to support the use of Andexxa over 4F-PCCs demonstrates that these metrics did not fairly evidence demand when viewed in light of (i) the timing of the

studies, (ii) comments by a CW, and (iii) an article published in *Seeking Alpha* on January 30, 2020 calling this additional Portola data into doubt:

a. This data was pushed out only after Portola stopped relying on "reorder rate" (¶197) and refused to answer specific questions about historical trends regarding demand and utilization during the November 5, 2019 analyst call (¶202), and as the Company neared the end of the Class Period and the point when the truth about demand and revenue was going to emerge;

b. CW8 stated that Portola conducted an additional study of Andexxa which was presented at the American Society of Hospital Pharmacist convention in December 2019 in Las Vegas, Nevada which, in his opinion, was weak and still not convincing enough to change the Andexxa restrictions (¶145); and

c. On January 30, 2020, *Seeking Alpha* published a report authored by Edmund Ingham entitled "Portola: Doubtful Trials And Falling Sales Make Andexxa An Unlikely Blockbuster." Ingham discussed data Portola had published in 2019 claiming to support Andexxa as "best-in-class." "Finally, Portola has published numerous pieces of research during 2019 supporting management's claim that Andexxa is a best-in-class solution for treatment of Factor Xa related bleeds. … As I will describe below however, ***doubts have been cast about these results that are quite troubling and could prevent Andexxa from making it onto hospital formulary lists"*** (¶217).

258. The truth that "new hospitals added" and "reorder rates" were not reliable metrics is further evidenced by the following:

a. the Company's ultimate admissions on January 9, 2020 that the Portola encountered "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts" and that in certain of these accounts, hospital pharmacies curtailed use of Andexxa following drug utilization reviews in an effort to manage pharmacy budgets" (¶208);

b. the Company's admissions on January 14, 2020 that Andexxa sales had fallen because of "lower distributor purchases to manage inventory" in order "to keep their inventory levels at a constant level in the fourth quarter" (¶¶215-216);

c. the Company's acknowledgement on February 26, 2020 that the Company had to internally restructure its operations, including the discontinuation of all Bevyxxa operations to focus on Andexxa (¶219); and

d. the Company's admission in its FY 2019 Form 10-K filed on February 28, 2020 that the Company was having significant difficulties competing with the off-label use of 4F-PCCs and other coagulation factors and that hospital formulary committees were resistant to utilizing Andexxa because the Company lacked a clinical trial data comparing it to treatments used before Andexxa's FDA approval (¶223).

259. These misstatements were material because a reasonable investor would have relied on these metrics because Portola viewed these as reliable indicators of demand for Andexxa and showed that the commercialization of Andexxa was a success. Further, analysts noted in reports throughout the Class Period that demand utilization of Andexxa were factors driving the commercial success of the Company:

a. "[W]e continue to see notable upside in Portola shares as the commercial expansion of Andexxa into additional hospitals drives revenue growth and label expansions into emergency surgery and enoxaparin reversal increase the total market opportunity." (William Blair, Apr. 4, 2019.)

b. "The next few quarters will be critical to see how the initial demand translates into orders and sales and the likelihood of the product being able to achieve the $1.34Bn in peak global sales that we currently forecast." (Credit Suisse, May 8, 2019.)

c. "[M]anagement remains very encouraged by the launch and believes it is progressing better than expected based on analogues of other hospital launches from the past 30 years. The message remains that the relatively slow uptake should not be unexpected at the outset of a hospital launch, the US demand for Andexxa is strong and growing." (Credit Suisse, June 27, 2019.)

d. "We are encouraged by the continued growth of Andexxa, particularly with 74% of sales in the quarter coming from hospitals reordering Andexxa. In addition, management commentary continues to be positive, highlighting the increased utilization trends with current accounts, recent increase in CMS NTAP reimbursement level (to 65% from 50%), access to the Veterans Administration health system, and first sales in Europe. We believe there is continued longterm momentum for Andexxa beyond the addition of new accounts over the next several quarters, including strong growth of the factor Xa class, label expansion to include urgent surgery and enoxaparin, and continued guidance recommendations including the recent Joint Commission updates." (William Blair, Aug. 8, 2019.)

e. "Andexxa is now available in roughly 550 hospitals in the United States, including another 125 new hospitals added in the quarter, and 76% of sales were from reorders as opposed to initial stocking (compared to 74% in the second quarter). We believe the continued uptake of Andexxa has been encouraging in both the United States and Europe, and continue to see a long-term opportunity for Andexxa through increasing penetration into a rapidly growing market." (William Blair, Nov. 6, 2019.)

f. The significant stock drops on January 10, 2020, and February 27, 2020, which revealed the weak demand and utilization of Andexxa further demonstrate the materiality of these false and misleading statements.

### 2. Defendants Issued False and Misleading Statements Concerning Andexxa's Accounting Practices for Net Product Revenue

260. Throughout the Class Period, Defendants made false and misleading statements concerning Portola's revenue recognition policies; in particular, the Company told investors that it would record product revenues in the following manner:

> ***Product Revenue, Net***
>
> … We sell Andexxa … to a limited number of specialty distributors and wholesalers in the United States ('Customers')…. [We] recognize revenue on product sales when the Customer obtains control of our product, which occurs at a point in time (upon delivery)…. ***Product revenues are recorded net of applicable reserves for variable consideration, including discounts and allowances***….
>
> ***Reserves for Variable Consideration***
>
> Revenues from product sales are recorded at the net sales price (transaction price), which includes estimates of variable consideration for which reserves are established and which result from discounts, returns, chargebacks, rebates, copay assistance and other allowances that are offered within contracts between us and our Customers, group purchasing organizations, payors and other indirect customers relating to our product sales. These reserves as detailed below are based on the amounts earned or to be claimed on the related sales and are classified as reductions of accounts receivable (if the amount is payable to the Customer) or a current liability (if the amount is payable to a party other than a Customer). Where appropriate, these estimates take into consideration a range of possible outcomes that are probability-weighted in accordance with the expected value method under ASC 606 for relevant factors. These factors include current contractual and statutory requirements, specific known market events and trends, industry data, and/or forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the respective underlying contracts.
>
> ***
>
> *Product Returns:* We generally offer Customers a right of return based on the product's expiration date or other market-based factors for product that has been purchased from us. We estimate the amount of our product sales that may be returned by our Customers and record this estimate as a reduction of revenue in the period the related product revenue is recognized. We currently estimate product return liabilities using

available industry data, our own sales information and our visibility into the inventory remaining in the distribution channel.[35]

