Nicole Lavallee (SBN 165755)
Daniel E. Barenbaum (SBN 209261)
Jeffrey V. Rocha (SBN 304852)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        dbarenbaum@bermantabacco.com
        jrocha@bermantabacco.com

*Counsel for the Lead Plaintiff Alameda County Employees'*
*Retirement Association and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PAUL HAYDEN, et al., | No. 3:20-cv-00367-VC |
|             Plaintiffs, | **CLASS ACTION** |
| v. | **LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| PORTOLA PHARMACEUTICALS INC., et al., | |
|             Defendants. | Date:  October 27, 2022<br>Time: 10:00 a.m.<br>Dept.: 4 – 17th Floor<br>Judge:  Hon. Vince Chhabria |

## TABLE OF CONTENTS

STATEMENT OF ISSUES TO BE DECIDED ........................................................................... xi

NOTICE OF MOTION AND MOTION ................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

I.    INTRODUCTION ......................................................................................................... 2

II.   SUMMARY OF THE LITIGATION ........................................................................... 3

    A.    Plaintiffs' Claims Against Defendants................................................................. 3

    B.    Procedural History .............................................................................................. 5

    C.    Mediation ............................................................................................................ 6

III.  ARGUMENT ................................................................................................................ 7

    A.    The Court Should Preliminarily Approve The Settlement ................................... 7

        1.    The Hanlon Factors Support Approval ..................................................... 8

            a)    The Strength of Plaintiffs' Case Balanced Against the
Substantial Risks of Continued Litigation ..................................... 9

            b)    The Expense, Complexity, and Likely Duration of Further
Litigation ..................................................................................... 15

            c)    The Risk of Maintaining Class Action Status Throughout the
Trial ............................................................................................. 17

            d)    The Amount Offered in Settlement is Substantial ........................ 18

            e)    The Extent of Discovery Completed and the Stage of the
Proceedings .................................................................................. 20

            f)    The Experience and Views of Counsel ......................................... 20

            g)    The Settlement Agreement Resulted From Arm's-Length
Negotiations And Is Not The Product Of Collusion ..................... 21

        2.    The Rule 23(e)(2) Factors Support Approval ........................................... 22

            a)    Class Representatives and Class Counsel Have Adequately
Represented the Class ................................................................... 23

            b)    The Settlement was Negotiated at Arm's-Length ......................... 23

            c)    The Relief Provided Is Adequate, Taking into Account the
Costs, Risks, and Delay of Trial and Appeal, as Well as
Other Factors ................................................................................ 23

d)   The Settlement Treats Settlement Class Members Equitably Relative to Each Other ................................................................. 25

B.   Certification Of The Settlement Class Under Fed R. Civ. P. 23 Is Appropriate ............................................................................................. 27

1.   The Settlement Class is Sufficiently Numerous ...................................... 28

2.   Common Questions Of Fact Or Law Exist ............................................... 29

3.   Plaintiffs' Claims Are Typical Of Those Of The Settlement Class .......... 30

4.   Plaintiffs And Lead Counsel Will Fairly And Adequately Represent The Interests Of The Settlement Class ...................................................... 31

5.   The Requirements of Rule 23(b)(3) Are Also Satisfied .......................... 32

a)   Common Legal And Factual Questions Predominate ................... 32

b)   A Class Action Is The Superior Means To Adjudicate The Claims Raised ................................................................................. 33

C.   The Proposed Notice Plan Meets All Requirements ............................................ 34

D.   The Intended Request For Attorneys' Fees And Expenses And An Award For Costs And Expenses Of Plaintiffs .................................................................. 36

E.   The Claims Administrator ..................................................................................... 37

F.   Schedule For Final Approval ................................................................................ 38

IV.   CONCLUSION .................................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Allen v. Bedolla,
  787 F.3d 1218 (9th Cir. 2015) ................................................................................. 7

Amchem Prods. v. Windsor,
  521 U.S. 591 (1997).................................................................................... 32, 33

Armstrong v. Davis,
  275 F.3d 849 (9th Cir. 2001), <u>overruled on other grounds by Johnson v. California</u>,
  543 U.S. 499 (2005)................................................................................... 30

Azar v. Blount Int'l, Inc.,
  No. 3:16-cv-0483, 2019 WL 7372658 (D. Or. Dec. 31, 2019)................................. 19

Baird v. BlackRock Institutional Tr. Co., N.A.,
  No. 17-CV-01892-HSG, 2021 WL 5991060 (N.D. Cal. July 12, 2021) ................... 22

Berson v. Applied Signal Tech., Inc.,
  527 F.3d 982 (9th Cir. 2008) ................................................................................ 14

Booth v. Strategic Realty Tr., Inc.,
  No. 13-cv-04921-JST, 2015 WL 3957746 (N.D. Cal. June 28, 2015) ................... 30

Campbell v. Facebook, Inc.,
  951 F.3d 1106 (9th Cir. 2020) .............................................................................. 7

Churchill Village, L.L.C. v. Gen. Elec.,
  361 F.3d 566 (9th Cir. 2004) ........................................................................... 7, 9

Corzine v. Whirlpool Corp.,
  No. 15-cv-05764-BLF, 2019 WL 7372275 (N.D. Cal. Dec. 31, 2019)................... 21

Cotter v. Lyft, Inc.,
  193 F. Supp. 3d 1030 (N.D. Cal. 2016) ........................................................ 7, 8, 28

Cottle v. Plaid Inc.,
  340 F.R.D. 356 (N.D. Cal. 2021).......................................................................... 20

Davy v. Paragon Coin, Inc.,
  No. 18-CV-00671-JSW, 2020 WL 4460446 (N.D. Cal. June 24, 2020)................. 30

Dyer v. Wells Fargo Bank, N.A.,
  303 F.R.D. 326 (N.D. Cal. 2014).......................................................................... 8

Farrell v. Bank of Am. Corp., N.A.,
    827 F. App'x 628 (9th Cir. 2020), cert. denied sub nom.,
    Threatt v. Farrell, 142 S. Ct. 71 (2021)................................................................. 24

Fleming v. Impax Lab'ys Inc.,
    No. 16-CV-06557-HSG, 2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) ............................... 31

Hanlon v. Chrysler Corp.,
    150 F.3d 1011 (9th Cir. 1998), overruled on other grounds by
    Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011)........................................... passim

Hefler v. Wells Fargo & Co.,
    No. 3:16-cv-05479-JST, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) .................................. 25

Hesse v. Sprint Corp.,
    598 F.3d 581 (9th Cir. 2010) ......................................................................... 28

Hildes v. Arthur Andersen LLP,
    734 F.3d 854 (9th Cir. 2013) ......................................................................... 14

Hodges v. Akeena Solar, Inc.,
    274 F.R.D. 259 (N.D. Cal. 2011)................................................................... 29, 30

In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,
    No. MDL 1500, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)................................................ 16

In re Celera Corp. Sec. Litig.,
    No. 5:10-CV-02604-EJD, 2015 WL 7351449 (N.D. Cal. Nov. 20, 2015) ........................ 15, 20

In re Diamond Foods, Inc.,
    295 F.R.D. 240 (N.D. Cal. 2013)....................................................................... 31

In re Extreme Networks, Inc. Sec. Litig.,
    No. 15-cv-04883-BLF, 2019 WL 3290770 (N.D. Cal. July 22, 2019).............................. 19, 25

In re Heritage Bond Litig.,
    546 F.3d 667 (9th Cir. 2008) ........................................................................... 7

In re Heritage Bond Litig.,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ...................................... 21

In re Hyundai & Kia Fuel Econ. Litig.,
    926 F.3d 539 (9th Cir. 2019) .................................................................. 18, 23, 33

In re Immune Response Sec. Litig.,
    497 F. Supp. 2d 1166 (S.D. Cal. 2007)................................................................. 37

In re Intuitive Surgical Sec. Litig.,
    No. 5:13-CV-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .............................. 29

In re LinkedIn User Privacy Litig.,
    309 F.R.D. 573 (N.D. Cal. 2015)........................................................................... 16, 34

In re Lyft Inc. Sec. Litig.,
    No. 19-CV-02690-HSG, 2021 WL 3711470 (N.D. Cal. Aug. 20, 2021)................................ 33

In re Mego Fin. Corp. Sec. Litig.,
    213 F.3d 454 (9th Cir. 2000), as amended (June 19, 2000)..................................... 21

In re Mercury Interactive Corp. Sec. Litig.,
    618 F.3d 988 (9th Cir. 2010) .............................................................................. 38

In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.,
    768 F. App'x 651 (9th Cir. 2019) ......................................................................... 24

In re Omnivision Techs., Inc.,
    559 F. Supp. 2d. 1036 (N.D. Cal. 2007) .................................................................... 21

In re Portal Software, Inc. Sec. Litig.,
    No. C 03 5138 VRW, 2007 WL 1991529 (N.D. Cal. June 30, 2007) .................... 18, 27, 33, 36

In re Tableware Antitrust Litig.,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) .................................................................... 21

In re TracFone Unlimited Serv. Plan Litig.,
    112 F. Supp. 3d 993 (N.D. Cal. 2015) ...................................................................... 18

In re UTStarcom, Inc. Sec. Litig.,
    No. C 04-04908 JW, 2010 WL 1945737 (N.D. Cal. May 12, 2010)........................................ 32

In re Zynga Inc. Sec. Litig.,
    No. 12-cv-04007-JSC, 2015 WL 6471171 (N.D. Cal. Oct. 27, 2015) .................................... 26

Kim v. Allison,
    8 F.4th 1170 (9th Cir. 2021) ................................................................................. 7

Knapp v Art.com, Inc.,
    283 F. Supp. 3d 823 (N.D. Cal. 2017) ....................................................................... 8

Lane v. Facebook, Inc.,
    696 F.3d 811 (9th Cir. 2012) .............................................................................. 18

Lloyd v. CVB Fin. Corp.,
    811 F.3d 1200 (9th Cir. 2016) ............................................................................. 14

Luna v. Marvell Tech. Grp., Ltd.,
  No. C 15-05447 WHA, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ................................... 29

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,
  221 F.R.D. 523 (C.D. Cal. 2004) ................................................................................... 9, 20

Nursing Home Pension Fund v. Oracle Corp.,
  No. C01-00988 MJJ, 2006 WL 8071391 (N.D. Cal. Dec. 20, 2006) ...................................... 29

Omnicare v. Laborers Dist. Council Constr. Indus.,
  575 U.S. 175 (2015) ........................................................................................................... 12

Quiruz v. Specialty Commodities, Inc.,
  No. 17-cv-03300-BLF, 2020 WL 6562334 (N.D. Cal. Nov. 9, 2020) .................................... 21

Rodriguez v. W. Publ'g Corp.,
  563 F.3d 948 (9th Cir. 2009) .............................................................................................. 16

Schuler v. Medicines Co.,
  No. CV 14-1149 (CCC), 2016 WL 3457218 (D.N.J. June 24, 2016) ..................................... 19

Sudunagunta v. NantKwest, Inc.,
  No. 2:16-cv-01947-MWF-JEM, 2019 WL 2183451 (C.D. Cal. May 13, 2019)...................... 22

Todd v. STAAR Surgical Co.,
  No. CV 14-5263 MMF (GJSx), 2017 WL 4877417 (C.D. Cal. Oct. 24, 2017) ............. 9, 20, 37

Todd v. STAAR Surgical Co.,
  No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017).............................. 30

Torrisi v Tucson Elec. Power Co.,
  8 F.3d 1370 (9th Cir. 1993) ................................................................................................ 16

Uschold v. NSMG Shared Servs., LLC,
  333 F.R.D. 157 (N.D. Cal. 2019)........................................................................................ 21

Vataj v. Johnson,
  No. 19-cv-06996-HSG, 2021 WL 1550478 (N.D. Cal. Apr. 20, 2021) ....................... 19, 24, 37

Wilson v. LSB Indus., Inc.,
  No. 1:15-CV-07614-RA-GWG, 2019 WL 3542844 (S.D.N.Y. June 28, 2019) ..................... 37

**Statutes**

15 U.S.C. § 77z-1(a)(7)........................................................................................................ 34

15 U.S.C. § 78u-4(a)(4) ...................................................................................................... 36

15 U.S.C. § 78u-4(a)(7) ...................................................................................................... 34

28 U.S.C. § 1715 ................................................................................................................ 35

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ 7, 34, 36

Fed. R. Civ. P. 23(a) ......................................................................................... 28, 29, 32

Fed. R. Civ. P. 23(a)(2) ............................................................................................... 29

Fed. R. Civ. P. 23(a)(4) ............................................................................................... 31