261. Based on these purportedly followed practices, Portola reported reserves and Andexxa net revenues during the following three quarters of the Class Period:

| Date | Quarter | Reduction to Revenue for "Primarily Distribution Fees and Reserves for Chargebacks and Returns" (millions) | Andexxa Net Product Revenue (millions) | Andexxa Gross Revenue (millions)[36] | % Reserves to Gross Revenues |
|---|---|---|---|---|---|
| 5/8/2019 | Q1 2019 | $2.4[37] | ***$20.3***[38] | $22.7 | 11% |
| 8/7/2019 | Q2 2019 | $3.7[39] | ***$27.1***[40] | $30.8 | 8% |
| 11/5/2019 | Q3 2019 | $5.6[41] | ***$32.9***[42] | $38.5 | 6% |

262. These statements regarding the Company's practices for determining net product revenue and reserves for product returns and the Company's financial results set forth in the table above were false and misleading because the Company materially under-reserved for product returns.

263. The truth that Portola had manipulated Andexxa net product revenue by understating reserves for product returns is evidenced by the following:

---

35 FY 2018 Form 10-K, at 60-61.

36 Gross revenue is calculated by adding net product revenue to the reserves used to reduce revenue.

37 Q1 2019 Form 10-Q, at F-10.

38 May 8, 2019 Press Release; Q1 2019 Form 10-Q, at F-2.

39 Q2 2019 Form 10-Q, at F-10.

40 Q2 2019 Form 10-Q, at F-2.

41 Q3 2019 Form 10-Q, at F-10.

42 Q3 2019 Form 10-Q, at F-9.

a. an admission by the Company on January 9, 2020, in a press release that it was being forced to incur a $5 million gross-to-net adjustment "due to a return reserve for short dated product" (¶208);

b. the statement of Dier during the January 9, 2020 Conference Call that the reserve addresses both "what's been returned, it's a little bit of catch-up for the year, and then you need to make an estimate of what you think may be returned based on what you've seen so far. That's just accounting for return reserves. So we come up with a calculation. We feel good about the $5 million, taking the $5 million now. And then moving forward, we'll have our classic return reserve adjustment as part of our gross-to-net calculations," constitutes an admission that (i) their prior reserves were inadequate because they have to "catch up" and (ii) their return to a "classic return reserve adjustment" shows that they have not engaged in quarterly reviews (¶¶209-210);

c. an admission by Garland during the January 9, 2020 Conference Call that the Company knowingly sold "short-dated" Andexxa that was set to expire in 6 to 12 months (¶210);

d. statements by CW6 that Andexxa clients were advised when their order included short-dated product and that Portola offered to replenish any short-dated product that was not used within the specified shelf life (¶131);

e. the fact that the percentage of reserves to gross reserves diminished over the first three quarters of 2019 showed that reserves were not keeping up with product being sold (¶261);

f. the fact that Portola's accounting practices for product return reserves were red flagged as a "Critical Audit Matter" by the Company's auditors, Ernst & Young, in the audit for the fiscal year ended December 31, 2019 (¶224);

g. the fact that the Company needed to reach a milestone for Andexxa net revenue by the end of the third quarter of 2019 to access the second $62.5 million tranche of its Secured Term Loan (¶60); and

h. the fact that Portola senior management has strong visibility into Andexxa sold to hospitals, the expiration date of Andexxa sold, the rate of usage of Andexxa by the hospitals, and the protocols limiting usage at the hospitals (¶265).

264. These misstatements concerning net product revenue were material because a reasonable investor would have relied on the Company's net product revenue metric for Andexxa. Andexxa was Portola's main drug and was responsible for virtually all of the Company's revenues. The Company touted Andexxa net product revenue in each of its press releases and during conference calls with investors. Moreover, the significant stock drops on January 10, 2020, and February 27, 2020, further demonstrate the materiality of these false and misleading statements.

**B. Additional Allegations of Scienter**

265. In addition to the detailed allegations above supporting scienter (including, but not limited to, those regarding the CW's descriptions of Defendants' knowledge of the true facts, as detailed in the following paragraphs—¶¶85(d), 85(g), 85(h), 90, 97, 106, 110, 116, 123, 127-129, 139, 145, 146, 151, 166), three key facts further support a strong inference of scienter as to the Company and each of the Officer Defendants

### 1. The Nature and Significance of the Problems with Andexxa, Which is the Company's Core Business, Further Support Scienter

266. Andexxa was of crucial importance to the Company. It accounted for virtually all of the Company's sales. The Officer Defendants closely monitored all aspects of Andexxa's commercialization, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning Andexxa. For example,

- ***Portola Queried Hospitals Concerning the Bleeds that Andexxa Treated.*** "But as we query multiple hospitals, we do see uses in other situations, GI patients with severe signs of shock or other critical bleeds. So we're happy that it's starting with the intracranial hemorrhages but then expanding to other labeled uses as well, as we expect." (Jeet Mahal, Jan. 8, 2019 Conference Call.)

- ***Portola Talked to Hospitals about Utilization.*** "I do know that when we spoke to customers about Q4 utilization, …" (Garland, Jan. 8, 2019 Conference Call.)

- ***Portola Tracked Hospital Purchases.*** "We also track internally the number of hospitals who've made their first purchase, the number of hospitals who've made their second, the number of hospitals that have made their third and more purchases. And we're seeing steady increases week-on-week, month-on-month in those metrics." (Garland, Sept. 10, 2019 Morgan Stanley Health Conference Call.)

- ***Portola Chart Audits.*** "We do conduct a regular chart audit where we go out and pull records from patients who have been given Andexxa in the hospital. And what we're seeing actually is broad utilization. We're not seeing it niched to just intracranial hemorrhage." (Garland, Sept. 10, 2019 Morgan Stanley Health Conference Call.)[43]

- ***Portola Mined Electronic Records from Hospitals.*** "[W]e mine electronic medical records from hospitals to look at patients who are discharged that were—had as a primary diagnosis a Factor Xa-related bleed. We take that data and we mirror it with the IMS prescription data for Eliquis and Xarelto to find just those patients that were discharged on a Xa-related—that had a Xa-

[43] *See also* Garland, Mar. 1, 2019 Conference Call ("[Portola uses] chart pulls to see if the actual – when the product ultimately gets used…. [W]e have is visibility into the hospital in terms of its use").

related bleed as their primary diagnosis." (Garland, June 11, 2019 Goldman Sacks Global Healthcare Conference.)