Fed. R. Civ. P. 23(b)(3) .......................................................................................... 32, 33

Fed. R. Civ. P. 23(b)(3)(D) .......................................................................................... 33

Fed. R. Civ. P. 23(c)(2)(B) .......................................................................................... 35

Fed. R. Civ. P. 23(c)(3) ............................................................................................... 34

Fed. R. Civ. P. 23(e) ................................................................................................ 7, 18

Fed. R. Civ. P. 23(e)(1)(B) .......................................................................................... 35

Fed. R. Civ. P. 23(e)(2) ..................................................................................... 8, 22, 27

Fed. R. Civ. P. 23(e)(2)(C)(ii) ..................................................................................... 24

Fed. R. Civ. P. 23(e)(2)(C)(iii) .................................................................................... 24

Fed. R. Civ. P. 23(e)(2)(C)(iv) ............................................................................... 25, 27

Fed. R. Civ. P. 23(e)(3) ............................................................................................... 25

Fed. R. Civ. P. 23(g)(1)(A) .......................................................................................... 32

Fed. R. Civ. P. 23(g)(1)(B) .......................................................................................... 32

**Docketed8**

Hayden v. Portola Pharmaceuticals, Inc., et al.,
    No. 3:20-cv-00367-VC (N.D. Cal.) ........................................................................ 5

In re SanDisk LLC Sec. Litig.,
    No. 15-cv-01455-VC (N.D. Cal. Oct. 23, 2019) .................................................... 37

In re Vivendi Universal, S.A. Sec. Litig.,
    No. 1:02-cv-05571 (S.D.N.Y.) ............................................................................... 16

Jaffe Pension Plan v. Household Int'l., Inc.,
  No. 1:02-cv-05893 (N.D. Ill.) ................................................................. 16

McCutcheon v. Portola Pharmaceuticals, Inc., et al.,
  No. 3:20-cv-00949-EMC (N.D. Cal.) ........................................................ 5

SEB Inv. Mgmt. AB v. Align Tech., Inc.,
  No. 3:18-cv-06720 (N.D. Cal. April 28, 2022) ......................................... 19

Southeastern Pennsylvania Transportation Authority v.
  Portola Pharmaceuticals, Inc., et al.,
  No. 3:20-cv-01501-WHA (N.D. Cal.) ........................................................ 5

## KEY DEFINED TERMS

### Parties

| | |
|---|---|
| Lead Plaintiff or ACERA | Lead Plaintiff Alameda County Employees' Retirement Association |
| OFPRS | Additional Named Plaintiff Oklahoma Firefighters Pension and Retirement System |
| Plaintiffs | Collectively, Lead Plaintiff and OFPRS |
| Portola | Portola Pharmaceuticals, Inc. |
| Officer Defendants | Defendants Scott Garland, Mardi Dier, and Sheldon Koenig |
| Director Defendants | Defendants Hollings C. Renton, Jeffrey W. Bird, Laura Brege, Dennis Fenton, John H. Johnson, David C. Stump, and H. Ward Wolff |
| Portola Defendants | Collectively, Portola, Officer Defendants, and Director Defendants |
| Underwriter Defendants | Defendants Goldman Sachs & Co. LLC; Citigroup Global Markets Inc.; Cowen and Company, LLC; William Blair & Company, L.L.C.; and Oppenheimer & Co. Inc. |

### Key Documents in Chronological Order

| | |
|---|---|
| LP/LC Order | Order Granting Motion to Appoint Lead Plaintiff and Lead Counsel, Vacating Hearing, and Setting Briefing Schedule for Amended Pleadings, filed **April 22, 2020 (ECF No. 49)** |
| Consolidated Complaint or CC | Consolidated Complaint for Violations of the Securities Laws, filed **May 20, 2020 (ECF No. 51)** |
| MTD CC Tr. | Transcript of Zoom Webinar Proceedings of the Official Electronic Sound Recording 11:19 – 12:30 p.m. for the Hearing on Defendants' Motion to Dismiss the Consolidated Complaint held on **September 24, 2020 (ECF No. 83)** |
| FAC | First Amended Complaint for Violations of the Securities Laws, filed **November 5, 2020 (ECF No. 87)** |
| SAC | Second Amended Complaint for Violations of the Securities Laws, filed **March 31, 2021 (ECF No. 113)** |
| MTD SAC or Motion to Dismiss the SAC | Notice of Motion and Motion to Dismiss the Second Amended Consolidated Class Action Complaint: Memorandum of Points and Authorities in Support Thereof, filed **May 5, 2021 (ECF No. 119)** |

| | |
|---|---|
| MTD SAC Opp. | Lead Plaintiff's Opposition to Defendants' Motion to Dismiss The Second Amended Consolidated Class Action Complaint, filed **June 9, 2021 (ECF No. 121)** |
| MTD SAC Order | Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Second Amended Consolidated Class Action Complaint, filed **August 10, 2021 (ECF No. 143)** |
| Joint CMC Statement | Joint Case Management Statement and [Proposed] Order, filed **August 25, 2021 (ECF No. 146)** |
| TAC | Third Amended Complaint for Violations of the Securities Laws, filed **August 31, 2021 (ECF No. 149)** |
| MTD TAC or Motion to Dismiss the TAC | Notice of Motion and Motion to Dismiss the Third Amended Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Thereof, filed **September 21, 2021 (ECF No. 163)** |
| MTD TAC Opp. | Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Third Amended Consolidated Class Action Complaint, filed **October 12, 2021 (ECF No. 165)** |
| MTD TAC Reply | Reply Memorandum of Points and Authorities in Further Support of Motion to Dismiss the Third Amended Consolidated Class Action Complaint, filed **October 26, 2021 (ECF No. 169)** |
| MTD TAC Tr. | Transcript of Zoom Webinar Proceedings of the Official Electronic Sound Recording 10:23 – 10:51 a.m. for the Hearing on Defendants' Motion to Dismiss the Third Amended Consolidated held on **January 20, 2022 (ECF No. 185)** |
| Motion for Class Cert. | Lead Plaintiff's Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof, filed **February 17, 2022 (ECF No. 190)** |
| Class Cert. Opp. | Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, filed **April 25, 2022 (ECF No. 202)** |
| Class Cert. Reply | Lead Plaintiff's Reply in Support of Motion for Class Certification, filed **June 2, 2022 (ECF No. 217)** |

**<u>Other Terms</u>**

| | |
|---|---|
| GAAP | Generally Accepted Accounting Principles |
| ASC 606 | Accounting Standards Codification, Topic 606, <u>Revenue from Contracts with Customer</u> |

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the proposed Settlement[1] of this action between Plaintiffs and Defendants is within the range of fairness, reasonableness, and adequacy to warrant: (a) preliminary approval under Rule 23(e) of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, 15 U.S.C. § 77z-1, and Cotter v. Lyft, Inc., 193 F. Supp. 3d 1030, 1035-37 (N.D. Cal. 2016); (b) the dissemination of the Notice to proposed Settlement Class Members; and (c) setting a hearing date for final approval of the Settlement and an application for attorneys' fees and reimbursement of expenses and an award to Plaintiffs for their costs and expenses in connection with the litigation.

2.      Whether a Settlement Class[2] should be certified.

3.      Whether the proposed Notice of Pendency of Class Action and Proposed Settlement, Final Approval Hearing, and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") adequately apprises the Settlement Class Members about the terms of the Settlement and their rights with respect to it.

4.      Whether the proposed Proof of Claim and Release form ("Claim Form") is sufficient to be disseminated to the Class.

---

[1] All capitalized terms not otherwise defined herein are defined in the Stipulation and Agreement of Settlement, dated September 19, 2022 (the "Stipulation" or "Stip."), a true and correct copy of which is appended as Exhibit 1 to the Declaration of Daniel E. Barenbaum in Support of Lead Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement ("Barenbaum Declaration" or "Barenbaum Decl."). Unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks, and citations are omitted.

[2] For purposes of settlement only, the "Settlement Class" or "Class" is defined generally as all persons and entities who purchased or otherwise acquired the common stock of Portola between January 8, 2019 through February 28, 2020, inclusive (the "Settlement Class Period" or "Class Period"), and were damaged thereby; including those who purchased or otherwise acquired Portola common stock either in or traceable to Portola's secondary public offering ("SPO") on or about August 14, 2019, and were damaged thereby. Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, or controlling person of Portola Inc. or any of the Underwriter Defendants; (iv) any subsidiaries or affiliates of Portola or any of the Underwriter Defendants; (v) any entity in which any such excluded party has, or had, a direct or indirect majority ownership interest; (vi) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded persons or entities. These exclusions do not exclude any "Investment Vehicles," as defined in the Stipulation at ¶1.40. Also excluded from the Settlement Class is any Settlement Class Member that validly and timely requests exclusion in accordance with the requirements set by the Court. As detailed below, the Settlement Class Period is two days longer than the Class Period alleged in the operative complaint, which encompassed January 8, 2019 through February 26, 2020. The extended Settlement Class Period results from the Court's Orders surrounding the issue of loss causation on the motions to dismiss the SAC and TAC, and the iterative briefing and oral argument that informed those Orders.

5.  Whether Lead Plaintiff ACERA and Additional Named Plaintiff OFPRS should be appointed as Class representatives and Lead Counsel Berman Tabacco should be appointed Class Counsel for purposes of implementing the proposed Settlement.

6.  Whether Epiq Systems, Inc. ("Epiq") should be appointed as the Claims Administrator to administer the notice and claims process.

<u>**NOTICE OF MOTION AND MOTION**</u>

PLEASE TAKE NOTICE that on October 27, 2022, at 9:30 a.m., via Zoom Webinar ID: 161 285 7657, Password: 547298, Lead Plaintiff ACERA will move this Court for an order: (1) preliminarily approving a proposed settlement of this action (the "Settlement"), including the Claim Form to be disseminated to the Settlement Class as well as the proposed Plan of Allocation; (2) preliminarily certifying a class (the "Settlement Class") and appointing ACERA and Additional Named Plaintiff OFPRS as Class representatives as well as Lead Counsel Berman Tabacco ("Lead Counsel") as class counsel ("Class Counsel") for purposes of implementing the proposed Settlement; (3) approving the form and manner of giving Notice to the Settlement Class;  (4) scheduling a hearing before the Court to determine whether the proposed Settlement, Plan of Allocation, and fee and expense requests should be granted final approval; and (5) appointing Epiq as the Claims Administrator to administer the Notice and claims process ("Preliminary Approval Order[3]").  The proposed Settlement provides for the payment of $17.5 million in cash, plus interest earned thereon, for the benefit of the proposed Settlement Class and, if approved, would fully resolve all claims against all Defendants.

The grounds for this Motion are, <u>inter alia</u>, that: (1) the proposed Settlement and Plan of Allocation are within the range of fairness, reasonableness, and adequacy so that Notice should be disseminated to members of the proposed Settlement Class ("Settlement Class Members"); (2) the criteria applicable to certifying a Settlement Class are met; and (3) the proposed Notice adequately apprises the Settlement Class Members of the Settlement terms and their rights with respect to it.

This Motion is based on the Memorandum of Points and Authorities submitted below, the accompanying Barenbaum Declaration, the Declaration of Eric Blow in Support of Lead Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement ("Blow

---

[3] The proposed Preliminary Approval Order is attached as Exhibit A to the Stipulation, which is Ex. 1 to the Barenbaum Declaration.  The Notice is attached as Exhibit A-1 to the Preliminary Approval Order.

Decl.") (attached as Exhibit 4 to the Barenbaum Declaration), and all other pleadings and matters of record.

Defendants do not oppose this Motion.  <u>See</u> Barenbaum Decl. ¶56.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   <u>INTRODUCTION</u>

Plaintiffs and Defendants have negotiated a proposed Settlement of this action in exchange for a cash settlement of $17.5 million for the benefit of the Settlement Class in consideration for resolving all claims alleged in the above-captioned action.  The proposed Settlement, if approved, would provide the Settlement Class with a substantial, immediate, concrete benefit and allow the parties to avoid those protracted risks and uncertainties present in this action and inherent in complex securities class action litigation generally.  <u>See</u> Barenbaum Decl. Ex. 1.  The Settlement is the result of extensive arm's-length negotiations between highly experienced counsel, which included a full-day mediation session before nationally recognized mediator Robert A. Meyer, Esq., followed extensively by individual follow up sessions with counsel.