- ***Portola Tracked Andexxa Shipped to Hospitals from Distributors.*** "So we certainly have visibility into the data that goes from our distributors to our hospitals. ***We get that data on a relatively regular basis***." (Garland, Mar. 1, 2019 Conference Call.)

- ***Garland Touted the Data at his Disposal.*** Garland touted the information at his disposal stating that he had "enough data to feel very confident in both the short- and the long-term trajectory of Andexxa." (June 11, 2019 Goldman Sacks Global Healthcare Conference.)

267. Given the extreme importance of Andexxa to the Company, the Officer Defendants' access to reports and information about the problems with Andexxa's commercialization process, and their representations that their statements were based on data, the Officer Defendants knew or were deliberately reckless in ignoring the true facts that rendered the statements false and misleading when made.

### 2. The Defendants Consummated the August 2019 Offering to Exploit the Artificial Inflation in the Company's Common Stock

268. Because of the substantial costs to manufacture and launch Andexxa along with other research and development projects, Portola had a significant cash burn even with Andexxa sales rolling in. The Defendants' false and misleading statements concerning the commercialization of Andexxa enabled Portola to artificially inflate the price of its shares of common stock for its August 2019 Offering. Consequently, Defendants were motivated to continue to misrepresent the sales and demand for Andexxa in order to keep Portola's stock price artificially inflated and to generate sufficient funds in the August 2019 Offering.

### 3. The Defendants Were Motivated to Inflate Andexxa Sales to Access the $62.5 Million Second Tranche of the Secured Term Loan

269. In an effort to continue to fund its commercial launch of Andexxa, the Company announced on March 1, 2019 that it had entered into a $125 million credit agreement with

HealthCare Royalty Partners and its Affiliates ("HCR") and Athyrium Opportunities III Acquisition LP ("Athyrium") in February 2019 (the Secured Term Loan). However, HCR and Athyrium agreed to provide only one-half of the funds (or $62.5 million) to Portola unless Andexxa net sales reached at least $50 million by the end of the third quarter of 2019.

270. The loan under the credit agreement contained significant restrictions which impacted Portola's ability to operate its business because (i) it was secured by substantially all the Company's assets; (ii) required the Company to maintain $31.3 million in cash (and $50 million, if the Company drew down the second $62.5 million tranche); (iii) limited or restricted the Company from incurring additional debt; and (iv) limited its ability to make certain investments and acquisitions or engage in new lines of business.[44]

271. The second tranche of $62.5 million was to be available as of November 15, 2019 only if (i) the Company had received all regulatory approval from EMA for Ondexxya, and (ii) Andexxa's consolidated net sales for the three fiscal-quarter periods ending September 30, 2019 were at least $50 million. If the Company did not achieve both these milestones, it would not receive the remaining $62.5 million.[45]

272. On November 21, 2019, the Company announced that it had met the necessary $50 million in Andexxa net sales requirement (having exceeded Andexxa net product revenues in the nine months ended September 30, 2019) and had drawn down the entire $62.5 million available from the second tranche.[46]

---

[44] FY 2018 Form 10-K, at 20, F-49-50.

[45] *Id.*

[46] Form 8-K, filed with the SEC on Nov. 21, 2019.

273. Since the Company's access to the $62.5 million second tranche of the Secured Term Loan was essential to the Portola's survival, senior management was motivated to inflate Andexxa net sales as much as possible in the first three quarters of 2019 to meet the milestone. The Company did this by (i) under-reserving for Andexxa returns which were probable due to short-dated stock that senior management knew was on hospital shelves, but was not being utilized and (ii) by pushing excessive Andexxa product to its specialty distributors and recognizing such revenue despite the fact that senior management was aware that such supply exceeded hospital demand.

**C. Loss Causation**

274. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Portola common stock and operated as a fraud or deceit on Class Period purchasers of Portola common stock. At all relevant times, Defendants issued materially false and misleading statements or omissions concerning the commercialization of Andexxa. In particular, the Company falsely stated that Andexxa demand was strong and growing and inflated Andexxa sales results by inadequately reserving for product returns. These materially false and misleading statements caused Portola common stock price to be artificially inflated during the Class Period. Lead Plaintiff and other Class members purchased Portola's common stock at those artificially inflated prices.

275. As detailed above, as the truth about the commercialization of Andexxa was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. The timing and magnitude of the common stock price decline negates any inference that the losses suffered by Lead Plaintiff and other members of the Class were

caused solely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, these false and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

276. The truth about the commercialization of Andexxa was revealed in a series of disclosures until the end of the Class Period, including:

a. On January 9, 2020, Portola admitted that utilization by hospital customers had been curtailed during drug utilization review and that demand was weak and resulted in fewer sales. Further, the Company revealed that it was forced to make a $5 million reserve adjustment for "short-dated product" which impacted Andexxa net sales. On this news, the Company's share price fell $9.98 per share to close at $14.76 per share on January 10, 2020, an approximately 40% decline.

b. On February 26, 2020, Portola announced its financial results for the fourth quarter and full year 2019 and held a conference call that revealed in more detail the serious problems with customers' adoption of the Andexxa drug and confirmed investors' concerns after the Company's pre-announcement of financial results the previous month that the Company was forced to cease Bevyxxa commercialization efforts and undertake an internal restructuring in order to focus its efforts on handling the problems surrounding its primary product, Andexxa. On this news, the Company's share price fell $2.35 per share to close at $10.17 per share on February 27, 2020, an approximately 19% decline.

277. The economic loss suffered by Lead Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Portola's common stock and the subsequent decline in the value of Portola's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**D. Presumption of Reliance**

278. Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a. Portola common stock was actively traded on the NASDAQ;

b. The market price of Portola's common stock reacted promptly to the determination of public information regarding the Company;

c. The Company's stock was followed by financial analysts, including those cited in this complaint.

d. The average weekly trading volume for Portola stock during the Class Period was over 3.5 million shares;

e. As a regulated issuer, Portola filed with the SEC periodic public reports during the Class Period;

f. Portola regularly communicated with public investors via established market communication mechanisms; and

g. During the Class Period, the Company had over 78 million shares outstanding. Also, the Company's market capitalization reached as high as $2.4 billion during the Class Period.

279. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Portola and the Officer Defendants continued to pump materially false and misleading information into the marketplace regarding the Company. This information was promptly reviewed and analyzed by analysts and institutional investors, and assimilated into the price of the Company's securities.