Lead Plaintiff secured the Settlement due to its vigorous efforts over the course of hard-fought litigation.  These efforts included, inter alia: (i) interviews with former Portola employees and customers; (ii) extensive consultation with, and analysis by, forensic auditing and damages consultants; (iii) detailed reviews of Portola's public filings, annual reports, press releases, conference call transcripts, and other publicly available information; (iv) the review of analysts' reports and articles relating to Portola; (v) the drafting of a consolidated complaint and three amended complaints; (vi) research of the applicable law with respect to the claims asserted in the TAC and the potential defenses thereto; (vii) extensive briefing regarding the asserted legal and factual claims, both in opposing Defendants' motions to dismiss each complaint and in preparing a motion for and reply brief in support of class certification; (viii) the review of

thousands of documents produced in discovery,[4] including third-party discovery of Plaintiffs' investment managers; and (ix) the taking or defending of seven depositions, including expert depositions, Plaintiffs' depositions, and depositions of Plaintiffs' external investment managers. See, e.g., Barenbaum Decl. ¶24.

Based upon their experience, evaluation of the facts and the applicable law, and recognition of the substantial amount provided under the Settlement and of the risks and expenses of protracted litigation against Defendants, Lead Counsel and Lead Plaintiff submit that the proposed Settlement is an excellent result and in the best interests of the Settlement Class, and ask that the Court enter the proposed Preliminary Approval Order.  See Stip. Ex. A. As provided herein, the proposed Settlement and Notice are within the range of fairness, reasonableness, and adequacy so that Notice should be disseminated to the proposed Settlement Class Members; the criteria applicable to certifying a Settlement Class are met; and the proposed Notice adequately apprises Settlement Class Members of the terms of the Settlement and their rights under it.

## II.  __SUMMARY OF THE LITIGATION__

### A.  __Plaintiffs' Claims Against Defendants__

In this action, Plaintiffs allege the following, which Defendants vigorously deny.

Plaintiffs allege that Defendant Portola began bringing to market on a commercial scale its new and claimed-to-be novel drug, Andexxa (Portola's only viable product), which was designed to address bleeding emergencies resulting from the use of certain anti-coagulants. TAC ¶¶59, 68.  During the Class Period, Portola sold short-dated 6-12 month product.  Id. ¶12. Andexxa was extremely expensive and only utilized in emergencies, so relatively few doses were stocked by customers, and it was unknown whether or when the drug would be used.  Id. ¶¶60, 126, 214.  "Presumably because of these challenges, Portola offered customers a very generous return policy for Andexxa…." (MTD SAC Order 3), where customers or distributors

---

[4] Defendants produced to Lead Plaintiff of over 32,000 documents (including over 211,000 produced pages).  Barenbaum Decl. ¶24.

could return Andexxa from 3 months prior to expiration through 6 months after (id. at 3-4). That meant that short-dated product sold in late 2018 or into 2019 could have been returned well into 2020. Id. at 4.

Plaintiffs allege that—despite a generous return policy, likely impending returns from short-dated and soon-expiring product, and a lack of appropriate bases to predict how much product might be returned—Portola recognized most Andexxa revenue immediately upon sale to its distributors in direct violation of recently adopted GAAP rule ASC 606. TAC ¶¶152, 180-203. In order to recognize revenue for Andexxa sales, ASC 606 required that the Company have a high-level certainty that significant revenue reversal would not occur in the future. Id. ¶171.

Relatedly, Plaintiffs also allege that Portola regularly and repeatedly attempted to paint a picture of incredibly high and regular demand and utilization throughout the Class Period. That was allegedly false and misleading for two reasons: first, those statements were based on the improperly recognized revenue under ASC 606 (TAC ¶218(e)), and second, Portola knew internally that demand was anemic and usage of Andexxa, when sold, was limited (id. ¶¶209-21).

The alleged truth about the demand and utilization for Andexxa and revenues stemming from it emerged through disclosures on January 9, February 26, and February 28, 2020. Analysts and the market reacted. TAC ¶¶252-86. As that truth was revealed to investors, Portola's stock price declined. Id. ¶¶250-79. As a result of Defendants' alleged wrongful acts and omissions and the decline in the market value of Portola's securities, Lead Plaintiff, OFPRS, and Settlement Class Members suffered significant losses and damages. Id.

Plaintiffs and OFPRS assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R § 240.10b-5, as well as Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o (the "Securities Act"). TAC ¶1.

**B.      Procedural History**

The proposed Settlement comes after two-plus years of hard-fought litigation, with Lead Plaintiff's motion for class certification fully briefed; it was reached less than two months prior to the fact discovery cut-off, with trial scheduled in early 2023.  Plaintiffs filed four complaints, engaged in several rounds of briefing related to the motions to dismiss as well as the motion for class certification, and conducted extensive document discovery in addition to taking and defending several depositions.

This securities fraud class action commenced on January 16, 2020, with the filing of the initial complaint, captioned Hayden v. Portola Pharmaceuticals, Inc., et al., No. 3:20-cv-00367-VC (N.D. Cal.).  ECF No. 1.[5]  By Order dated April 22, 2020, the Court appointed ACERA as Lead Plaintiff and approved its selection of Berman Tabacco as Lead Counsel.  ECF No. 49.

On May 20, 2020, Plaintiffs filed their Consolidated Complaint.  ECF No. 51.  Defendants filed their motion to dismiss the Consolidated Complaint on July 1, 2020.  ECF No. 67.  The Court orally granted Lead Plaintiff leave to amend at the hearing on the motion on September 24, 2020.  ECF No. 82.  The FAC followed (ECF No. 87), and the Court granted Defendants' motion to dismiss with leave to amend (ECF No. 90), ordering Lead Plaintiff to clarify and shorten its complaint from 230-plus pages to under 100 pages.  The SAC accomplished that.  ECF No. 113.

After Defendants' Motion to Dismiss the SAC (ECF No. 119), the Court issued an order (ECF No. 143) finding that Plaintiffs had alleged a plausible case of securities fraud, sustaining the Securities Act claims and granting the motion as to the Exchange Act claims with leave to amend so that Plaintiffs could re-plead loss causation.  See MTD SAC Order 10-11.  Confident that Lead Plaintiff would succeed in repleading loss causation, the Court ordered that discovery could commence.  Id. at 12.  After Lead Plaintiff filed the TAC (ECF No. 149) and it was

---

[5] Two subsequently filed complaints—McCutcheon v. Portola Pharmaceuticals, Inc., et al., No. 3:20-cv-00949-EMC (N.D. Cal.), and Southeastern Pennsylvania Transportation Authority v. Portola Pharmaceuticals, Inc., et al., No. 3:20-cv-01501-WHA (N.D. Cal.)—were later consolidated into the Hayden action on March 29, 2022.  ECF No. 199.

briefed and argued, the Court issued an order on January 20, 2022 denying Defendants' motion in its entirety (ECF No. 178).

The Court entered an initial pretrial schedule order on September 8, 2021.  ECF No. 156. On February 22, 2022, the Court entered an amended pretrial schedule order that, among other things, set the fact discovery cutoff for August 25, 2022, and trial for March 20, 2023.  ECF No. 191.  Between entry of the September 8, 2021 pretrial schedule order and June 9, 2022, the date a binding settlement term sheet was signed, the parties conducted discovery, including Defendants' production to Plaintiffs of over 32,000 documents (over 211,000 produced pages), seven depositions, and third-party discovery.  Barenbaum Decl. ¶16.  Lead Plaintiff filed its motion for class certification on February 17, 2022.  ECF No. 190.  After extensive document and deposition discovery, Defendants filed their opposition on April 25, 2022 (ECF No. 202) and Lead Plaintiff filed its reply on June 2, 2022 (ECF No. 217).

### C.    Mediation

In late March 2022, the parties retained nationally recognized mediator Robert A. Meyer, Esq., of JAMS to mediate a possible settlement of this action.  See Barenbaum Decl. ¶20.  Detailed opening and reply mediation briefs were submitted in advance.  Id.  On May 24, 2022, the parties engaged in a full-day hybrid mediation session with Mr. Meyer.  Id. ¶21.  The action did not settle on that date.  Id.  Over the following two weeks, Mr. Meyer continued to engage the parties in significant mediation dialog, conducting multiple calls with each party.  Id.

On June 9, with Mr. Meyer's continued assistance and recommendation, the parties reached an agreement to settle the action for $17.5 million, subject to Court approval. See Barenbaum Decl. ¶22.  On that same date, the parties agreed on all material terms of the Settlement and executed a binding term sheet/agreement.  Id.  On September 19, 2022, after further negotiations, the parties executed the Stipulation of Settlement.  Id. ¶23 & Ex. 1.

## III.   ARGUMENT

### A.     The Court Should Preliminarily Approve The Settlement

Rule 23(e) requires judicial approval for any compromise of claims brought on a class

basis.  Approval of a proposed settlement is within the broad authority of the district court.  See

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998), overruled on other grounds by

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011).  Nevertheless, "there is a strong judicial

policy that favors settlements, particularly where complex class action litigation is concerned."

Allen v. Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015).

Although class action settlement approval is determined over two phases—preliminary

and final—this Court "review[s] class action settlements just as carefully at the initial stage" as

it does "at the final stage."  See Cotter v. Lyft, Inc., 193 F. Supp. 3d 1030, 1035-37 (N.D. Cal.

2016); see also Standing Order for Civil Cases before Judge Vince Chhabria ("Standing Order")

¶57.  "A district court may approve a proposed settlement in a class action only if the

compromise is fundamentally fair, adequate, and reasonable."  In re Heritage Bond Litig.,

546 F.3d 667, 674-75 (9th Cir. 2008) (citing Fed. R. Civ. P. 23(e)).

To determine whether a proposed settlement is fair, reasonable, and adequate, the Ninth

Circuit considers eight non-exhaustive "Hanlon factors:"

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely
> duration of further litigation; [3] the risk of maintaining class action status
> throughout the trial; [4] the amount offered in settlement; [5] the extent of
> discovery completed and the stage of the proceedings; [6] the experience and
> views of counsel; [7] the presence of a governmental participant; and [8] the
> reaction of the class members to the proposed settlement.

Campbell v. Facebook, Inc., 951 F.3d 1106, 1121 (9th Cir. 2020).[6]  Rule 23, as amended in

December 2018, provides additional guidance for whether preliminary approval of a class action

---

[6] See also Churchill Village, L.L.C. v. Gen. Elec., 361 F.3d 566, 576 n.7 (9th Cir. 2004).  The
Ninth Circuit refers to these factors as both the "Hanlon factors" and the "Churchill factors,"
though the factors are the same.  See, e.g., Campbell, 951 F.3d at 1121 (citing "Hanlon" factors);
Kim v. Allison, 8 F.4th 1170, 1178 (9th Cir. 2021) (citing "Churchill factors").  This brief
references the Hanlon factors consistent with this Court's Standing Order.  See Standing Order
¶57.

settlement should be granted.  See Fed. R. Civ. P. 23(e)(2).  Those factors include whether: (1) "the class representative and class counsel have adequately represented the class;" (2) "the [proposed settlement] was negotiated at arm's length;" (3) "the relief provided is adequate…;" and (4) "the [proposed settlement] treats class members equitably relative to each other."  Id.

Under both the Hanlon and Rule 23(e)(2) standards, preliminary approval of the proposed Settlement should be granted and dissemination of the Notice should be ordered.

### 1.    The Hanlon Factors Support Approval

At preliminary approval, this Court assesses the "settlement taken as a whole."  Cotter, 193 F. Supp. 3d at 1035.  Courts "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery."  Knapp v Art.com, Inc., 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

Here, Plaintiff's damages consultant has determined that the **maximum** amount of class-wide damages for the Exchange Act claims are $301.1 million.  Barenbaum Decl. ¶29.  This assumes that 100% of the stock drops were caused by the revelation of the alleged fraud and that Plaintiffs prevail on merits, loss causation, and damages arguments.  The proposed Settlement recovery of $17.5 million here represents approximately 5.8% of those estimated maximum alleged damages.  Id. ¶30.  That percentage is in line with median reported values for securities fraud class actions generally and exceeds the Ninth Circuit's median recovery of 4.9% of damages. Id.; see infra Section III.A.2.c.  Further, if Defendants prevailed on some or many of their arguments, damages would be reduced (even potentially to zero).  Barenbaum Decl. ¶¶39, 42.  Moreover, even if Plaintiffs were able to secure a judgment against Defendants despite their myriad of attacks, Plaintiffs and the Class might nonetheless ultimately recover nothing after appeal. See, e.g., Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 331 (N.D. Cal. 2014).