280. As a result of the misconduct alleged herein (including Defendants' false and misleading statements and omissions), the market for Portola's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

281. Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Portola's common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

282. Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose. Because this action involves Defendants' failure to

disclose material adverse information regarding the utilization and adoption of Andexxa—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of hospital customers' and other institutions' utilization and adoption of Andexxa, that requirement is satisfied here

283. Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased Portola's common stock at artificially inflated prices.

### E. Exchange Act Counts

#### 1. Count One - Violations of Section 10(b) and Rule 10b-5 (Against Portola and the Officer Defendants)

284. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

285. Throughout the Class Period, the Company and the Officer Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of the common stock of Portola during the Class Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

286. The Company and Officer Defendants, as the most senior officers of Portola during the Class Period, are liable as direct participants in all of the wrongs complained of through the date they left the Company.

287. As detailed above, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

288. Lead Plaintiff and other members of the Class relied upon Defendants' statements and/or on the integrity of the market in purchasing shares of Portola's common stock during the Class Period.

289. As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the Class suffered damages in connection with their purchases of Portola's common stock at artificially inflated prices during the Class Period. Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' materially false and misleading statements, they would not have purchased Portola's common stock at artificially inflated prices during the Class Period.

290. In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's business operations, growth, and financial condition, so that the market

price of the Company's securities would be based on truthful, complete, and accurate information.

291. By virtue of the foregoing, Defendants violated 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

### 2. Count Two - Violations of Section 20(a) of the Exchange Act (Against the Officer Defendants)

292. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

293. The Officer Defendants acted as control persons of Portola within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness of Portola's operations, and/or intimate knowledge of the false financial statements filed by Portola with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Portola, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of Portola's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

294. In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Portola and therefore is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations alleged and exercised that power.

295. As a direct and proximate result of the Officer Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Portola's common stock during the Class Period.

296. As set forth above, Portola and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

297. By reason of the conduct of Portola alleged in this complaint, and by virtue of their positions as control persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII. SECURITIES ACT VIOLATIONS

### A. Summary of Offering

298. Lead Plaintiff and named representative, Oklahoma Firefighters, bring claims arising under the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against all Defendants. In this action, and, as explained above, the "Class" consists of all persons and entities who purchased or otherwise acquired Portola common stock between January 8, 2019 and February 26, 2020, inclusive and were damaged as a result. The Securities Act claims asserted herein are brought on behalf of only those Class members who purchased or otherwise acquired shares of Portola common stock pursuant and/or traceable to the Company's August 2019 Offering. The Securities Act claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act claims, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct. In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 1, 2, 3, 8, 9, 10, 11, 12, 13, 15,

16, 18, 19, 20, 22, 23, 24, 37, 84, 85, 86, 90, 91, 92, 97, 98, 105, 106, 110, 116, 123, 127, 128, 129, 132, 139, 145, 146, 151, 166, 206, 217, and 218 and in Sections VI(A), VI(B), VI(C), VI(D), and VI(E) in their entirety.

299. On August 7, 2019, the Company filed the Registration Statement with the SEC. The Registration Statement became effective on August 7, 2019. On August 12, 2019, Portola filed a Preliminary Prospectus Supplement on Form 424(b)(5) with the SEC, which preliminarily announced a public offering. On August 14, 2019, the Company filed a Prospectus Supplement on Form 424(b)(5) with the SEC. In the Registration Statement and Prospectus, Portola incorporated by reference the following Company documents: (a) the FY 2018 Form 10-K; (b) Q1 2019 Form 10-Q; and (c) Q2 2019 Form 10-Q. As described *supra* ¶194, these are the Offering Materials.

300. On August 14, 2019, shares of Portola common stock issued in connection with the Offering commenced regular public trading. The Offering closed on August 16, 2019.

301. The Underwriter Defendants acted as the underwriters and book-running managers in connection with the Offering. The Underwriter Defendants were granted a 30-day option to purchase an additional 1,205,357 shares of common stock at the offering price to cover over-allotments in connection with the Offering.

302. The Underwriter Defendants received a fee of $14.2 million and exercised their over-allotment option in full. In total, the Offering raised gross proceeds of over $258 million for the Company.

303. The proceeds raised in the Offering were allegedly to be used:

> [T]o fund the commercial launch of Andexxa in the United States and Ondexxya in the European Union, support on-going manufacturing and clinical trial costs required to satisfy post-marketing commitments required by the FDA and EMA, as well as clinical trial costs for proposed label expansion studies for

> Andexxa/Ondexxya and advancing our product candidate, cerdulatinib; and … for working capital, capital expenditures and other general corporate purposes, which may include the acquisition or licensing of other products, businesses or technologies.

### B. The Materially Untrue and Misleading Statements in the Offering Materials

304. The Underwriting Agreement, included as Exhibit 1.1 to the Registration Statement and the Company's Current Report filed on Form 8-K with the SEC on August 14, 2019, falsely represented that "the Registration Statement and the Prospectus comply … in all material respects with the Securities Act and the applicable rules and regulations of the [SEC] thereunder," and "did not contain … any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

305. Contrary to this representation and, as set forth below, the Offering Materials contain numerous untrue statements of material fact, and omit material facts required to be stated therein or omit to state material facts necessary to make the statements therein not misleading, concerning the demand for Andexxa and the Company's revenues.

#### 1. Untrue and Misleading Statements Concerning New Hospital Additions and Reorder Rates

306. In the Prospectus, Portola touted two non-GAAP metrics: hospital adds and reorder rate.

> Andexxa is tracking with the most successful among 45 other acute care hospital drugs launched in the past 30 years based on average quarterly sales for the first four full quarters of launch. In addition, in the second quarter of 2019, ***Andexxa had a reorder rate of 54% with 74% of Andexxa revenues from reorders for the quarter.*** In the same period ***we added 125 additional hospitals for a total of over 400 hospitals*** that have ordered Andexxa since launch.

307. The Company portrayed these metrics as strong indicators that Andexxa was being well-received by hospitals, that Andexxa was receiving strong demand, and that the full

commercial launch was a success. However, these metrics were misleading because (i) the new hospital additions included hospitals that did not intend to use Andexxa, but stock it only for liability purposes only, or so heavily restricted Andexxa use that it was unlikely that the Andexxa stock would ever be used, and (ii) the "reorder rate" was not a valid indicator of demand and pull-through in hospitals particularly because it concealed the magnitude of reorders and included all hospitals in its calculation whether they had been stocking Andexxa for several quarters or were added just recently. It is further misleading because what contributes to "reorder rates" is neither defined nor known. For example, does "reorder rate" include exchanges of returned expired or short-shelf-life doses for longer-life doses? Does it include the return of original 100 mg FDA-approved Andexxa for newly-FDA-approved 200 mg Andexxa? These inputs, if included, would be extraordinarily misleading.

308. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is evidenced by the following statements by former employees of Portola:

a. statements by CW1 that (i) hospitals had difficulty justifying the high cost of Andexxa and that they could rely on other treatments that they had been using for years without spending as much; (ii) the data concerning the effectiveness of Andexxa did not justify the cost versus the benefit; (iii) some hospitals were carrying Andexxa as a "CYA" and did not intend to use it; and (iv) because of price, a hospital covered by CW1 had very restrictive use protocols in place limiting Andexxa's use to life-threatening intracranial bleeds (¶¶88-89);

b. statements by CW3 that (i) Andexxa's price was problematic, "[i]t was a struggle for [him/her] from day one to sell Andexxa," and "the hospital pharmacists were terrified of [Andexxa] and not from a clinical point[, but] strictly from a cost point"; (ii) small, rural hospitals that CW3 called on believed that Andexxa was priced "way too aggressively" and many could not afford it; (iii) a hospital with 100 beds or less would have to make a choice between purchasing Andexxa and hiring a staff member because of the high cost; and (iv) Kcentra, another anti-coagulant reversal drug, was a cheaper alternative to Andexxa for many hospitals (¶¶100-102, 104);

c. statements by CW4 that (i) hospital pharmacists were shocked at the price difference between Kcentra and Andexxa; (ii) s/he believed that hospitals were initially worried about being sued if a patient died following a severe bleed and the particular hospital did not carry Andexxa, but an article written by three pharmacists in 2019 provided hospital pharmacy directors with information to push back on ordering Andexxa; (iii) many hospitals used the publication of the article to further bolster their position that Andexxa was too expensive to carry when a cheaper alternative such as Kcentra was available; and (iv) the high cost of Andexxa put a strain on pharmacy budgets (¶¶108-109, 111);

d. statements by CW5 that (i) from his/her perspective, the biggest issues Portola had concerning Andexxa usage was the cost of the drug combined with the off-label use of Kcentra; (ii) pharmacies made the purchasing decisions, and they told doctors who wanted Andexxa that the drug was not available or that

its use was restricted and that Kcentra was the only available treatment on the formulary; (iii) he/she believes that hospitals made a cost versus utilization analysis and determined that it was too costly to stock more than 3 to 5 boxes of Andexxa or to reorder additional boxes given that the indications were so limited; and (iv) insurance coverage does not affect a hospital pharmacy department's decision about whether to purchase Andexxa because third-party reimbursement tends to go back to the general hospital accounts and generally does not get refunded to the pharmacy department's budget (¶¶117-120); and

e. statements by CW6 that (i) two Level I large bed trauma center hospitals in his/her district pushed back on the pricing of Andexxa and placed restrictions on who could use the drug; and (ii) Portola was "absolutely" struggling to sell Andexxa in the period leading up the to its August 2019 Offering (¶¶125-126, 130).

309. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is further evidenced by the following statements by customers or potential customers who were marketed Andexxa by Portola:

a. statements by CW7 that (i) s/he presented Andexxa to the P&T Committee, and it was felt that the data presented in the clinical trial was "flimsy;" (ii) nonetheless, the hospital felt that it was irresponsible to not carry the drug while prescribing Xarelto or Eliquis; it restricted use to only life-threatening intercranial bleeding for patients being treated with Xarelto or Eliquis, which s/he understands is consistent with how hospitals throughout the country are utilizing Andexxa; (iii) the hospital system only stocks one high dose and one

low dose of Andexxa because the usage is so limited, where the system only authorizes Andexxa's use for intercranial bleeding, which is normally accompanied by a stroke; (iv) in his/her hospital system, restrictions were based on effectiveness and not price; (v) the system only stocked one high and one low dose because the usage was so limited; and (vi) the data on the use of Kcentra was as effective in many of the same situations as Andexxa (¶¶134, 135, 136, 137, 138);

b. statements by CW8 that (i) his/her hospital system has Andexxa on its formulary but restricts its usage to only life-threatening events involving intercranial bleeding; (ii) the decision to restrict Andexxa's use is based on the cost versus benefit and the data presented in Portola's clinical trials; (iii) treatments such as Kcentra and Feiba have been used in the past and have been shown to be effective for less cost; (iv) throughout the entire hospital system, Andexxa has been used less than half a dozen times; (v) the data supporting use of Andexxa for gastrointestinal bleeding was not enough to support its use for that type of bleed; and (vi) s/he believes that most hospitals have similar restrictions on Andexxa (¶¶142, 144, 147);

c. statements by CW9 that (i) his/her team determined that the cost of Andexxa was too high when the benefits are compared with other medications, including PCC treatments such as Kcentra and Feiba, which were effective for significantly less cost; (ii) most hospitals in his/her hospital's peer group have made the same determination concerning Andexxa—that it is too costly when compared with other treatments; (iii) it is possible that, by carrying Andexxa,

a hospital pharmacy may be unable to hire a technician or otherwise fill a vacant position; and (iv) Andexxa is a drug that would come out of the hospital pharmacy's budget (and third-party reimbursements do not affect the cost to the pharmacy department) (¶¶150, 152-154); and

d. statements by CW10 that (i) his/her hospital determined that the cost of Andexxa was too prohibitive to carry and that there was no justification for Andexxa's pricing when they could try other things; (ii) if they had a patient that was critical and needed Andexxa, then the patient should be immediately transferred by ambulance to a larger hospital within the area that carried Andexxa; and (iii) the hospital's CCO said that other drugs that were cheaper than Andexxa, such as Kcentra, could be used (¶¶159, 160).

310. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is further evidenced by the admission made by Garland during the Morgan Stanley Healthcare Conference Call on September 10, 2019 when he stated that the Company could not rely on it and shifted to a new metric percentage of revenue from reorders:

a. "[Garland:] The reorder rate, we've talked about before, it was 55%, which was stable quarter-on-quarter, is heavily influenced by when a hospital comes online. And remember, we added 125 hospitals in the second quarter. Many of those were later in the quarter. And as a result, they are in the denominator, but they haven't been around long enough to contribute to the numerator. ***So that had an impact on the reorder rate, which is why we gave it a new metric, which was that roughly 3/4 of our business, or 74% of our business, came from reorders***. So what we're seeing consistently is that the drug is getting utilized." (¶197).