Each of the relevant <u>Hanlon</u> factors is set forth and discussed in detail below.[7]  While Plaintiffs believe in the merits of the case, there can be no question after considering the factors that there are substantial risks (including the risk of failure to recover)—risks that on balance weigh in favor of settlement.  Barenbaum Decl. ¶¶31-35, 40-42.

a)  **The Strength of Plaintiffs' Case Balanced Against the Substantial Risks of Continued Litigation**

Defendants presented a multitude of arguments in their motions to dismiss and briefs in opposition to class certification, as well as throughout the discovery process, vigorously disputing virtually all elements of the Plaintiffs' claims, both legal and factual.  Plaintiffs, through Lead Counsel, have made a thorough investigation and analysis into the facts, legal issues, and circumstances relevant to the claims here.  <u>See</u> <u>supra</u> pp. 2-3, 5-6; Barenbaum Decl. ¶¶6-13, 15-19, 24-28, 31-35, 37, 43.  Lead Counsel has therefore had an opportunity to thoroughly examine the issues and consider the relative strengths and weaknesses of the claims and defenses.  <u>Id.</u>; <u>see also</u> <u>id.</u> ¶¶38-42; <u>see</u> <u>Todd v. STAAR Surgical Co.</u>, No. CV 14-5263 MMF (GJSx), 2017 WL 4877417, at *4 (C.D. Cal. Oct. 24, 2017) (approving settlement after, among other things, the parties "engaged in substantial discovery" and "had ample information with which to make informed settlement decisions").

The most prominent risks to Plaintiffs success are set forth by category below.

<u>**The Risk of Establishing Material Misstatements and Omissions**</u>

The alleged false and misleading statements generally fall into two categories:

(1) statements and omissions about compliance with GAAP and ASC 606 (an accounting fraud theory) and (2) statements about stellar demand and utilization.  Those about GAAP and ASC 606 were allegedly materially misleading because, as alleged, Defendants recognized

---

[7] The <u>Hanlon</u> factors used to evaluate settlements are non-exclusive and need not all be shown. <u>Churchill Village</u>, 361 F.3d at 576 n.7.  This analysis does not include two non-applicable <u>Hanlon</u> factors: The first factor not included is the reaction of the Settlement Class; because this is a motion for preliminary (and not final) approval, notice has not yet distributed and there cannot yet be a reaction.  The second factor is not included is the "presence of a governmental participant," because there is none.  In such situations, courts have found that this consideration is inapplicable.  <u>Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("There is no governmental participant in this Class Action. As a result, this factor does not apply to the Court's analysis.").

revenue promptly upon sale without determining the relative certainty that the sale would not result in a return, as Plaintiffs alleged is required under ASC 606.  The statements about demand and utilization were allegedly materially misleading because, as alleged, Defendants knew internally that demand and utilization were weak and statements about demand were based on the misstated revenue numbers recognized in violation GAAP and ASC 606.

  **The Focus on the 2018 Return Reserve Account Balance.**  While the Court generally seemed to embrace Plaintiffs' accounting fraud theory at the motion to dismiss phase (see e.g., MTD SAC Order 3-10) and noted that the accounting fraud made the allegations about the demand and utilization statements more plausible (id. at 10-11 n.5), it did so by focusing on an omissions theory that was factually tethered to the 2018 end-of-year return reserve balance of only $299,000—a drop of 90% with up to 18 more months of 2018 sales returns to follow—that went undisclosed to the public until 14 months later, when on February 28, 2020 it was disclosed in the 2019 SEC Form 10-K (see id. at 6-10).

- 2018 Reserve "Discrete" Issue.  Using the Court's MTD SAC Order, Defendants have repeatedly argued that the scope of the case did not include 2019 sales and was limited to a "discrete" or "narrow" issue focused solely only on the failure to disclose the $299,000 2018 return reserve balance.  See generally MTD TAC (ECF No. 163); see also Joint CMC Statement (ECF No. 146), at 3-4.  Plaintiffs disagree, but understand that they face litigation risk regarding the scope of the case and in proving a misstatement in 2019.  If the scope of the case were narrowed, the value of Plaintiffs' case would vastly diminish, possibly to zero if the trier of fact rejected Plaintiffs' theory outright.  Barenbaum Decl. ¶¶39, 42.

- The $299,000 2018 Year-End Return Reserve Account Balance and Depletion.  Citing Portola's 10-K for 2019, the Complaint alleged that Portola's alleged GAAP violations were evidenced, in part, by the fact that Portola reserved $2.611 million for Andexxa returns during 2018 and that $2.312 million (or 90%) of that amount had been depleted by actual returns prior to year-end 2018.  The Court's description of the

omissions theory in its MTD SAC Order had focused on the return reserve balance and the allegations surrounding the 90% depletion of the returns reserve account at year-end 2018 given that there appeared to be 18 months still remaining in the return window.  See MTD SAC Order 6-7.  Defendants, however, believe that the evidence would show that half of the 2018 provisions for returns was attributable to Portola's earlier released and stagnant Bevyxxa, not Andexxa (the focus of this case and the Court's decision).  Defendants further believe that the evidence would show that an additional $1 million in the returns reserve account were earmarked for a small batch of unusually short-dated Andexxa that had shipped in May 2018 and expired on June 30, 2018).  Defendants argue that after removing the 2018 reserves for Bevyxxa and the unusually short-dated Andexxa from earlier in the year, there was no additional depletion of reserves for Portola's general short-dated Andexxa during 2018—that the 90% depletion in the account was not related to that short-dated Andexxa or indicative of expected returns of that product.  While Lead Counsel would have argued that the $299,000 reserve was unreasonable on its face, Plaintiffs understand that they would have faced litigation risk regarding this issue, which had the potential to drastically undermine and damage Plaintiffs' case before the Court and/or jury at summary judgment or trial.  Barenbaum Decl. ¶¶32-33, 40-42.

- Materiality.  Defendants have also argued that the amount of any error in the return reserve balance was immaterial.  See MTD SAC 2, 5, 7, 11; Joint CMC Stmt. 3-4. Plaintiffs have countered that materiality must consider total recognition of revenue, not just the charges for past returns (see, e.g., MTD SAC Opp. 11-12), and that Defendants fail to consider qualitative materiality (required under any materiality analysis).  See id.; TAC ¶¶157-60, 202.  Nevertheless, Plaintiffs understand that they face litigation risk in proving materiality.  Should either a jury or the Court adopt Defendants' argument, Plaintiffs accounting fraud claims would likely fail and Plaintiffs would stand to recover nothing.  Barenbaum Decl. ¶42.

**Clean Audit / Lack of Restatement.**  Defendants could also point to the fact that Portola's auditor, Ernst & Young ("EY"), provided a clean audit opinion and did not require a restatement.  Indeed, EY raised the issue of revenue recognition and ASC 606 as a Critical Audit Matter in 2019, but it nonetheless ultimately gave Portola a clean audit opinion at year's end. <u>See</u> Joint CMC Stmt. 4; MTD SAC 12.  ASC 606 was a newly implemented rule with limited published guidance.  EY would have essentially served as a "free testifying expert" supporting Defendants' position.  Such testimony could have made a significant, if not insurmountable, impression on the Court and/or the jury, which would leave the value of Plaintiffs' claim at nothing.  Barenbaum Decl. ¶¶39, 42.

**Opinion:  Omnicare.**  Defendants have argued that their decisions about provisioning for reserves were good faith opinions protected by the heightened requirements for proving a misstatement under <u>Omnicare v. Laborers Dist. Council Constr. Indus.</u>, 575 U.S. 175 (2015). <u>See</u> MTD SAC 7-14.  Plaintiffs have asserted that even if Defendants' revenue figures were considered opinions, liability could be established under <u>Omnicare</u> on a number of grounds.  <u>See</u> MTD SAC Opp. 9-12, 16.  The issue was ripe for appeal or for later consideration by the Court. There is a risk that the Court at summary judgment, a jury at trial, or an appellate court on appeal would find for Defendants on this issue, making it difficult, if not impossible, for Plaintiffs to prove their claims and causing the value of the case to drop potentially to nothing.  Barenbaum Decl. ¶42.

**Defendants' Rejection of Demand and Utilization as Surviving or Viable Claims.** Defendants have also argued that claims related to "demand and utilization" statements did not survive their motions to dismiss and are inactionable for a variety of reasons.  <u>See, e.g.</u>, MTD TAC Reply 1-2.  Plaintiffs disagree and maintain that even if the "demand and utilization" statements were deemed inactionable (and they were not), "demand and utilization" <u>trends</u> are clearly relevant to ASC 606 on its face.  <u>Id</u>. at 2; MTD TAC Opp. 5-6, 8, 12.  The issue directly

affected both the scope of discovery and the merits of the case.[8]  Accordingly, Plaintiffs

understand that these issues create additional litigation risk.  Barenbaum Decl. ¶42.

**The Risk of Establishing Scienter**

      **Core Operations Doctrine/Inferential Evidence.**  Plaintiffs pled scienter under two

theories.  First, under the core operations doctrine, Plaintiffs alleged that it would be absurd to

suggest Defendants were not aware that their revenue figures were false or misleading.  Second,

Plaintiffs pled scienter through more direct circumstantial evidence, such as the Officer

Defendants' own statements and their presence at alleged key discussions.  See MTD SAC Opp.

19-20.  The Court accepted and relied solely upon the core operations doctrine and the idea that

it would be "absurd to think that any of Portola's officers and directors did not know about the

rate of Andexxa returns or its relevance to the company's revenue statements."  MTD SAC

Order 9-10.  While the Court's ruling allowed Plaintiffs to overcome Defendants' attacks on the

pleadings, Plaintiffs would have faced two significant hurdles to proving scienter at summary

judgment and trial.  First, Defendants would argue that Plaintiffs have little direct, non-

inferential evidence that Defendants had actual knowledge that Portola's revenue figures (and

that their public statements about Portola's operations) were materially misleading.  And, there is

a risk that a jury would not find the circumstantial evidence and/or the core operations doctrine

compelling.

      Second, the Court also tied its absurdity analysis, at least in part, to the 2018 year-end

return reserve account balance of $299,000 and the fact that 90% of Portola's reserves had been

depleted.  See MTD SAC Order 10.  The Court found that "any suggestion that the company's

officers and directors were not aware of such basic information as how much product had been

returned by the end of 2018 and how that compared to the reserves taken for 2018 sales would be

---

[8] The "demand and utilization" claims were subject to a discovery dispute.  See Joint Letter to
Magistrate Illman re Discovery Dispute (ECF No. 214).  While Lead Counsel believe that they
were entitled to more discovery on these issues, Plaintiffs did receive significant discovery that
touched on both the accounting and "demand and utilization" claims that was sufficient to reach
an informed settlement of these claims.  Moreover, Plaintiffs cannot know how Magistrate
Illman or the Court would have ruled on the pending discovery motion and faced significant risk.

absurd." Id.  Again, while this advanced Plaintiffs past the pleading stage and into discovery, that focus alone does not necessarily expand to Defendants' knowledge about what was necessary to comply with GAAP and ASC 606 throughout the Class Period.

**A Lack of Other Indicia of Scienter.**  In addition to the above arguments, even if Plaintiffs' evidence on scienter were given some weight, this case does not involve some of the more-established indicia of scienter in securities fraud cases, such as a restatement, SEC action or investigation, or criminal action or investigation.  A jury may find that the lack of these additional factors undermines a finding that the Defendants acted with scienter.

*     *     *

Persuading a jury as to Defendants' scienter would be challenging.  Should Plaintiffs fail to demonstrate scienter, or should Defendants' other affirmative scienter arguments be given credence,[9] then Plaintiffs' Exchange Act claims would fail and the case would be limited to the Securities Act claims, for which the damages are much lower, specifically, a maximum of approximately $46.3 million.  Barenbaum Decl. ¶30.

**The Risk of Establishing Loss Causation and Damages**

"Loss causation is shorthand for the requirement that 'investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss.'"  Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016).  For Exchange Act claims, it is a plaintiff's burden to affirmatively allege loss causation.  See Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 989-90 (9th Cir. 2008).  For Securities Act claims, a plaintiff is not required to plead loss causation; however, a defendant can rebut loss causation as an affirmative defense.  Hildes v. Arthur Andersen LLP, 734 F.3d 854, 859-60 (9th Cir. 2013).  Defendants offered a litany of challenges to loss causation.

---

[9] Some of the material misrepresentation arguments detailed above would also serve to demonstrate a lack of scienter, were Defendants to prevail on them.  For example, Defendants would argue that their revenue recognition / reserve positions were good faith opinions lacking an intent to defraud.  See supra p. 12.  Similarly, they would argue that EY provided a clean audit opinion after looking at the issue, supporting Defendants' alleged belief that they were properly recognizing revenue and appropriately complying with ASC 606.  See id.