311. The truth that "new hospitals added" and "reorder rates" were not reliable metrics to show demand for Andexxa is further evidenced by an admission made by Garland during the September 10, 2019 Morgan Stanley Health Conference Call when he stated that the Company could not rely on it and shifted to a new metric percentage of revenue from reorders, and by a

response that Garland gave to a question during the November 5, 2019 Q3 2019 analyst call when he was asked where he had seen the reorder rate trending and what the Company expected for the rate going forward and he avoided substantively answering the past trend question and declined to provide "***any sort of*** forward-looking guidance:"

a. "[Garland:] The reorder rate, we've talked about before, it was 55%, which was stable quarter-on-quarter, is heavily influenced by when a hospital comes online. And remember, we added 125 hospitals in the second quarter. Many of those were later in the quarter. And as a result, they are in the denominator, but they haven't been around long enough to contribute to the numerator. ***So that had an impact on the reorder rate, which is why we gave it a new metric, which was that roughly 3/4 of our business, or 74% of our business, came from reorders***. So what we're seeing consistently is that the drug is getting utilized." (¶197).

b. "[**Analyst**]: I'm just wondering if you could start to give … some kind of on a comparison or, if it's high level even about the current utilization at some of those hospitals that have been online for at least a year maybe even over a year versus maybe some that have come online in the past six month….

[**Garland**]: [N]ow that we've got a couple of years under—or a year under our belt how does the utilization look[?] We aren't giving any detailed information around utilization per hospital per month. ***What we have seen is that, that utilization per hospital per month stays—has been staying consistent in 2019***." (¶202).

312. The truth that "new hospitals added" and "reorder rates" were not reliable metrics is further evidenced by the following:

a. the Company's ultimate admissions on January 9, 2020 that the Portola encountered "[f]lat quarter over quarter demand due to a decrease in utilization, primarily in tier 1 accounts" and that in certain of these accounts, hospital pharmacies curtailed use of Andexxa following drug utilization reviews in an effort to manage pharmacy budgets" (¶208);

b. the Company's admissions on January 14, 2020 that Andexxa sales had fallen because of "lower distributor purchases to manage inventory" in order "to

keep their inventory levels at a constant level in the fourth quarter" (¶¶215-216);

c. the Company's acknowledgement on February 26, 2020 that the Company had to internally restructure its operations, including the discontinuation of all Bevyxxa operations to focus on Andexxa (¶219); and

d. the Company's admission in its FY 2019 Form 10-K filed on February 28, 2020 that the Company was having significant difficulties competing with the off-label use of 4F-PCCs and other coagulation factors and that hospital formulary committees were resistant to utilizing Andexxa because the Company lacked a clinical trial data comparing it to treatments used before Andexxa's FDA approval (¶223).

313. These untrue statements were material because a reasonable investor would have relied on these metrics because Portola viewed these as reliable indicators of demand for Andexxa and showed that the commercialization of Andexxa was a success. Further, analysts noted in reports throughout the Class Period that demand and utilization of Andexxa were factors driving the commercial success of the Company:

a. "[W]e continue to see notable upside in Portola shares as the commercial expansion of Andexxa into additional hospitals drives revenue growth and label expansions into emergency surgery and enoxaparin reversal increase the total market opportunity." (William Blair, Apr. 4, 2019.)

b. "The next few quarters will be critical to see how the initial demand translates into orders and sales and the likelihood of the product being able to achieve the $1.34Bn in peak global sales that we currently forecast." (Credit Suisse, May 8, 2019.)

c. "[M]anagement remains very encouraged by the launch and believes it is progressing better than expected based on analogues of other hospital launches from the past 30 years. The message remains that the relatively slow uptake should not be unexpected at the outset of a hospital launch, the US demand for Andexxa is strong and growing." (Credit Suisse, June 27, 2019.)

d. "We are encouraged by the continued growth of Andexxa, particularly with 74% of sales in the quarter coming from hospitals reordering Andexxa. In addition, management commentary continues to be positive, highlighting the increased utilization trends with current accounts, recent increase in CMS NTAP reimbursement level (to 65% from 50%), access to the Veterans Administration health system, and first sales in Europe. We believe there is continued longterm momentum for Andexxa beyond the addition of new accounts over the next several quarters, including strong growth of the factor Xa class, label expansion to include urgent surgery and enoxaparin, and continued guidance recommendations including the recent Joint Commission updates." (William Blair, Aug. 8, 2019.)

e. "Andexxa is now available in roughly 550 hospitals in the United States, including another 125 new hospitals added in the quarter, and 76% of sales were from reorders as opposed to initial stocking (compared to 74% in the second quarter). We believe the continued uptake of Andexxa has been encouraging in both the United States and Europe, and continue to see a long-term opportunity for Andexxa through increasing penetration into a rapidly growing market." (William Blair, Nov. 6, 2019.)

f. The significant stock drops on January 10, 2020, and February 27, 2020, which revealed the weak demand and utilization of Andexxa further demonstrate the materiality of these untrue and misleading statements.

### 2. Untrue and Misleading Statements Concerning Andexxa Product Revenues and Reserves for Returns

314. Defendants made untrue statements concerning Portola's revenue recognition policies; in particular, the Company told investors that it would record product revenues in the following manner:

> ***Product Revenue, Net***
>
> … We sell Andexxa … to a limited number of specialty distributors and wholesalers in the United States ('Customers')…. [We] recognize revenue on product sales when the Customer obtains control of our product, which occurs at a point in time (upon delivery)…. ***Product revenues are recorded net of applicable reserves for variable consideration, including discounts and allowances***….
>
> ***Reserves for Variable Consideration***
>
> Revenues from product sales are recorded at the net sales price (transaction price), which includes estimates of variable consideration for which reserves are established and which result from discounts, returns, chargebacks, rebates, copay

assistance and other allowances that are offered within contracts between us and our Customers, group purchasing organizations, payors and other indirect customers relating to our product sales. These reserves as detailed below are based on the amounts earned or to be claimed on the related sales and are classified as reductions of accounts receivable (if the amount is payable to the Customer) or a current liability (if the amount is payable to a party other than a Customer). Where appropriate, these estimates take into consideration a range of possible outcomes that are probability-weighted in accordance with the expected value method under ASC 606 for relevant factors. These factors include current contractual and statutory requirements, specific known market events and trends, industry data, and/or forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the respective underlying contracts.