**Scope of the Case and Loss Causation.**  Were Defendants to prevail on their arguments that certain of Plaintiffs' liability theories were out of the case or inactionable, then Plaintiffs could face an argument that certain disclosures tied to those theories could have created loss causation issues.  If, for example, Defendants were successful in arguing that "demand and utilization" trends are not part of the case and not relevant to GAAP/ASC 606, Plaintiffs could face loss causation challenges in terms of whether certain of the alleged corrective disclosures were still applicable to the remaining claims. While Plaintiffs disagree that Defendants would have prevailed on any theory of liability, they understand that there was litigation risk.

**Disaggregation of Competing Information Incorporated Into the Price of the Stock.**
Defendants argued that the stock price movements on each alleged corrective disclosure date were caused, in whole or in part, by disclosures of non-corrective information and that the stock price effect of any corrective disclosure could not be disaggregated from the confounding effects.  See, e.g., MTD TAC 7-8, 12; MTD SAC 13; Class Cert. Opp. 14-17, 22.  Plaintiffs disagreed about what information was corrective, and they asserted that it was unnecessary to disaggregate and that, even if disaggregation was required, Plaintiffs' expert could do so.  See Class Cert Reply 8-10.  Nonetheless, these issues could have created a battle of the experts.  See, e.g., In re Celera Corp. Sec. Litig., No. 5:10-CV-02604-EJD, 2015 WL 7351449, at *6 (N.D. Cal. Nov. 20, 2015) ("The damages assessment from the parties' experts is expected to vary substantially, and would therefore result in a 'battle of the experts' at trial.").  Even a mixed result on these issues could have substantially affected the recoverable damages.  For example, were the Court to only look to the February 28, 2020 corrective disclosure, damages arguably may be eviscerated, ranging from as high as approximately $18.9 million to zero.

        **b)**        **The Expense, Complexity, and Likely Duration of Further Litigation**

Given the "notorious complexity" of class actions, settlement is often proper as it "circumvents the difficulty and uncertainty inherent in long, costly trials."  In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., No. MDL 1500, 2006 WL 903236, at *8, (S.D.N.Y. Apr. 6,

2006); see Torrisi v Tucson Elec. Power Co., 8 F.3d 1370, 1375-76 (9th Cir. 1993) (finding settlement fair due to "the cost, complexity and time of fully litigating the case"); In re LinkedIn User Privacy Litig., 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

If the putative class were to survive class certification, the action would have soon proceeded to summary judgment.  And if the Class were to have survived summary judgment, the action would have proceeded to trial, which would have been extremely complex, expensive, and risky.  Win or lose, the litigation would likely have continued for years after trial without any payment to the Class due to post-trial appeals.  See, e.g., Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009) ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years.  This factor, too, favors the settlement.").

Indeed, in other securities fraud class actions that have gone to trial, it has taken as long as seven years to proceed from verdict to final judgment, which would enormously magnify the Class's expenses; delay in compensation, if any; and risk of recovery.  See, e.g., Jaffe Pension Plan v. Household Int'l., Inc., No. 1:02-cv-05893 (N.D. Ill.) (verdict form entered on May 7, 2009 (ECF No. 1611) & Final Judgment entered on Nov. 10, 2016 (ECF No. 2267)), and In re Vivendi Universal, S.A. Sec. Litig., No. 1:02-cv-05571 (S.D.N.Y.) (verdict form entered on Feb. 10, 2010 (ECF No. 998) & Final Judgment entered on May 9, 2017 (ECF No. 1317)). Moreover, assuming the Class won at trial and that verdict was affirmed on appeal, Settlement Class Members would have likely faced a complex, lengthy, and contested claims administration process to recover their individual awards.

Without settlement, resolution of this action would unquestionably entail considerable time, expense, and uncertainty, making the present value of a certain and substantial recovery far preferable to the mere chance of a greater recovery in the distant future and the real possibility of a smaller one or none at all.  Barenbaum Decl. ¶¶38, 40, 42.

c)      **The Risk of Maintaining Class Action Status Throughout the Trial**

Class certification—which was fully briefed at the time the agreement to settle was reached, though the hearing had not yet occurred—poses additional risks.  Barenbaum Decl. ¶¶38, 40.  Defendants vigorously contested class certification, raising a litany of arguments against it in their opposition brief.  Id.  Key arguments include the following.

**Predominance.**  Defendants argued that Plaintiffs could not demonstrate the predominance requirement for class certification for several reasons.  First, they argued that Plaintiffs failed to offer a classwide damages methodology; second, they argued price impact rebuttals for three of the four alleged corrective disclosure dates; and third, they argued individualized issues with proving Securities Act standing.  See Class Cert. Opp. 13-22, 24. Plaintiffs disagreed, including for the reasons stated in Plaintiffs' reply brief, but these issues posed litigation risk.  Without the required showing that common questions predominate, Plaintiffs would have been unable to certify a class.  Class certification would be at risk both at the district and appellate court levels.  If the Class was not certified or certification was overturned, the value of Plaintiffs' case would drop to zero (or near zero).  Thus, this factor weighs in favor of preliminary approval of the Settlement.

**Adequacy and typicality**.  Defendants also argued that Lead Plaintiffs were not adequate and typical class representatives.  They asserted purported individualized rebuttals on issues of reliance and OFPRS' Securities Act standing.  See Class Cert. Opp. 4-12, 24-25.  Plaintiffs strongly disagree with these arguments, including for the reasons stated in Plaintiffs' class certification reply brief.  See Class Cert Reply 1-7.  As explained therein, Plaintiffs argued that their outside investment managers were simply value investors (that is, investors who seek investments that are undervalued and might increase in value over time) who are entitled to the fraud-on-the-market presumption, that there is nothing about either of the investment managers' actions or statements that would overcome Plaintiffs' ability to use the fraud-on-the-market doctrine, and, indeed, that their testimony was consistent with appropriate reliance on the legal doctrine of fraud on the market.  See Class Cert. Reply 2-5.  Defendants' standing argument was

neither logical nor supported by the law, and Plaintiffs offered ample evidence that OFPRS' shares were purchased <u>in</u> the offering, including, among other things, the submission of custodial bank and investment manager trading reports showing that OFPRS' outside investment manager, Jackson Square Investment Partners, purchased shares on behalf of OFPRS at the offering price, on the offering date, directly from Goldman Sachs (as underwriter for the offering).  In addition, Plaintiffs adduced evidence showing that, on the offering date, the shares never traded at the offering price on the open market.  <u>Id.</u> at 14-15.

*       *       *

Given these arguments that Defendants raise against class certification, this factor weighs in favor of preliminary approval of the Settlement.[10]   Barenbaum Decl. ¶¶38, 40.

### d)      The Amount Offered in Settlement is Substantial

A district court's role is "to ensure the settlement is 'fundamentally fair within the meaning of Rule 23(e).'"  <u>In re TracFone Unlimited Serv. Plan Litig.</u>, 112 F. Supp. 3d 993, 1004-05 (N.D. Cal. 2015) (quoting <u>Lane v. Facebook, Inc.</u>, 696 F.3d 811, 819 (9th Cir. 2012)).  When evaluating the adequacy of a settlement, courts balance a plaintiff's expected recovery against the value of the offer.  <u>In re Portal Software, Inc. Sec. Litig.</u>, No. C 03 5138 VRW, 2007 WL 1991529, at *6 (N.D. Cal. June 30, 2007).  This complex case involves a range of disputed and potentially "close call" issues, including issues surrounding accounting practices, scienter, loss causation, class certification, and damages.  <u>See generally</u> <u>supra</u>, Section III.A.1. While Plaintiffs believe that the Class has meritorious claims, Defendants have denied, and continue to deny, each and every claim and contention asserted by Plaintiffs.  <u>See</u> Barenbaum Decl. ¶¶26, 38; <u>see also</u> <u>id</u>. ¶¶32-35.  Defendants would also likely argue that even if Plaintiffs

---

[10] These arguments raised by Defendants do not pose a challenge to certifying a settlement class here.  Plaintiffs saw little to no risk in the adequacy and typicality arguments asserted by Defendants.  Moreover, Defendants' arguments were premised on the purported risk that these unique defenses could in the future become a distraction at trial.  <u>See</u> Class Cert. Reply 4.  The arguments have no bearing on the adequacy of representation relevant to the certification of a class for settlement purposes.  <u>See</u> <u>In re Hyundai & Kia Fuel Econ. Litig.</u>, 926 F.3d 539, 556 (9th Cir. 2019) ("criteria for class certification are applied differently in litigation classes and settlement classes").

were able to establish liability, Plaintiffs would have trouble showing what part of the stock-price decline is attributable to the alleged fraud rather than other company-specific bad news. Id. ¶41.

After over two years of hard-fought litigation, Plaintiffs and Lead Counsel have succeeded in obtaining a substantial recovery for the class of $17.5 million in cash. Barenbaum Decl. ¶24. No portion of the Settlement Amount will revert to Defendants. Based on consultation with Plaintiffs' damages consultant, aggregate maximum possible damages for the Exchange Act claims are $301.1 million (using the 80/20 Multi-Trader Model with market loss constraints).[11] See id. ¶29. Therefore, the $17.5 million recovery under the proposed Settlement constitutes approximately 5.8% of the maximum recoverable damages assuming Plaintiffs prevailed on all claims against the Defendants. See id. ¶¶29-30. This recovery is in line with recent comparable securities class action settlements and is within the range of recoveries found reasonable by courts in this Circuit and others. See, e.g., Vataj v. Johnson, No. 19-cv-06996-HSG, 2021 WL 1550478, at *9 (N.D. Cal. Apr. 20, 2021) (2% of estimated damages); SEB Inv. Mgmt. AB v. Align Tech., Inc., No. 3:18-cv-06720 (N.D. Cal. April 28, 2022), ECF No. 215 (J. Chhabria) (3.3% to 9.1% of likely recoverable damages).[12] Moreover, the $17.5 million recovery is a substantial benefit for the Settlement Class when considered against the significant risk that there would be no (or a smaller) recovery after trial and appeals, possibly years in the future. Barenbaum Decl. ¶40.

---

[11] Damages for the Securities Act claims are not additive to those for the Exchange Act claims, but are rather subsumed within them. Nonetheless, maximum aggregate damages under Securities Act using an 80/20 Multi-Trader model (and assuming Defendants prevail on proving negative causation for all losses to Settlement Class Members other than their losses in Portola stock that resulted from the alleged corrective disclosures) are $46.3 million. See Barenbaum Decl. ¶30.

[12] See also In re Extreme Networks, Inc. Sec. Litig., No. 15-cv-04883-BLF, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) (5% to 9.5% of "maximum potential damages"); Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (4% of estimated recoverable damages); Azar v. Blount Int'l, Inc., No. 3:16-cv-0483, 2019 WL 7372658, at *7 (D. Or. Dec. 31, 2019) (4.63% to 7.65% of total estimated damages).

---

In light of these considerations, the $17.5 million provided by the Settlement constitutes a recovery that is fundamentally fair to the proposed Settlement Class.  Barenbaum Decl. ¶37.

### e)       The Extent of Discovery Completed and the Stage of the Proceedings

"Class settlements are presumed fair when they are reached 'following sufficient discovery and genuine arms-length negotiation.'"  Cottle v. Plaid Inc., 340 F.R.D. 356, 375 (N.D. Cal. 2021) (quoting DIRECTV, Inc., 221 F.R.D. at 528).  Discovery here is more than just sufficient.  Document production was substantially complete, a number of depositions were taken prior to Defendants filing their opposition to the class certification motion, and the close of fact discovery set for August 25, 2022 was just over two months away at the time of the June 9, 2022 agreement to settle.  See Barenbaum Decl. ¶14.  Moreover, Plaintiffs and their counsel have a deep understanding of the evidence because they reviewed in large part Defendants' document productions; opposed Defendants' four motions to dismiss; produced the expert report of Zachary Nye, Ph.D. in support of Plaintiffs' motion for class certification and defended his deposition; deposed Defendants' class certification experts Mark J. Garmaise and Jack R. Wiener; produced expert reports of Dr. Nye and Thomas Lee Hazen in support of Lead Plaintiff's reply brief in support of class certification; and participated in ACERA's and OFPRS' Rule 30(b)(6) depositions, as well as three depositions of representatives from Plaintiffs' investment managers.  Id. ¶¶7-9, 12, 16-19, 24-25.