***

*Product Returns:* We generally offer Customers a right of return based on the product's expiration date or other market-based factors for product that has been purchased from us. We estimate the amount of our product sales that may be returned by our Customers and record this estimate as a reduction of revenue in the period the related product revenue is recognized. We currently estimate product return liabilities using available industry data, our own sales information and our visibility into the inventory remaining in the distribution channel.[47]

315. Based on these purportedly followed practices, Portola reported reserves and Andexxa net revenues during the following three quarters of the Class Period:

| **Date** | **Quarter** | **Reduction to Revenue for "Primarily Distribution Fees and Reserves for Chargebacks and Returns" (millions)** | **Andexxa Net Product Revenue (millions)** | **Andexxa Gross Revenue (millions)[48]** | **% Reserves to Gross Revenues** |
|---|---|---|---|---|---|
| 5/8/2019 | Q1 2019 | $2.4[49] | ***$20.3***[50] | $22.7 | 11% |

[47] FY 2018 Form 10-K, at 60-61.

[48] Gross revenue is calculated by adding net product revenue to the reserves used to reduce revenue.

[49] Q1 2019 Form 10-Q, at F-10.

[50] May 8, 2019 Press Release; Q1 2019 Form 10-Q, at F-2.

| **Date** | **Quarter** | **Reduction to Revenue for "Primarily Distribution Fees and Reserves for Chargebacks and Returns" (millions)** | **Andexxa Net Product Revenue (millions)** | **Andexxa Gross Revenue (millions)[48]** | **% Reserves to Gross Revenues** |
|---|---|---|---|---|---|
| 8/7/2019 | Q2 2019 | $3.7[51] | ***$27.1***[52] | $30.8 | 8% |
| 11/5/2019 | Q3 2019 | $5.6[53] | ***$32.9***[54] | $38.5 | 6% |

316. These statements regarding the Company's practices for determining net product revenue and reserves for product returns and the Company's financial results set forth in the table above were untrue and misleading because the Company materially under-reserved for product returns.

317. The truth that Portola had manipulated Andexxa net product revenue by understating reserves for product returns is evidenced by the following:

a. an admission by the Company on January 9, 2020, in a press release that it was being forced to incur a $5 million gross-to-net adjustment "due to a return reserve for short dated product" (¶208);

b. the statement of Dier during the January 9, 2020 Conference Call that the reserve addresses both "what's been returned, it's a little bit of catch-up for the year, and then you need to make an estimate of what you think may be returned based on what you've seen so far. That's just accounting for return

[51] Q2 2019 Form 10-Q, at F-10.

[52] Q2 2019 Form 10-Q, at F-2.

[53] Q3 2019 Form 10-Q, at F-10.

[54] Q3 2019 Form 10-Q, at F-9.

reserves. So we come up with a calculation. We feel good about the $5 million, taking the $5 million now. And then moving forward, we'll have our classic return reserve adjustment as part of our gross-to-net calculations," constitutes an admission that (i) their prior reserves were inadequate because they have to "catch up" and (ii) their return to a "classic return reserve adjustment" shows that they have not engaged in quarterly reviews (¶¶209-210);

c. an admission by Garland during the January 9, 2020 Conference Call that the Company knowingly sold "short-dated" Andexxa that was set to expire in 6 to 12 months (¶210);

d. statements by CW6 that Andexxa clients were advised when their order included short-dated product and that Portola offered to replenish any short-dated product that was not used within the specified shelf life (¶131);

e. the fact that the percentage of reserves to gross reserves diminished over the first three quarters of 2019 showed that reserves were not keeping up with product being sold (¶261);

f. the fact that Portola's accounting practices for product return reserves were red flagged as a "Critical Audit Matter" by the Company's auditors, Ernst & Young, in the audit for the fiscal year ended December 31, 2019 (¶224);

g. the fact that the Company needed to reach a milestone for Andexxa net revenue by the end of the third quarter of 2019 to access the second $62.5 million tranche of its Secured Term Loan (¶60); and

h. the fact that Portola senior management has strong visibility into Andexxa sold to hospitals, the expiration date of Andexxa sold, the rate of usage of Andexxa by the hospitals, and the protocols limiting usage at the hospitals (¶265).

318. These misstatements concerning net product revenue were material because a reasonable investor would have relied on these on the Company's net product revenue metric for Andexxa. Andexxa was Portola's main drug and was responsible for virtually all of the Company's revenues. The Company touted Andexxa net product revenue in each of its press releases and during conference calls with investors.

## C. The Securities Act Counts

### 1. Count One - Violations of Section 11 of the Securities Act (Against all Defendants, Except Koenig)

Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of any allegation that could be construed as alleging fraud, recklessness, or intentional misconduct. In addition this disclaimer expressly excludes all allegations above contained in paragraphs 1, 2, 3, 8, 9, 10, 11, 12, 13, 15, 16, 18, 19, 20, 22, 23, 24, 37, 84, 85, 86, 90, 91, 92, 97, 98, 105, 106, 110, 116, 123, 127, 128, 129, 132, 139, 145, 146, 151, 166, 206, 217, and 218 and in Sections VI(A), VI(B), VI(C), VI(D), and VI(E) in their entirety.

319. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who bought shares of Portola common stock pursuant and/or traceable to the Offering Materials, which includes the Registration Statement, against all Defendants (except Koenig). This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

320. As set forth above, the Offering Materials contained untrue and/or misleading statements of material fact, omitted material facts which were necessary to make those statements not misleading, and omitted to state material facts required to be stated in it. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Materials.

321. Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Offering Materials did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Offering Materials.

322. Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered to the public.

323. Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Offering Materials have sustained damages and are entitled to damages pursuant to 15 U.S.C. § 77k(e).

324. Portola is the registrant for the Offering and, as issuer of the shares, it is strictly liable to Lead Plaintiff and to the members of the Class for materially untrue and/or misleading statements and omissions alleged herein.

325. None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects. Had they exercised

reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

326. Defendants Garland, Dier, and the Director Defendants signed or authorized the signing of the Registration Statement. By virtue of signing the Registration Statement, they issued, caused to be issued, and participated in the issuance of the Offering Materials, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein. The Underwriter Defendants acted as the underwriters of the Offering within the meaning of Section 11 of the Securities Act by selling and distributing the Portola common stock offered to the investing public and purchased or otherwise acquired by Lead Plaintiff and members of the Class.