In short, a careful and complete evaluation of the evidence led to the conclusion that entering into the proposed Settlement would produce an appropriate recovery for the Settlement Class.  See STAAR Surgical, 2017 WL 4877417, at *4 ("the parties had ample information with which to make informed settlement decisions" after, among other things, having "engaged in substantial discovery").

### f)       The Experience and Views of Counsel

In evaluating a proposed settlement, "the recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  Celera Corp., 2015 WL 7351449, at *7; In re

Omnivision Techs., Inc., 559 F. Supp. 2d. 1036, 1043 (N.D. Cal. 2007).  Here, Lead Counsel endorses the proposed Settlement as fair, adequate, and reasonable.  Barenbaum Decl. ¶37.  Lead Counsel has decades of experience litigating and trying class action cases and similar complex litigation, including securities cases.  Id. ¶36 & Ex. 2.  As detailed above, through extensive discovery, litigation, and mediation, Lead Counsel has a comprehensive understanding of the merits and risks of the claims and of the proposed Settlement.  Given Lead Counsel's extensive experience with securities cases and class actions, its assessment that the proposed Settlement is a favorable outcome for Settlement Class Members merits substantial weight.[13]  Id.

### g)      The Settlement Agreement Resulted From Arm's-Length Negotiations And Is Not The Product Of Collusion

In addition to the Hanlon factors, the Court should look to whether the proposed settlement appears to be the product of collusion among the negotiating parties or other conflicts of interest.  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000), as amended (June 19, 2000); Uschold v. NSMG Shared Servs., LLC, 333 F.R.D. 157, 169 (N.D. Cal. 2019).  In applying this factor, courts give substantial weight to the experience of the attorneys who prosecuted the case and negotiated the settlement.  See In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).

Indeed, when a settlement is negotiated at arm's-length by experienced counsel, there is a presumption that it is fair and reasonable, particularly where it occurs after meaningful discovery.  Quiruz v. Specialty Commodities, Inc., No. 17-cv-03300-BLF, 2020 WL 6562334, at *7 (N.D. Cal. Nov. 9, 2020); Corzine v. Whirlpool Corp., No. 15-cv-05764-BLF, 2019 WL 7372275, at *5 (N.D. Cal. Dec. 31, 2019); see also In re Heritage Bond Litig., No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005).  Further, settlements reached with "[t]he assistance of an experienced mediator" are generally deemed fair and non-collusive.  See,

---

[13] Further, Saxena White P.A., counsel to OFPRS, which also has substantial experience prosecuting securities class actions and other forms of complex shareholder litigation, and also expended significant resources assisting in the prosecution this action on behalf of the Settlement Class, similarly endorses the proposed Settlement as fair, adequate, and reasonable.  Barenbaum Decl. ¶36 & Ex. 3.

e.g., Baird v. BlackRock Institutional Tr. Co., N.A., No. 17-CV-01892-HSG, 2021 WL 5991060, at *5 (N.D. Cal. July 12, 2021).

The proposed Settlement here is the product of extensive, arm's-length negotiations by experienced counsel, supervised by an experienced mediator, Robert A. Meyer, Esq.  See Barenbaum Decl. ¶20; Sudunagunta v. NantKwest, Inc., No. 2:16-cv-01947-MWF-JEM, 2019 WL 2183451, at *3 (C.D. Cal. May 13, 2019) (approving settlement that was "the outcome of an arms-length negotiation conducted with the help of an experienced mediator, Robert Meyer, Esq.").  On June 9, 2022, after exchanging numerous offers and counteroffers, the parties agreed to a mediator's proposal that the parties settle the claims asserted in this action for $17.5 million.  Barenbaum Decl. ¶22.  The negotiations were informed by the knowledge that Lead Counsel and OFPRS' counsel gained through their investigation and analysis of the facts and legal issues.  See id. ¶¶13, 16-19, 24-25, 43.  Armed with a thorough understanding of the strength and weaknesses of the claims at issue, the parties were able to negotiate a fair settlement, taking into account the costs and risks of continued litigation. Id. ¶43.  The negotiations were at all times hard-fought and have produced a result that the settling parties believe to be in their respective interests.

* * *

To summarize, the Hanlon factors strongly support approving the proposed Settlement because: the amount offered is substantial; continued litigation would pose significant risks of non-recovery or lesser recovery, while imposing considerable delays and expense on the Settlement Class; and nearing the end of fact discovery and having tested expert opinions via deposition, the Parties and their experienced counsel were well informed about the strengths and weaknesses of their claims.

### 2.     The Rule 23(e)(2) Factors Support Approval

The Rule 23(e)(2) factors largely overlap with the Hanlon factors and also strongly favor approving the proposed Settlement.

a) **Class Representatives and Class Counsel Have Adequately Represented the Class**

Plaintiffs and Lead Counsel respectfully submit that they have adequately represented the Class, including with respect to the proposed Settlement.  See Barenbaum Decl. ¶¶36-37.  Within the Ninth Circuit, the adequacy inquiry is governed by two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class." Hyundai, 926 F.3d at 566 (quoting Hanlon, 150 F.3d at 1020). Plaintiffs' interests are directly aligned with those of absent Settlement Class Members because they all have an interest in obtaining the largest possible recovery from Defendants.  Plaintiffs, along with all eligible Settlement Class Members, will share pro rata in the Settlement Class's recovery pursuant to the Plan of Allocation.  Barenbaum Decl. ¶¶48, 49.  Moreover, Plaintiffs have actively supervised the litigation and retained experienced counsel who have vigorously prosecuted the action on behalf of the Class.  Id. ¶¶24, 36, 44.

b) **The Settlement was Negotiated at Arm's-Length**

Not only is the Settlement a product of arm's-length negotiations, as required, but it also resulted from a lengthy mediation process overseen by nationally recognized mediator, Robert A. Meyer, Esq.  See supra Section III.A.1.g.

c) **The Relief Provided Is Adequate, Taking into Account the Costs, Risks, and Delay of Trial and Appeal, as Well as Other Factors**

The primary element of this factor—whether the relief (in this instance the amount offered) is adequate, taking into account the costs, risks, and delay of trial and appeal—overlaps with several of the Hanlon factors.  As discussed, the $17.5 million payment to the Settlement Class is a substantial recovery, particularly when weighed against the risks of demonstrating falsity, scienter, loss causation, and damages, as described at length supra, Section III.A.1.  It is also a substantial recovery when weighed against the potential negative consequences of ongoing litigation and the potential for little or no recovery (supra Section III.A.1.b) as well as risks surrounding whether the Class would be certified (supra Section III.A.1.c).

This factor also analyzes the adequacy of the relief relative to several other considerations, including the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims[.]"  Fed. R. Civ. P. 23(e)(2)(C)(ii).  As set forth in Section III.A.2.d infra, the proposed Plan of Allocation provides for a fair, reasonable, and effective method of distributing the Net Settlement Fund to Settlement Class Members.  Barenbaum Decl.  ¶¶48-53.

In addition, this factor takes into account "the terms of any proposed award of attorney's fees[.]"  Fed. R. Civ. P. 23(e)(2)(C)(iii).  As the Settlement Notice explains, Lead Counsel plan to seek an award of attorneys' fees not to exceed 25% of the Settlement Fund.  Barenbaum Decl. ¶44.  A 25% fee award, if requested, would be in line with the Ninth Circuit's 25% benchmark and within the "usual range."  Farrell v. Bank of Am. Corp., N.A., 827 F. App'x 628, 631 (9th Cir. 2020), cert. denied sub nom., Threatt v. Farrell, 142 S. Ct. 71 (2021) (encouraging district courts to use the 25% benchmark "as a yardstick.").  It would also result in a negative multiplier of less than 0.5—that is, it would be less than Plaintiffs' counsel's collective lodestar to date. Barenbaum Decl. ¶45.  Given the substantial amount of effort necessary to bring the action to class certification and through a significant portion of the discovery process, and to achieve the excellent recovery described herein, Lead Counsel respectfully submits that an award of up to 25% would be appropriate, and courts have granted such awards in similar circumstances.  In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig., 768 F. App'x 651, 653 (9th Cir. 2019) (noting Ninth Circuit case law "permit[s] awards of attorneys' fees ranging from 20 to 30 percent of settlement funds, with 25 percent as the benchmark award"); see, e.g., Vataj, 2021 WL 1550478, at *8 (stating 25 percent is the benchmark for common fund attorneys' fees awards).  Lead Counsel will also seek reimbursement of reasonable litigation expenses, not to exceed $840,000, and reimbursement of Plaintiffs' costs and wages for work expended on the action, not to exceed $20,000 in total.  Barenbaum Decl. ¶¶45-47.  Here too, in light of the substantial amount of expert and factual development necessary to bring the action to this stage and prepare for class

certification, Lead Counsel respectfully submits that such reimbursement is appropriate, and courts have granted such awards in similar circumstances.

Finally, this factor takes into account "any agreement made in connection with the propos[ed]" settlement. Fed. R. Civ. P. 23(e)(2)(C)(iv) & (e)(3). The only such agreement here, assuming it falls within that rule, is the parties' confidential Supplemental Agreement. Stip. ¶8.3. It would permit Defendants to terminate the Settlement if the amount of Settlement Class Members who request exclusion from the Settlement exceed a certain amount. Such agreements are standard provisions in securities class actions and ensure that Defendants are receiving finality, without affecting Settlement Class Members' rights under, or altering the substance or fairness of, the Settlement.[14]

> **d)    The Settlement Treats Settlement Class Members Equitably Relative to Each Other**

The proposed Plan of Allocation treats all Settlement Class Members equitably relative to each other.

The proposed Plan of Allocation was developed by the Settlement Class's damages consultant. Barenbaum Decl. ¶¶27, 49. It is based on the methodologies and analysis performed in support of class certification and market efficiency, including an event study, as well as relevant loss causation and damages considerations and calculations. Id. ¶¶27-29, 49-50. Thus, it provides for a claims process that distributes the Net Settlement Fund pro rata based on the approximate individual losses of eligible Settlement Class Members. See Stip. Ex. A-1, at 17-23 (Notice). Courts regularly approve similar allocation plans in securities class actions. See Extreme Networks, 2019 WL 3290770, at *8 (finding pro rata allocation "did not constitute

---

[14] Should the Court wish to review the Supplemental Agreement, the Parties respectfully request that they be permitted to present it in camera, as litigants and courts typically treat such agreements as confidential. See, e.g., Hefler v. Wells Fargo & Co., No. 3:16-cv-05479-JST, 2018 WL 4207245, at *7 (N.D. Cal. Sept. 4, 2018) ("There are compelling reasons to keep this information confidential in order to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts.").

improper preferential treatment" and was "equitable"); In re Zynga Inc. Sec. Litig., No. 12-cv-04007-JSC, 2015 WL 6471171, at *12 (N.D. Cal. Oct. 27, 2015).[15]

As more fully described in the Notice, the Plan of Allocation assumes that the price of Portola's common stock was artificially inflated throughout the Settlement Class Period. Barenbaum Decl. ¶49.  The computation of the estimated alleged artificial inflation in the price of Portola's common stock during the Settlement Class Period is based on certain misrepresentations alleged by Lead Plaintiff in the TAC and the price change in the stock, net of market- and industry-wide factors, in reaction to the public announcements that allegedly corrected the misrepresentations alleged.  Id. ¶50.  The Plan of Allocation sets forth Recognized Loss (as defined in the Notice) estimates based on Lead Plaintiff's determination, made in consultation with its damages consultant, that corrective disclosures removed artificial inflation from the price of Portola's common stock on January 10, 2020, February 27, 2020, and March 2, 2020 (the "Corrective Disclosure Impact Dates").  Id.  Thus, in order for a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, Portola's common stock must have been purchased or acquired during the Settlement Class Period and held through at least one of these Corrective Disclosure Impact Dates.  See id. ¶¶48-50.  Distribution of pro rata settlement proceeds to Settlement Class Members that submit timely claims will be based on these calculations described, taking into account the date of purchase and sale of each share.  See id. ¶¶51-53.