327. For the foregoing reasons, all Defendants (except Koenig) violated Section 11 of the Securities Act and are strictly liable to Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Offering Materials.

#### 2. Count Two - Violations of Section 12(a)(2) of the Securities Act (Against Portola and the Underwriter Defendants)

328. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of any allegation that could be construed as alleging fraud, recklessness, or intentional misconduct. In addition this disclaimer expressly excludes all allegations above contained in paragraphs 1, 2, 3, 8, 9, 10, 11, 12, 13, 15, 16, 18, 19, 20, 22, 23, 24, 37, 84, 85, 86, 90, 91, 92, 97, 98, 105, 106, 110, 116, 123, 127, 128, 129, 132, 139, 145, 146, 151, 166, 206, 217, and 218 and in Sections VI(A), VI(B), VI(C), VI(D), and VI(E) in their entirety.

329. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Portola common stock pursuant to the Offering Materials, which includes the Prospectus, against Portola and the Underwriter Defendants. This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

330. Portola and the Underwriter Defendants were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

331. By means of the Offering Materials (as well as instruments of transportation and communication in interstate commerce and the mails), the Defendants named in this Count, through the Offering, which was a public offering, solicited and sold Portola common stock to members of the Class.

332. As set forth above, the Offering Materials contained untrue and/or misleading statements of material fact, omitted material facts which were necessary to make those statements not misleading, and omitted to state material facts required to be stated in it. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Materials.

333. Class members who purchased or otherwise acquired shares pursuant to the Offering Materials did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Offering Materials.

334. Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years

elapsed from the time that the securities upon which this cause of action is brought were sold to the public.

335. As the issuer of the registered securities, Portola is strictly liable for the untrue statements and omissions of material facts contained in the Offering Materials.

336. None of the Underwriter Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

337. By reason of the foregoing, Portola and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Class members who purchased or otherwise acquired securities sold pursuant to the Offering Materials. These Class members also have the right to rescind and recover the consideration paid for these securities upon tender of their stock to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold the securities.

### 3. Count Three - Violations of Section 15 of the Securities Act (Against the Officer and Director Defendants)

338. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of any allegation that could be construed as alleging fraud, recklessness or intentional misconduct. In addition this disclaimer expressly excludes all allegations above contained in paragraphs 1, 2, 3, 8, 9, 10, 11, 12, 13, 15, 16, 18, 19, 20, 22, 23, 24, 37, 84, 85, 86, 90, 91, 92, 97, 98, 105, 106, 110, 116, 123, 127, 128, 129, 132, 139, 145, 146, 151, 166, 206, 217, and 218 and in Sections VI(A), VI(B), VI(C), VI(D), and VI(E) in their entirety.

339. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all class members who bought shares of Portola common stock pursuant and/or traceable to the Offering Materials, which includes the Registration Statement and Prospectus, against the Officer and Director Defendants. This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

340. At all relevant times, the Officer and Director Defendants were controlling persons of Portola within the meaning of Section 15 of the Securities Act. As set forth herein, by reason of their positions of control and authority as officers and/or directors of Portola, the Officer and Director Defendants had the power to directly or indirectly control or influence Portola to engage in the acts described herein, including by causing Portola to conduct the Offering pursuant to the Offering Materials, and exercised the same.

341. Specifically, the Officer Defendants each served as an executive officer of Portola prior to and at the time of the Offering. As such, at all relevant times the Officer Defendants each participated in the operation and management of Portola, including participating in the preparation and dissemination of the Offering Materials, and/or otherwise participated in the process necessary to conduct the Offering. By virtue of their positions as officers of Portola, and their status as signatories of the Registration Statement, each of the Officer Defendants had the power to control, and did control, Portola in its conduct of the Offering, including controlling the contents of the Offering Materials, which contained materially untrue statements. As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Portola's business operations, growth, and financial condition.

342. Similarly, each of the Director Defendants served as directors on Portola's Board of Directors at the time the Offering was conducted. As directors of a publicly owned company, the Director Defendants had a duty to disseminate accurate and truthful information with respect to the Portola's operations at the time of the Offering. Each Director Defendant signed the Registration Statement disseminated to the investing public and were Directors of the Company at the time the Offering was conducted. Thus, the Director Defendants controlled the contents and dissemination of the Offering Materials.

343. None of the Officer or Director Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Offering Materials were true, were without omissions of material fact, and were not misleading. By reason thereof, each of the Officer and Director Defendants is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to the Class members who purchased or otherwise acquired Portola common stock pursuant and/or traceable to the Offering Materials.

344. As a direct result of the aforementioned conduct, these Class members suffered damages in connection with their purchase of Portola common stock. Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered or sold to the public.

## VIII. CLASS ALLEGATIONS

345. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil procedure on behalf of a class consisting of all persons and

entities who purchased or otherwise acquired Portola common stock during the Class Period, including shares sold in the August 2019 Offering, and were damaged as a result (the "Class"). Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling person Portola; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

346. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Indeed, as of February 20, 2020, Portola had 78,080,365 outstanding shares of common stock.

347. Members of the Class may be identified from records maintained by Portola or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

348. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b) whether the statements made were materially false or misleading, or omitted material facts.

(c) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements in violation of the Exchange Act claims.

(d) whether the Underwriter Defendants exercised due diligence;

(e) whether the prices of Portola's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

349. Lead Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

350. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

351. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

352. Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Portola's securities during

the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## IX. NO SAFE HARBOR

353. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint. The statements alleged to be false and misleading all relate to historical or then-existing facts and conditions.

354. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

355. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Portola who knew that those statements were false, misleading, or omitted necessary information when they were made. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## X. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Federal Rule of Civil Procedure 23, and appointing Lead Plaintiff's counsel as Class Counsel;

(b) Awarding compensatory and/or rescissionary damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

(c) Granting equitable and/or injunctive relief as permitted by law, equity and federal law;

(d) Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees;

(e) Awarding such other and further relief as the Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff hereby demands a trial by jury.

DATED: May 20, 2020

Respectfully submitted,

**BERMAN TABACCO**

By: *__/s/Nicole Lavallee__*
Nicole Lavallee

Daniel E. Barenbaum
Jeffrey V. Rocha
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com
jroacha@bermantabacco.com

*Counsel for Lead Plaintiff Alameda County Employees' Retirement Association and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
Brandon Marsh (SBN 268316)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
Email: dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

*Attorneys for Additional Plaintiff Oklahoma Firefighters Retirement System*