In all respects, the terms embodied in the Stipulation are customary in nature.  The Settlement creates a $17.5 million gross fund for the benefit of the entire Settlement Class.  In

---

[15] If, after the first distribution, a sufficient amount of money remains unclaimed from the Net Settlement Fund, Epiq will make a second distribution according to the Plan of Allocation, should it be economically efficient to do so.  Barenbaum Decl. ¶53.  Within 21 days of the distribution process being complete, but before any remainder is distributed, Lead Counsel will file a "post-distribution accounting" as described in the Northern District's Procedural Guidance for Class Action Settlements ("N.D. Cal. Guidance"), and will seek Court approval to have Epiq distribute any identified remainder in the Net Settlement Fund to  FINRA Investor Education Foundation (or such other non-profit organizations approved by the Court)—an organization that promotes interests of Settlement Class Members and with which the Parties, Class Counsel, and Defendants' Counsel have no relationships. Id

particular, Plaintiffs' recovery from the Settlement Fund will be determined according to precisely the same formula as the recoveries of other Settlement Class Members.  The Settlement "does not improperly grant preferential treatment to [the Plaintiffs] or segments of the class."  <u>Portal Software</u>, 2007 WL 1991529, at *5.[16]

Further, there are no side agreements (which are required to be disclosed under Rule 23(e)(2)(C)(iv)) other than that regarding the opt-out threshold.  <u>See</u> <u>supra</u> Section III.A.2.c.

Finally, this is not a claims-made settlement and there will be no reversion to Defendants.  <u>See</u> Stip. ¶3.8.

\* \* \*

Like the <u>Hanlon</u> factors, the Rule 23(e)(2) factors strongly support preliminary approval because the Settlement will provide a substantial recovery as a result of extensive litigation and arm's-length negotiation, avoid the potential negative outcomes of additional litigation, and disseminate the Settlement proceeds in an efficient and equitable manner.

### B.    Certification Of The Settlement Class Under Fed R. Civ. P. 23 Is Appropriate

For purposes of settlement, Plaintiffs seek certification of a Settlement Class consisting of all persons and entities who purchased or otherwise acquired the common stock of Portola between January 8, 2019 and February 28, 2020, inclusive,[17] and were damaged thereby; including those who purchased or otherwise acquired Portola common stock either in or traceable to Portola's SPO on or about August 14, 2019, and were damaged thereby.[18]

---

[16] As noted, Class Representatives will also seek reimbursement of their reasonable costs, including lost wages, for work they performed in the action.  Barenbaum Decl. ¶¶46-47.

[17] The class period as set forth in the TAC includes those who purchased common stock of Portola through February 26, 2020 instead of February 28, 2020.  The extended Settlement Class Period results from the Court's Orders surrounding the issue of loss causation on the motions to dismiss the SAC and TAC, and the iterative briefing and oral argument that informed those Orders.

[18] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, or controlling person

Further, the claims to be released encompass the claims in the TAC and related Released Claims against Released Persons as defined in the Stipulation (and also described in the Notice and Claim Form). While the Released Claims include not only those claims that were asserted, but also those that could have been asserted, it limits such Released Claims that arise out of or relate in any way to both: "(i) the purchase, acquisition, or sale of shares of Portola publicly traded common stock during the Settlement Class Period by Settlement Class Members; and (ii) the facts, matters, allegations, transactions, events, disclosures, occurrences, representations, or omissions," and states that "Released Plaintiffs' Claims are only those claims based on the identical factual predicate as the securities fraud claims at issue in the Action." Stip. ¶1.37. The scope of this release weighs in favor of approval. See Hesse v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010); Cotter, 193 F. Supp. 3d at 1038; see also Standing Order ¶57. Likewise, there are no differences between the claims to be released and the claims alleged or that could have been alleged in the operative complaint. See N.D. Cal. Guidance § 1(c). Such releases are common in approved securities class action settlements.

In order for a class action to be certified, the following requirements must be met pursuant to Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Hanlon, 150 F.3d at 1019.

### 1.    The Settlement Class is Sufficiently Numerous

To meet the numerosity requirement, the class representative need only demonstrate that it is difficult or inconvenient to join all members of the class, who may be geographically

---

of Portola Inc. or any of the Underwriter Defendants; (iv) any subsidiaries or affiliates of Portola or any of the Underwriter Defendants; (v) any entity in which any such excluded party has, or had, a direct or indirect majority ownership interest; (vi) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded persons or entities. These exclusions do not exclude any "Investment Vehicles," as defined in the Stipulation at ¶1.40. Also excluded from the Settlement Class is any Settlement Class Member that validly and timely requests exclusion in accordance with the requirements set by the Court.

dispersed.  <u>Nursing Home Pension Fund v. Oracle Corp.</u>, No. C01-00988 MJJ,

2006 WL 8071391, at *2 (N.D. Cal. Dec. 20, 2006); <u>see also</u> <u>In re Intuitive Surgical Sec. Litig.</u>,

No. 5:13-CV-01920-EJD, 2016 WL 7425926, at *4 (N.D. Cal. Dec. 22, 2016) ("District courts

have consistently found a proposed class to be sufficiently numerous in securities fraud cases

where 'several million shares of stock were purchased during the class period.'").  In this case,

during the Settlement Class Period, over 66 million shares of Portola's common stock traded on

the NASDAQ, including over 9.2 million shares sold in the August 2019 SPO.  Therefore, the

Court may reasonably conclude that there are likely thousands of Settlement Class Members

across the country.  The threshold for a presumption of impracticality of joinder is thus easily

met.  <u>Hanlon</u>, 150 F.3d at 1019.[19]

### 2.    Common Questions Of Fact Or Law Exist

In order for a class to be certified, there must be "questions of law or fact common to the

class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement "has been construed

permissively [and a]ll questions of fact and law need not be common to satisfy the rule."

<u>Hanlon</u>, 150 F.3d at 1019; <u>see also</u> <u>Hodges v. Akeena Solar, Inc.</u>, 274 F.R.D. 259, 266 (N.D.

Cal. 2011).  "In securities fraud cases, commonality is often satisfied as a result of the inherent

nature of such cases."  <u>Intuitive Surgical</u>, 2016 WL 7425926, at *4; <u>see also</u> <u>Luna v. Marvell</u>

<u>Tech. Grp., Ltd.</u>, No. C 15-05447 WHA, 2017 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017)

("[L]ead plaintiff's allegations that investors were defrauded by the same misleading statements

over the same period of time, and suffered similar losses as a result are sufficient to fulfill Rule

23(a)'s commonality requirement.").

This case presents numerous common questions of law and fact, including, but not

limited to: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants'

public statements during the Settlement Class Period misrepresented or omitted material facts;

(iii) whether, for the Exchange Act claims, Defendants acted with scienter in issuing false and

---

[19] Indeed, Defendants did not challenge numerosity in their class certification opposition.

misleading statements and whether and to what extent the price of Portola's common stock was artificially inflated by Defendants' false and misleading statements or omissions; (iv) whether the members of the putative Class suffered damages and what the appropriate measure of those damages is; and (v) whether the individual defendants were controlling persons of the Company.

### 3.  Plaintiffs' Claims Are Typical Of Those Of The Settlement Class

The "typicality" prong has been met where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Davy v. Paragon Coin, Inc., No. 18-CV-00671-JSW, 2020 WL 4460446, at *6 (N.D. Cal. June 24, 2020); Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001), overruled on other grounds by Johnson v. California, 543 U.S. 499 (2005).  Typicality does not require that the interests of the named representatives and the class members be substantially identical.  Hanlon, 150 F.3d at 1020.  Typicality is generally satisfied in securities fraud class actions, where, as here, "plaintiffs have bought and sold stock for investment purposes, subject to the same information and representations as the market at large."  Todd v. STAAR Surgical Co., No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *5 (C.D. Cal. Jan. 5, 2017); see also Booth v. Strategic Realty Tr., Inc., No. 13-cv-04921-JST, 2015 WL 3957746, at *4 (N.D. Cal. June 28, 2015).

Here, the Plaintiffs' claims are typical of the claims or defenses of the Settlement Class. Simply put, typicality is satisfied here because the evidence that Plaintiffs would present to prove their claims would also prove the Settlement Class's claims.  See Hodges, 274 F.R.D. at 266-67.  Under the Exchange Act claims, Plaintiffs and Settlement Class Members all purchased Portola common stock and assert the same Section 10(b) claims, based on the same misstatements and omissions by Defendants, and the same Section 20(a) claims of "control person" liability.  Similarly, OFPRS, like all other Settlement Class Members who purchased in the August 2019 SPO, purchased in, or have purchases traceable to, the August 2019 SPO and asserts the same Sections 11, 12(a)(2) and 15 claims, based on misstatements and omissions by

Defendants in those offering materials. Plaintiffs and Settlement Class Members thus share the same basic claims, legal theories, and evidence and, as such, Plaintiffs are typical of the proposed Settlement Class. The typicality prong has therefore been met.

### 4. Plaintiffs And Lead Counsel Will Fairly And Adequately Represent The Interests Of The Settlement Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  "The two key inquiries are (1) whether there are conflicts within the class; and (2) whether plaintiffs and counsel will vigorously fulfill their duties to the class.  The adequacy inquiry also 'factors in competency and conflicts of class counsel.'" In re Diamond Foods, Inc., 295 F.R.D. 240, 252 (N.D. Cal. 2013).

Plaintiffs purchased Portola common stock on the open market during the Settlement Class Period (and OFPRS also purchased common stock in the August 2019 SPO), suffering significant losses as a result of the same course of conduct that allegedly injured other Settlement Class Members.  Therefore, Plaintiffs' interest in demonstrating Defendants' liability and maximizing possible recovery are aligned with the interests of the absent class members; there is no evidence that Plaintiffs have interests antagonistic to the those of other Settlement Class Members, and, indeed, they do not.  See, e.g. Fleming v. Impax Lab'ys Inc., No. 16-CV-06557-HSG, 2021 WL 5447008, at *7 (N.D. Cal. Nov. 22, 2021) (finding adequacy in part supported by fact that the lead plaintiff's "interests [were] directly aligned with the interests of other class members, as [all] purchased [defendants'] [s]ecurities during the [c]lass [p]eriod and suffered losses as a result of [defendants'] alleged misconduct").  As the Court previously determined, ACERA is qualified and appropriate to act as Lead Plaintiff.  LP/LC Order (ECF No. 49).  Similarly, OFPRS, who purchased directly in the August 2019 SPO, also understands the role and obligations of representing a class and is committed to protecting the interests of the class.  See Motion for Class Cert. 9-10; Decl. of Chase Rankin in Supp. of Motion for Class Cert. (ECF No. 190-5), ¶¶3-5.

As for the adequacy of class counsel, a court must consider the following: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).[20] Here, Lead Counsel are highly experienced in litigating securities class actions and have fairly and adequately prosecuted the claims of the Settlement Class.[21]  See Barenbaum Decl. ¶¶36 & Ex. 2; see also LP/LC Order (ECF No. 49) (appointing Berman Tabacco as Lead Counsel).  Lead Counsel have further demonstrated their adequacy by the substantial work undertaken in prosecuting this action, as discussed supra Section III.A.2.a.

In view of these facts, Plaintiffs should be appointed "Class Representatives," and Lead Counsel should be appointed "Class Counsel."

### 5.    The Requirements of Rule 23(b)(3) Are Also Satisfied

Rule 23(b)(3) authorizes certification where, in addition to the requirements established by Rule 23(a), common questions of law or fact predominate over any individual questions, and a class action is superior to other means of adjudication.  Amchem Prods. v. Windsor, 521 U.S. 591, 607 (1997).  This case easily meets the requirements of Rule 23(b)(3).

### a)    Common Legal And Factual Questions Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud…."  Amchem, 521 U.S. at 625; see also In re UTStarcom, Inc. Sec. Litig., No. C 04-04908 JW, 2010 WL 1945737, at *9 (N.D. Cal. May 12, 2010) ("The predominance requirement is readily met in securities fraud cases.").

---

[20] A court "may [also] consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

[21] Similarly, OFPRS' counsel Saxena White P.A. is also highly experienced in litigating complex securities class actions and has successfully litigated such cases for over fifteen years. Barenbaum Decl. Ex. 3; see also id. ¶36.

For the Exchange Act claims, Plaintiffs allege that the Defendants misled investors and/or concealed from the investing public information about Portola's compliance with GAAP and ASC 606 and demand and utilization, among other things.  The issues of whether Defendants, inter alia, made materially misleading statements or omitted material information, acted knowingly or with deliberate recklessness, or caused damages to the Settlement Class predominate over any individual issues that might exist.  See Hanlon, 150 F.3d at 1022 (Rule 23(b)(3) satisfied where a "common nucleus of facts and potential legal remedies dominate[d the] litigation"); see also Portal Software, 2007 WL 1991529, at *4-5.

For Securities Act claims, the existence and materiality of the misstatements and omissions made in connection with the August 2019 SPO are common issues that predominate over individual ones, if any.  In re Lyft Inc. Sec. Litig., No. 19-CV-02690-HSG, 2021 WL 3711470, at *5 (N.D. Cal. Aug. 20, 2021) (finding predominance for Securities Act claim where issues of whether defendant's "[r]egistration statement contained untrue statements or omissions, and whether any such misrepresentations or omissions were material, are common questions that can be proven through evidence common to the class").  The SPO offering materials, which contained the alleged misrepresentations and omissions at issue, were all filed with the SEC; the key statements were therefore identical for everyone in the proposed class and do not vary across individual Settlement Class Members.

**b)    A Class Action Is The Superior Means To Adjudicate The Claims Raised**

The second prong of Rule 23(b)(3) is, for all intents and purposes, demonstrated by the proposed Settlement itself.  As the Supreme Court explained in Amchem, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial."  521 U.S. at 620.  Any manageability problems, if any, that may have existed were this case to go to trial are eliminated by settlement.  See Hyundai, 926 F.3d at 556-57 ("[t]he criteria for class certification are applied differently in litigation

classes and settlement classes" and "manageability is not a concern in certifying a settlement

class"). Given the unwieldy alternative—many small trials to adjudicate individual claims—

which "would prove uneconomic for potential plaintiffs" and where "litigation costs would

dwarf potential recovery"—resolution of this case on a class-wide basis is clearly preferable.

See Hanlon, 150 F.3d at 1023; see also LinkedIn User Priv., 309 F.R.D. at 585.

### C.      The Proposed Notice Plan Meets All Requirements

Plaintiffs also request that the Court approve the form and content of the proposed

Notice  (attached as Exhibit A-1 to the proposed Preliminary Approval Order).

The proposed Notice fully complies with the requirements of Rule 23; the PSLRA,

15 U.S.C. § 78u-4(a)(7) and 15 U.S.C. § 77z-1(a)(7); the N.D. Cal. Guidance; and this Court's

Standing Order. The Notice is written in plain language and apprises Settlement Class

Members of the nature of the action, the definition of the Settlement Class to be certified, the

Settlement Class claims and issues, and the claims that will be released. Additionally, the

Notice: (1) describes the Settlement, Settlement Amount, and potential recovery both on an

aggregate basis and an average per-share basis; (2) explains that the parties disagreed regarding

whether any damages were recoverable even if Plaintiffs prevailed on their claims and includes

a brief description of why the parties are proposing the Settlement; (3) includes a brief

description of the maximum amount of fees and expenses that Lead Counsel will seek;

(4) describes the Plan of Allocation; (5) advises of the binding effect of a Judgment on

Settlement Class Members under Rule 23(c)(3); (6) advises that a Settlement Class Member

may enter an appearance through counsel if desired; (7) states that the Court will exclude from

the Settlement Class any Settlement Class Member who requests exclusion (and sets forth the

procedures and deadline for doing so); (8) describes how to object to the proposed Settlement

and/or requested attorneys' fees and Litigation Expenses and/or the request for an award to

Plaintiffs for their costs and expenses and describes what these payments amount to on an

average per share if approved; (9) provides instructions on how to complete and submit a Claim

Form; (10) provides the names, addresses, and telephone numbers of representatives of the

Claims Administrator (including the settlement website) and Lead Counsel, both of whom will be available to answer questions from Settlement Class Members; (11) includes instructions on how to access the case docket via PACER or in person at the court; (12) states the date, time, and location of the Final Approval Hearing and that the date may change without further notice to the Settlement Class and advises Settlement Class Members to check the settlement website or the Court's PACER site to confirm that the date has not been changed; and (13) includes the deadlines for submitting Claim Forms, opting out of the Settlement, and filing any objections to the Settlement, the Plan of Allocation, or to Lead Counsel's requested attorney's fees and Litigation Expenses or the request for an award to Plaintiffs for their costs and expenses.  These disclosures are thorough and should be approved.

Also, the Summary Notice (attached as Exhibit A-3 to the proposed Preliminary Approval Order) will be published once in Investor's Business Daily and through a national newswire.  Blow Decl. ¶¶5, 12.  The Notice plan also includes maintenance of a case-specific settlement website containing Settlement and case information and documents.[22]  Id. ¶15; see generally id. ¶¶4-21 (describing Notice plan).

The Federal Rules of Civil Procedure require that class members be provided with the "best notice that is practicable under the circumstances, including individual notice to all [class] members who can be identified through reasonable effort" and "who would be bound by the propos[ed]" settlement. Fed. R. Civ. P. 23(c)(2)(B) and 23(e)(1)(B) (notice must be given "in a reasonable manner").  Because of the availability of name and address data for Settlement Class Members from third-party banks, brokers, and nominees, and Epiq's ability to reach potential Settlement Class Members through individual mailed and published notice, Lead Counsel and Epiq have conferred and determined that using social media or hiring an outside marketing specialist would not be appropriate here.  Blow Decl. ¶13.

---

[22] No later than ten calendar days following the filing of the Stipulation with the Court, Defendants shall serve the notice required under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, et seq.  See Stip. ¶4.5; N.D. Cal. Guidelines ¶10.

Such notice by mail and publication satisfies the requirements of due process, Rule 23, and the PSLRA.  See Portal Software, 2007 WL 1991529, at *7.

### D.   The Intended Request For Attorneys' Fees And Expenses And An Award For Costs And Expenses Of Plaintiffs

Lead Counsel intends to request an attorney fee award no greater than 25% of the Settlement amount (approximately $4,375,000).  See Barenbaum Decl. ¶44.  Lead Counsel's and OFPRS' Counsel's lodestar is more than double that amount (id.) and thus represents a significant negative multiplier of less than 0.5.  Id. ¶45.  This requested fee amount is well within the normal range of such awards, as discussed supra, Section III.A.2.c.

Lead Counsel, on behalf of itself and OFPRS's Counsel, also intends to request reimbursement of the firms' costs and expenses not to exceed $840,000, which expenses include, inter alia, damages and forensic auditing consultants and experts, mediation costs, legal research, travel and lodging, court reporting services, ESI processing and storage, and filing fees.  See Barenbaum Decl. ¶45.

Further, Lead Plaintiff ACERA, on behalf of itself and Additional Named Plaintiff OFPRS, intends to seek awards not to exceed $20,000 in total for their costs and expenses.  See Barenbaum Decl. ¶46.  The PSLRA allows for "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  Among the tasks Lead Plaintiff and OFPRS have performed in executing their duties and responsibilities in this action include: (a) reviewing the complaints, briefing, discovery, and mediation submissions; (b) managing the collection of discovery documents, participating in Rule 30(b)(6) deposition witness preparation, and attending those depositions; (c) communicating with their counsel via email and telephone about case developments and litigation strategy; (d) attending the lead plaintiff hearing; (e) attending the mediation and evaluating the offers and counteroffers over several months of negotiations; and (f) evaluating the Settlement Amount, conferring with their counsel, and ultimately approving the Settlement.  Barenbaum Decl. ¶47.  Similar named

plaintiff awards have been found to be presumptively reasonable in this judicial district.  See, e.g., In re SanDisk LLC Sec. Litig., No. 15-cv-01455-VC, slip op. at ¶¶6-9 (N.D. Cal. Oct. 23, 2019), ECF No. 284 (J. Chhabria) (order awarding attorneys' fees, payment of litigation expenses, and reimbursement of class representatives' costs and expenses of $7,300, $7,717.50, $7,474.44, and $8,557.50 to each class representative); Vataj, 2021 WL 1550478, at *3, 12 (granting preliminary approval where lead plaintiffs intended to seek a $15,000 reimbursement); STAAR Surgical, 2017 WL 4877417, at *6 ($10,000 reimbursement); In re Immune Response Sec. Litig., 497 F. Supp. 2d 1166, 1173-74 (S.D. Cal. 2007) ($40,000 reimbursement to lead plaintiff); Wilson v. LSB Indus., Inc., No. 1:15-CV-07614-RA-GWG, 2019 WL 3542844, at *2 (S.D.N.Y. June 28, 2019) (reimbursement of $18,850 to Lead Plaintiff).

These payments, in total, if approved, will come out of the $17.5 million Settlement Fund, and are estimated to be an average of $0.19 per damaged share purchased in the Settlement Class Period.  Barenbaum Decl. ¶46.

### E.     The Claims Administrator

Lead Plaintiff also requests that the Court approve the appointment of Epiq as Claims Administrator.  Epiq has extensive relevant experience and is a nationally recognized notice and claims administration firm and was selected after receiving proposals from three administrators.  Blow Decl. ¶¶2-3 & Ex. A; Barenbaum Decl. ¶¶54-55.  Epiq staff consists of experienced certified public accountants, information technology specialists, and various other professionals with substantial experience in notice and claims administration.  Barenbaum Decl. ¶55.  Epiq has experience with class action settlements in this Circuit and further presented, after Lead Counsel's consideration of various factors, a highly economical and effective notice and administration program when compared to other bids Lead Plaintiff received.  Id. ¶¶54-55.

Epiq estimates that it will cost approximately $202,277 to administer the settlement of this case, based upon the dissemination of approximately 60,000 Notice packets and the submission of 15,000 Claim Forms, approximately 50-60% of which it anticipates will be valid and eligible for payment.  See Blow Decl. ¶¶18-19.  Epiq's expectations are based on publicly

available trading history during the Settlement Class Period for Portola as well as Epiq's

collective experience in administering securities class actions settlements.  Id. ¶¶19-20.

This amount is reasonable in relation to the value of the Settlement as it reflects

approximately 1.15% of the total Settlement.  Blow Decl. ¶19.

### F.      Schedule For Final Approval

Plaintiffs respectfully propose the below schedule for Settlement-related events, which

complies with In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988 (9th Cir. 2010)

(requiring that fee motion be made available to the Settlement Class before the deadline for

objecting to the fee), and the N.D. Cal. Guidelines.  As set forth in the Preliminary Approval

Order, the timing of events is determined by the date the Preliminary Approval Order is entered

and the date the Final Approval Hearing is scheduled—which Plaintiffs request be at least 90

calendar days after entry of the Preliminary Approval Order, or at the Court's earliest

convenience thereafter.

| EVENT | PROPOSED TIMING |
|---|---|
| Deadline for mailing Notice and Claim Form (proposed Preliminary Approval Order ¶9(b)) | 14 calendar days after Preliminary Approval Order ("Notice Date") |
| Deadline for publishing the Summary Notice (proposed Preliminary Approval Order ¶9(c)) | 7 calendar days after the Notice Date |
| Deadline for filing papers supporting final approval of Settlement, Plan of Allocation, attorney fee & expense motion and request for reimbursement of cost and expenses of Plaintiffs (proposed Preliminary Approval Order ¶19) | 35 calendar days before Final Approval Hearing[23] |
| Deadline for filing final approval/fee and expense reply papers (proposed Preliminary Approval Order ¶19) | 7 calendar days before Final Approval Hearing |

---

[23] This date is 14 days before (i) the post-mark deadline for requests for exclusion; and (ii) the received by date for objections.

| EVENT | PROPOSED TIMING |
|---|---|
| Deadline for exclusion requests and submitting objections (proposed Preliminary Approval Order ¶¶14, 16) | 21 calendar days before Final Approval Hearing[24] |
| Deadline for submitting Claim Forms (proposed Preliminary Approval Order ¶12) | Postmarked no later than 90 calendar days after Notice Date |
| Final Approval Hearing (proposed Preliminary Approval Order ¶6) | At least 90 days after entry of the Preliminary Approval Order |

IV.   **CONCLUSION**

Accordingly, based on the Stipulation, the attachments to the Stipulation, this memorandum of law, and the prior proceedings in this matter, Plaintiffs, with the consent of Defendants, respectfully request that the Court grant the motion and enter the proposed Preliminary Approval Order submitted herewith.

DATED:  September 19, 2022             Respectfully submitted,

**BERMAN TABACCO**

By:      */s/ Daniel E. Barenbaum*
        Daniel E. Barenbaum

Nicole Lavallee
Jeffrey V. Rocha
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
        dbarenbaum@bermantabacco.com
        jrocha@bermantabacco.com

Patrick T. Egan (*Pro Hac Vice*)
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email:  pegan@bermantabacco.com

*Attorneys for Lead Plaintiff Alameda County*
*Employees' Retirement Association and*
*Lead Counsel for the Class*

---

[24] This date is 14 days after the filing of (i) final approval motion; and (ii) attorney fee & expense and reimbursement of Plaintiffs' costs motion.

David R. Kaplan (SBN 230144)
**SAXENA WHITE P.A.**
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
Email:  dkaplan@saxenawhite.com

*Attorneys for Additional Plaintiff Oklahoma*
*Firefighters Pension and Retirement System*